**LITTLER MENDELSON, P.C.**
A Professional Corporation
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, Pennsylvania 19102
267-402-3000
Attorneys for Defendant General Electric Company

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, FREDERICK R. SHELLHAMMER, III, FRANK MICHIENZI, MARIO LAUREANO, ANTHONY CHELPATY, WILLIAM MADDEN, STEVEN LE BLANC, JEFFREY SCOTT WILKERSON, JEFFREY NAVARETT, PHILLIP ERIC BENSON, Individually, and on behalf of all others similarly situated<br><br>          Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, a New York corporation<br>          Defendant. | Civil Action No. 1:14-cv-00490-JEI-KMW |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
## <u>TO CONDITIONALLY CERTIFY AS COLLECTIVE ACTION</u>

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION .................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

   A.  General Background ................................................................ 2

   B.  The Work Of GEA Service Technicians Varies Depending On The
       Service Technicians' Zone, CSM, And The Terms Of Any Applicable
       Collective Bargaining Agreement ......................................... 3

       1.  Service technicians use GEA provided vans and portable
           computers ...................................................................... 3

       2.  "Direct-To-Tech" (DTT) Parts Delivery Program .................... 4

       3.  Compensability of drive time depends upon local practices, CBAs,
           and special assignments .................................................. 5

       4.  Although all service technicians are paid for overtime work, their
           procedure for notifying their CSMs about overtime and whether
           they have to get permission before doing so varies .................. 6

       5.  GEA does not have a single lunch policy ................................ 7

       6.  Performance Expectations ................................................ 8

   C.  GEA Requires Service Technicians To Accurately Report All Hours
       Worked ................................................................................... 9

   D.  CSMs Nationwide Direct Their Service Technicians To Accurately Report
       Their Time ............................................................................. 10

   E.  No Reason to Suspect Systemic Off-the-Clock Work ........................ 11

   F.  The "Service Mobility System" .............................................. 12

III.  LEGAL ARGUMENT ..................................................................... 13

   A.  FLSA Certification Process .................................................... 13

   B.  Plaintiffs Have Not Identified A Nationwide Policy Or Practice That
       Violates The FLSA ............................................................... 14

       1.  GEA requires service technicians to accurately record all time
           worked ......................................................................... 15

# TABLE OF CONTENTS
(CONTINUED)

PAGE

2.     A lawful policy is not rendered unlawful merely because a handful of technicians claim they chose not to follow the policy ........................ 17

3.     The theoretical existence of other data provides no basis on which to certify a class ..................................................................................... 18

4.     The fact that six declarants may have falsified time entries related to lunch breaks provides no basis for certifying a class .......................... 23

5.     The fact that six declarants allegedly chose to process parts deliveries off-the-clock provides no basis for certifying a class ............. 24

C.     The Need For Endless Individualized Inquiries Demonstrates Plaintiffs Are Not Similarly Situated And Confirms That No Class Should Be Certified ................................................................................................... 25

D.     A Nationwide Class Cannot Be Certified .......................................... 26

1.     Plaintiffs' limited evidence does not support certification of a nationwide class ................................................................................... 26

2.     To the extent any class is certified, the scope of the class must be limited to zones where the declarants worked ........................................ 27

3.     Notice should not be sent to employees who have agreed to arbitrate their claims ................................................................................ 28

IV.   CONCLUSION ................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Banks v. Radioshack Corp.*,
   No. 13–0685, 2014 WL 1724856 (E.D. Pa. Apr. 25, 2014) ...................................25

*Bernard v. Household Int'l., Inc.*,
   231 F. Supp. 2d 433 (E.D. VA. 2002) ...................................................................28

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
   729 F.3d 239 (3d Cir. 2013)...........................................................................13, 14

*Chambers v. Sears Roebuck and Co.*,
   428 Fed. Appx. 400 (5th Cir. 2011)................................................................22, 23

*Evancho v. Sanofi-Aventis U.S. Inc., et al.*,
   No. 07-2266, 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 19, 2007)....................14

*Genesis Healthcare Corp. v. Symczyk*,
   133 S. Ct. 1523 (2013)..........................................................................................13

*Guenzel v. Mount Olive Bd. of Educ.*,
   No. 10–4452, 2011 WL 5599717 (D.N.J. Nov. 16, 2011)....................................19

*Hall v. Guardsmark, LLC*,
   No. 11-213, 2012 WL 3580086 (W.D. Pa. Aug. 17, 2012) at *6 ..........................17

*Hertz v. Woodbury County Iowa*,
   566 F. 3d 775 (8th Cir. 2009) .........................................................................19, 20

*Newton v. City of Henderson*,
   47 F. 3d 746 (5th Cir. 1995) ...........................................................................20, 21

*Pomareda v. Moeding*,
   No. 06-61864, 2007 U.S. Dist. LEXIS 12572 (S.D. Fla. Feb. 22, 2007) ..............28

*Postiglione v. Crossmark, Inc.*,
   No. 11–960, 2012 WL 5829793 (E.D. Pa. Nov. 15, 2012)....................................17

*Rogers v. Ocean Cable Group, Inc.*,
   No. 10-4198, 2011 U.S. Dist. LEXIS 149197 (D.N.J. Dec. 29, 2011)............14, 27

*Salazar v. Agriprocessors, Inc.*,
   No. 07-CV-1006, 2008 U.S. Dist. LEXIS 40363 (N.D. Iowa 2008)......................29

*Settles v. General Electric, Inc.*,
   No. 4:12-cv-00602 , 2013 U.S. Dist. LEXIS 187008 (W.D. Mo. Feb. 19, 2013) ..................15

*Symczyk v. Genesis HealthCare Corp.*,
   656 F.3d 189 (3d Cir. 2011)...............................................................................13, 14

*Trezvant v. Fidelity Employer Servs. Corp.*,
   434 F. Supp. 2d 40 (D. Mass. 2006) .....................................................................28

*West v. Border Foods, Inc.*,
   No. 05-2525, 2006 WL 1892527 (D. Minn. July 12, 2006) ............................................25, 28

*White v. Rick Bus Co.*,
   743 F. Supp. 2d 380 (D.N.J. 2010) .......................................................................14

*Zavala v. Wal Mart Stores, Inc.*,
   691 F.3d 527 (3d Cir. 2012).........................................................................1, 14, 15

## STATUTES

29 U.S.C. § 216(b) .................................................................................................1, 13

29 U.S.C. § 254 .........................................................................................................22

I.   **INTRODUCTION**

Plaintiffs seek "conditional collective action certification"[1] of their claims under the federal Fair Labor Standards Act ("FLSA") pursuant to 29 U.S.C. § 216(b), and seek issuance of notice to all allegedly similarly situated service technicians who worked for General Electric Company's appliance division, GE Appliances ("GEA").   Plaintiffs claim they were not compensated for "pre-shift, post-shift, and lunch break work" and other work they allegedly did off-the-clock.

Plaintiffs' Motion should be denied because there is no legal or factual basis to support Plaintiffs' claims.   Plaintiffs do not and cannot identify any nationwide policy or practice that allegedly violates the law, making certification of a national class improper.   Plaintiffs cannot do so because no such policy or practice exists.   GEA's only nationwide directive to technicians pertaining to time-keeping is to *accurately record any and all* time worked.

Moreover, Plaintiffs' Motion fails to prove that Plaintiffs and the opt-ins are similarly situated to each other, much less similarly situated to service technicians nationwide.   Plaintiffs provide evidence from only six declarants, who worked in only four of the 96 zones across the country, for only two of GEA's 20 Consumer Service Managers ("CSMs") who supervise service technicians.   Even the six declarants' testimony is contradictory and demonstrates that class-wide analysis is impossible.   The declarants' experiences do not purport to be, and in fact are not, representative of the proposed nationwide class.   Moreover, the declarations from service technicians and CSMs submitted in support of GEA's Opposition further demonstrate the need

---

[1] As Plaintiffs note (Plaintiffs' MOL, 16), there is no actual "certification" of a collective action under Section 216(b) of the FLSA.   *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 536 (3d Cir. 2012).   Rather, Plaintiffs' Motion is a request to have the Court authorize them to send a notice of the lawsuit to individuals whom they contend are "similarly situated" to themselves.   *Id.* Nonetheless, for ease of reference, Defendant will refer to this process as "conditional certification."

1

for individualized inquiries as to each service technician's claim, such that this case incapable of resolution on a collective action basis.  Accordingly, this Court should deny Plaintiffs' Motion for Conditional Certification.

## II.   STATEMENT OF FACTS

### A.   General Background

Among its various business operations, General Electric Company operates an appliance division, GE Appliances ("GEA").  Within GEA is a business segment known as GE Consumer Home Service, which employs service technicians to service and repair GE appliances in residential customer homes.  (*See* Exhibit A, Declaration of Kristin Mathers, ("Mathers Decl.") ¶ 2).  The appliance repair work is performed through 96 different "zones," each of which is assigned to one of two regions (East or West).  (Mathers Decl. ¶ 3).  There are 50 zones in the East, 46 in the West.  Each zone employs from one to 36 service technicians.  In all 96 zones, GEA presently employs approximately 900 service technicians.  In the last three years (June 2011 to June 2014), GEA has employed approximately 1,200 service technicians in the 96 zones. (Mathers Decl. ¶ 3).

Zones are under the immediate management of a Consumer Service Manager ("CSM"). Each CSM typically manages three to eight zones.  (Mathers Decl. ¶ 6).  There are presently 20 CSMs.  (Mathers Decl. ¶ 6).  In 42 of the zones, service technicians are represented by various unions through a collective bargaining agreement ("CBA").  (Mathers Decl. ¶ 4).  There are presently six different unions, and 26 different locals, that represent GEA's service technicians in the 42 unionized zones.  (Mathers Decl. ¶ 4).

In the 54 non-union zones, service technicians are participants in GE's "Solutions" alternative dispute resolution program.  (Mathers Decl. ¶ 5).  As part of the Solutions program, non-union employees have agreed to resolve all disputes with GE only through arbitration and

not in court.  (Mathers Decl. ¶ 5, Ex. A). Moreover, GE and the non-union employees have agreed that any claims must be brought only in an individual capacity, not as a representative or member of a class or collective action.  (Mathers Decl. ¶ 5, Ex. A).

**B.      The Work Of GEA Service Technicians Varies Depending On The Service Technicians' Zone, CSM, And The Terms Of Any Applicable Collective Bargaining Agreement.**

Although GEA requires all service technicians to accurately report all hours worked and has no reason to suspect off the clock work by any service technicians, there are differences in the practices and procedures across zones that render collective treatment of Plaintiffs' off-the-clock claims impossible.  As the GE East Region Manager described, "[e]ach zone is like its own little business.   They all run independently of each other despite having the same general guidelines from GE . . . I can't micromanage my CSMs, I give them the discretion to manage each of their zones as they see fit."  (*See* Exhibit B, Declaration of John Wills, "Wills Decl." ¶ 2).   Likewise, many practices and procedures relevant to Plaintiffs' off-the-clock claims depend on whether the service technicians are a member of a union, and what the particular CBA for that union establishes regarding the service technicians' work rules.  (Wills Decl. ¶ 2).

1.      *Service technicians use GEA provided vans and portable computers*

Service technicians perform their work using GEA-provided vans and portable computers.  (Mathers Decl. ¶ 8.  In addition to using their computers for work, some service technicians are permitted to use their computers for personal reasons when they are not working. (*See* Exhibit C, Declaration of Rosa Walsh, "Walsh Decl." ¶ 8).

GEA and its service technicians are parties to van custody agreements.  In most of the country, the van custody agreement is a "Safe Driving Policy and Agreement Covering Custody and Maintenance of Company Trucks/Fleet Vehicles and Technician Portable Terminal." (Mathers Decl. ¶ 7, Exhibit B).  This Agreement outlines the Company's expectations and the

3

service technicians' responsibilities with respect to the Company's vans and computers.  CSMs typically review the van custody agreement with service technicians at an annual "Fast Start" meeting.  (Walsh Decl. ¶ 4).  Service technicians in California are subject to a similar, but somewhat different, van custody agreement.  (Mathers Decl. ¶ 7, Exhibit C).

Service technicians do not have a fixed worksite. Most service technicians drive a company van from their homes to their first service call and from their last service call back to their homes.  (*See* Exhibit D, Declaration of Robert Brinzer, "Brinzer Decl." ¶ 3; *See* Exhibit E, Declaration of Bobby Nelson, "Nelson Decl." ¶ 4).  A few service technicians who are unable to park their vans at their homes have made arrangements to park their vans in a secure area near their homes.  (*See* Exhibit F, Declaration of Chris Miller, "Miller Decl." ¶ 3; Walsh Decl. ¶ 3). Service technicians receive a list of service calls each morning through their company provided computers.  (*See* Exhibit G, Declaration of Benny Pruiett, "Pruiett Decl." ¶ 6).  Service technicians' primary job function is to travel to each customer's residence, determine the cause of the customer's concern, and perform the appropriate service.  (Mathers Decl. ¶ 8).

### 2.     *"Direct-To-Tech" (DTT) Parts Delivery Program*

To accomplish their service work efficiently, service technicians maintain in their vans an inventory of the most commonly used parts.  On an ongoing basis, service technicians receive parts shipments through "Direct-To-Tech" (DTT) parts delivery.  (Miller Decl. ¶ 10; Nelson Decl. ¶ 9; Walsh Decl. ¶ 9).  Some technicians receive parts shipped directly to their homes in plastic totes.  (Miller Decl. ¶ 10; Walsh Decl. ¶ 9).  Other service technicians receive their parts through shipments to local courier locations, such as UPS stores.  (Miller Decl. ¶ 10; Walsh Decl. ¶ 9).  These technicians typically stop by the courier location at some point during their work day to pick up the tote filled with parts.  (Miller Decl. ¶ 10; Walsh Decl. ¶ 9).  Service technicians are instructed that, when they arrive home from work to find a plastic tote waiting for

them, or they pick up a tote at a courier location, they are to simply place the tote into their vans for safe-keeping and then unload the tote during their work day, between their first and last calls. (*See* Exhibit H, Declaration of Dan McDermott, "McDermott Decl." ¶ 7; Miller Decl. ¶ 10; Walsh Decl. ¶ 9; *See* Exhibit I, Declaration of Gary Wolfe[2], "Wolfe Decl." ¶ 7).

From time to time technicians have very busy weeks and are not able to handle the parts deliveries during the normal work day.[3]  (*See* Exhibit J, Declaration of Mike Andre, "Andre Decl." ¶ 10).  It is up to each CSM to approve additional time outside of a service technician's first and last calls for putting away inventory and how to allocate that time.  (Wills Decl. ¶ 10). Some service technicians are required to ask their CSMs for permission to log time before their first trip or after their last trip to deal with inventory, but other service technicians are not required to seek advance approval because the additional time is provided for in their CBAs. (Andre Decl. ¶ 10; Wills Decl. ¶ 10).

> 3.    *Compensability of drive time depends upon local practices, CBAs, and special assignments*

Generally, service technicians' paid work day begins upon arrival at their first service call and ends when they leave their last service call.  Service technicians typically are not paid for the drive from home to the first call or for the drive home after the last call.  (Brinzer Decl. ¶ 7). However, under some union contracts and local practices, morning and evening drive time is paid to the extent it exceeds a designated time.  (Brinzer Decl. ¶ 7; Miller Decl. ¶ 8; Walsh Decl. ¶ 6).

---

[2] Defendants will submit a signed version of Mr. Wolfe's declaration as soon as possible.

[3] About once per year, service technicians work on a complete inventory.  (Andre Decl. ¶ 10; Nelson Decl. ¶ 9).  Special time is set aside for this inventory and, as always is the case, service technicians are instructed to record all of their time worked.  (Andre Decl. ¶ 10; Nelson Decl. ¶ 9).

4.     *Although all service technicians are paid for overtime work, their procedure for notifying their CSMs about overtime and whether they have to get permission before doing so varies*

As a general rule, service technicians are instructed to complete all work-related activities between their first service call and their last service call.  (Brinzer Decl. ¶ 4; *See* Exhibit K, Declaration of Windy Jones, "Jones Decl." ¶ 5; Miller Decl. ¶ 5; Nelson Decl. ¶ 7; *See* Exhibit L, Declaration of Mark Urbin, "Urbin Decl." ¶ 4; Walsh Decl. ¶ 4).   If service technicians need additional time to complete their work, however, they can do so by discussing the matter with their CSMs.  (Brinzer Decl. ¶ 9; Walsh Decl. ¶ 7).   The procedure for notifying CSMs about overtime work and/or obtaining permission from CSMs to work overtime varies by CSM.  (Wills Decl. ¶ 9).   Some CSMs require their service technicians to ask permission before working overtime, while others just ask for oral or written notice after a service technician has worked overtime.  (Jones Decl. ¶ 6; Wills Decl. ¶ 9).   Other CSMs do not require a technician to obtain prior approval before working overtime hours.   (*See* Exhibit M, Declaration of Tim Cooper, "Cooper Decl." ¶ 10).   Nevertheless, all service technicians are told they absolutely cannot work off the clock and that they must record all overtime worked.  (Andre Decl. ¶ 6; Nelson Decl. ¶ 6).

Service technicians are required to record any additional working time to insure proper payment of their wages.  (McDermott Decl. ¶ 4; Walsh Decl. ¶ 7).   Technicians follow these directives and do record their overtime worked.  (Andre Decl. ¶ 16; McDermott Decl. ¶ 4; Pruiett Decl. ¶ 11; Wolfe Decl. ¶ 5).   Indeed, technician Dan McDermott credits the extra overtime work as contributing to his performance numbers so that he can stay in GEA's "Hall of Fame" of high-performing technicians.  (McDermott Decl. ¶ 5).

Based on their self-reported time entries, service technicians are paid an hourly wage, plus overtime for hours worked in excess of 40 per week or as otherwise required by local law or the applicable collective bargaining agreement.  (Mathers Decl. ¶ 10).

5. *GEA does not have a single lunch policy*

GEA does not have a general lunch policy that applies to all service technicians. (Mathers Decl. ¶ 12). Instead, CSMs are charged with ensuring that their service technicians take lunch breaks (and other breaks) in accordance with applicable state and local laws, CBAs, and past practices. (Brinzer Decl. ¶ 6; Mathers Decl. ¶ 12; Miller Decl. ¶ 7). For example, in some of the zones supervised by former CSM Tim Cooper in Nevada, Mexico, and Oklahoma, the service technicians have one hour unpaid lunches. (Cooper Decl. ¶ 6). In other zones Mr. Cooper supervised, technicians had a 30 minute lunch break. (Cooper Decl. ¶ 6). On the other hand, according to a letter of understanding with the union in four of CSM Rosa Walsh's zones, service technicians are free to decide whether or not to take a lunch break. (Walsh Decl. ¶ 12). Most of her service technicians in those zones do not take a lunch break, or at least skip lunch several times a week. (Walsh Decl. ¶ 12). If they do not take a full 30 minute lunch break, they are paid for all of their time. (Walsh Decl. ¶ 12). But if/when they report a lunch break of at least 30 minutes, they are not paid for that time. (Walsh Decl. ¶ 12).

Some CSMs expect their technicians to call or email them if they are not going to be able to take a lunch break. (Nelson Decl. ¶ 10). Under those CSMs, if technicians miss a lunch break, they get paid for that time, but they are reminded that they need to take a lunch break whenever possible. (Nelson Decl. ¶ 10). The only lunch practice common to all service technicians is that they must report if they do not take their lunch so that they may be paid accordingly. (Mathers Decl. ¶ 12). As with GEA's other time reporting policies, service technicians are repeatedly reminded about the requirement that they accurately report their lunch hours. (Brinzer Decl. ¶ 6; Miller Decl. ¶ 7).

6.   *Performance Expectations*

GEA monitors service technicians' performance through certain objective measures. (Mathers Decl. ¶ 13).  For example, GEA measures efficiency and productivity through metrics such as Revenue Per Day ("RPD").  (Mathers Decl. ¶ 13).  RPD is simply a measure of revenue produced by service technicians relative to their number of hours worked.  (Mathers Decl. ¶ 13). For example, a service technician with an RPD goal of $750 would be expected to generate $750 of revenue in an eight-hour workday.  The dollar figure of the RPD varies from zone to zone based on pricing in the zones and other factors.  (Mathers Decl. ¶ 13).  Presently, the RPD ranges from $700-$815.  (Mathers Decl. ¶ 13).

The RPD goal is designed to set an attainable, but somewhat challenging, target for each service technician.   (Pruiett Decl. ¶ 10; Mathers Decl. ¶ 14).   The amount of time service technicians spend on inventory or vehicle maintenance should not preclude them from attaining their RPD goal.  (Wills Decl. ¶ 11).

CSMs regularly coach service technicians on ways to achieve their goal.  For example, service technicians are encouraged to sell additional products, such as water filters for refrigerators.   In addition, service technicians are encouraged to plan their days to maximize efficiency and minimize drive time between service calls.  (Mathers Decl. ¶ 13).  The RPD goal is readily attainable through hard work and efficiency.  (Andre Decl. ¶ 13; Pruiett Decl. ¶ 10). The vast majority of service technicians are successful in achieving their RPD goal.   (Andre Decl. ¶ 13; Mathers Decl. ¶ 13; Nelson Decl. ¶ 11).

When a CSM notices that a service technician is struggling to perform up to expectations, the CSM often discusses strategies with the service technician, and may conduct a "ride along" with the technician to get a first-hand look at how the technician is performing.  (Nelson Decl. ¶ 12).  If informal measures are not successful in improving performance, a CSM may move to a

8

more formal Performance Improvement Plan (PIP).  (Nelson Decl. ¶ 12).  Service technicians are reminded that under-reporting hours worked is not acceptable, and cannot be seen as an "escape" to artificially increase RPD.  (Mathers Decl. ¶ 14).

   **C.   GEA Requires Service Technicians To Accurately Report All Hours Worked**

   Service technicians are responsible for accurately reporting their own hours worked. Prior to January 2012, service technicians reported their hours worked by sending a daily e-mail to a dispatcher.  (Brinzer Decl. ¶ 11; Nelson Decl. ¶ 3; McDermott Decl. ¶ 2).  Dispatchers received the e-mails and entered the reported time into a time keeping system.  (Brinzer Decl. ¶ 11; Nelson Decl. ¶ 3; McDermott Decl. ¶ 2).

   Since January 2012, service technicians have used an electronic time card to directly enter their hours worked, which has eliminated the daily e-mails to a dispatcher.  (Brinzer Decl. ¶ 12; Miller Decl. ¶ 12; Nelson Decl. ¶ 3; McDermott Decl. ¶ 2).  In the current system, when a service technician submits a daily time entry by way of the electronic time card, a "pop up" notice appears, which states, "By clicking the submit button, I am certifying that the information I submitted is true and accurate, and reflects all the hours I have worked during the period for which I have entered my time.  I understand that entering false or inaccurate information may result in discipline, up to and including termination of my employment."  (Mathers Decl. ¶ 9, Ex. D).  In addition, GEA's work rules warn that technicians can be terminated for "[f]alsification of employment, medical, *time worked*, or work performed records."  (emphasis added) (Mathers Decl. ¶ 11, Exhibit E).  This same message has been reinforced by CSMs to service technicians.  (Wolfe Decl. ¶ 2).

   GEA has terminated the employment of service technicians who do not abide by its work rules related to time records.  (Mathers Decl. ¶ 15).  As a specific example, two service

9

technicians in Eastern Florida were terminated in 2014 for recording more time than they were actually working.  (Wills Decl. ¶ 4).

> **D.      CSMs Nationwide Direct Their Service Technicians To Accurately Report Their Time**

Consistent with GEA's policy requiring service technicians to accurately report all working time, CSMs frequently remind their service technicians to adhere to GEA's policy. (Brinzer Decl. ¶ 19; Nelson Decl. ¶ 6).  CSMs hold yearly Fast Start Meetings with their service technicians to discuss GEA's policies and procedures, including time keeping.  (Brinzer Decl. ¶ 4; Jones Decl. ¶ 4; Miller Decl. ¶ 5; Nelson Decl. ¶ 6).  For example, Rosa Walsh – current CSM for five zones in New York and Connecticut – emphasizes that service technicians need to report their working time accurately, and record all of their working time.  (Walsh Decl. ¶¶ 1, 15).  She also instructs technicians to perform all of their work-related activities after they arrive at their first call and before they leave their last call.  (Walsh Decl. ¶ 4).  Her service technicians can access e-mails on their laptop computers, so they can easily keep up with e-mails during their work day.  (Walsh Decl. ¶ 4).

As another example, Mike Andre – current CSM for South Jersey, Pennsylvania, and Delaware – made a presentation to his service technicians at the Fast Start Meeting about "Tech Time Card Reporting."  In his presentation, Mr. Andre emphasized "All time worked must be reported via your time card; if your time card is not working, call or email me and dispatch." (Andre Decl. ¶ 6, Exhibit A).

CSMs also periodically send their technicians reminders about accurate time reporting. For example, an August 2013 email from Mr. Andre to the service technicians in his zone instructed "Time reporting should always be accurate and correct.  If you don't know if it is correct, then ask the question, don't assume."  (Andre Decl. ¶ 6, Exhibit B).  On multiple

occasions, Mr. Andre also told technicians that all work related activities must occur between technicians' first and last calls, including preparing any special parts the technicians received for their service calls.  (Andre Decl. ¶ 6, Exhibit B).

### E.   No Reason to Suspect Systemic Off-the-Clock Work

GEA has taken numerous steps in an effort to ensure that technicians are accurately reporting their time worked.  In addition to the repeated instructions to record all working time, and in addition to the daily "pop up" notice whereby service technicians certify the accuracy of their time records, CSMs have performed periodic audits of available records.  (Andre Decl. ¶ 15; Brinzer Decl. ¶ 14; Nelson Decl. ¶ 13; Urbin Decl. ¶ 10; Walsh Decl. ¶ 13).  Although each CSM approaches the task somewhat differently, the CSMs typically compare time records, call records, and GPS data for randomly selected technicians.  (Andre Decl. ¶¶ 14-15; Brinzer Decl. ¶ 14; Nelson Decl. ¶ 13; Urbin Decl. ¶ 10; Walsh Decl. ¶ 13).  In most cases, the CSMs determine that the records "match up" and indicate that technicians have accurately reported their working time.  (Andre Decl. ¶¶ 14-15; Brinzer Decl. ¶ 14; Nelson Decl. ¶ 13; Urbin Decl. ¶ 10).  In the few instances where there appear to be discrepancies, the CSMs follow up with technicians, and usually determine that there is a legitimate explanation for what appear to be discrepancies. (Andre Decl. ¶¶ 14-15; Brinzer Decl. ¶ 14; Nelson Decl. ¶ 13; Urbin Decl. ¶ 10).  Based on the audits, CSMs have no reason to believe that service technicians have been under-reporting their working time on any sort of regular or systemic basis.  (Brinzer Decl. ¶¶ 15-16; Urbin Decl. ¶ 11; Walsh Decl. ¶ 13).

In addition, on May 5, 2014, GEA began sending a notice to CSMs that identified the date and time service technicians accessed a computer program known as Crystal Ball, which enables technicians to perform certain parts management functions.  The reports showed that,

with very few exceptions, technicians accessed Crystal Ball only during normal working hours. Even when technicians accessed Crystal Ball outside normal working hours, the time devoted to the task was typically less than five minutes. (Andre Decl. ¶ 8; McDermott Decl. ¶ 8). When CSMs became aware of after-hours access, CSMs spoke with the service technicians to make sure they reported the time they spent doing so, and counseled that they should wait to log onto the system until they are preparing to leave for their first call on Monday morning. (Andre Decl. ¶ 8). Nonetheless, to further limit the possibility of technicians performing work outside the normal workday, on May 16, 2014, GEA adjusted Crystal Ball so that it could only be accessed between 7:00 a.m. and 6:00 p.m. in each time zone Monday through Friday. (Andre Decl. ¶ 8; Mathers Decl. ¶ 17; McDermott Decl. ¶ 8; Pruiett Decl. ¶ 13). On May 31, 2014, GEA again adjusted Crystal Ball so that it also could be accessed from 8 a.m. to 1 p.m. in each time zone on Saturdays for the benefit of the few technicians who typically work partial days on Saturday. (Mathers Decl. ¶ 17).

F.       The "Service Mobility System"

Plaintiff's brief makes repeated reference to a "Service Mobility System." Plaintiffs attach an unauthenticated document, which they use as their only support for their references to the "Service Mobility System." GEA does not dispute that it makes use of various individual features described in the document, including GPS, dispatching, e-mail, and networked laptop computers. (Mathers Decl. ¶ 16). However, GEA personnel do not typically refer to these various features collectively as a "Service Mobility System." (Mathers Decl. ¶ 16). More importantly, none of those features was intended for use by, or is actually used by, GEA for payroll purposes. (Brinzer Decl. ¶ 13; Miller Decl. ¶ 13; Wills Decl. ¶ 12). Rather, as discussed above, service technicians self-report their working time, and certify the accuracy of those time

reports.

### III.   <u>LEGAL ARGUMENT</u>

Plaintiffs admit that the only nationwide, uniformly applied relevant policy at GEA is that service technicians must fully and accurately report all hours worked.  Indeed, Plaintiffs do not even so much as allege that anyone has directed them to do anything other than accurately report all of their working time.  Rather than point to any unlawful policy or practice that would bind together a nationwide class, they cite GEA's expectation that service technicians strive to achieve an efficiency standard, RPD, and they present declarations from six service technicians who allegedly chose to surreptitiously under-report their working time in an effort to meet the RPD standard.  Such "evidence" falls woefully short of establishing a nationwide policy or practice that violates the FLSA.  Consequently, Plaintiffs' Motion should be denied.

### A.      FLSA Certification Process

The FLSA permits employees to bring actions against their employers on their own behalf, or collectively on behalf of "similarly situated employees."  29 U.S.C. § 216(b).  Litigation brought on behalf of other employees is commonly referred to as a "collective action." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013).  The Third Circuit Court of Appeals follows a two-step practice in deciding whether to certify a collective action for purposes of sending notice to putative class members.  In the first step, the named plaintiffs must make a "modest factual showing" that they are "similarly situated" to the group of employees they seek to represent.  *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013).

The "similarly situated" inquiry focuses on the existence of an alleged class-wide policy or plan that violates the FLSA – that is, whether the Plaintiffs "and the prospective party plaintiffs *suffered from* a *single decision, plan or policy*."  *Symczyk v. Genesis HealthCare Corp.*,

13

656 F.3d 189, 192 (3d Cir. 2011) (emphasis added), *reversed on other grounds* 133 S. Ct. 1523 (2013)).  Thus, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the *employer's alleged policy* affected her and the manner in which it affected other employees."  *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 536 n.4 (3d Cir. 2012) (emphasis added) (quoting *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *reversed on other grounds* 133 S.Ct. 1523 (2013)).

If Plaintiffs satisfy this burden, the Court may authorize Plaintiffs to send a notice of the lawsuit to individuals whom the Court determines are "similarly situated" to Plaintiffs.  *White v. Rick Bus Co.*, 743 F. Supp. 2d 380, 386 (D.N.J. 2010).  Although courts have held that the burden on a moving party at the first stage is "modest," it is far from automatic or a "rubber stamp" process.  Courts in this jurisdiction have consistently denied motions where the plaintiffs have not met their burden.  *See, e.g., Rogers v. Ocean Cable Group, Inc.*, No. 10-4198, 2011 U.S. Dist. LEXIS 149197, at *8 (D.N.J. Dec. 29, 2011); *Evancho v. Sanofi-Aventis U.S. Inc., et al.*, No. 07-2266, 2007 U.S. Dist. LEXIS 93215, at *8 (D.N.J. Dec. 19, 2007) (collecting cases).

If the Court determines that notice may be sent to similarly situated individuals, and after the case proceeds through discovery, the Court engages in the second step of the process, making a final determination as to whether each opt-in plaintiff in fact is similarly situated to the named plaintiffs.  *Camesi*, 729 F.3d at 243.  Defendants typically trigger this determination by filing a motion for decertification.  *Symczyk*, 656 F.3d at 194.

**B.    Plaintiffs Have Not Identified A Nationwide Policy Or Practice That Violates The FLSA**

This action by Plaintiffs is little more than an effort to re-litigate an issue that has already been considered and decided, albeit in a different venue with a different plaintiff and plaintiff's counsel. Just over one year ago, a federal court in Missouri declined to certify a class of GEA

service technicians, recognizing that there was no nationwide policy or practice that violated the FLSA. *See Settles v. General Electric, Inc.*, No. 4:12-cv-00602 , 2013 U.S. Dist. LEXIS 187008, at *12-13 (W.D. Mo. Feb. 19, 2013). The service technicians in *Settles* contended that they did not report overtime hours because it would negatively impact their RPD goals. *Id.* at *9-10. However, as is the case here, the plaintiffs in *Settles* submitted no evidence to demonstrate that CSMs or anyone else at GEA knew the technicians worked off-the-clock. *Id.* at *10-11. In deciding not to certify the class, the court acknowledged that CSMs had discretion to implement productivity and work goals, which made it doubtable that all technicians could be subject to the same policies and procedures, and also discredited plaintiff's arguments concerning how they should be compensated for time spent maintaining their vehicles and commuting time. *Id.* at *14-16. As more fully discussed below, Plaintiffs here have provided no reason or evidence to suggest this Court should reach a different conclusion.

    1.    *GEA requires service technicians to accurately record all time worked*

To satisfy the standard at the first stage of certification, Plaintiffs must provide some evidence, beyond pure speculation, "'of a factual nexus between the manner in which the *employer's alleged policy* affected [them] and the manner in which it affected other employees.'" *Zavala*, 691 F.3d at 536 n.4 (emphasis added) (quoting *Symczyk*, 656 F.3d at 193).

Plaintiffs here fail to satisfy this fundamental requirement. Plaintiffs vaguely claim that their declarations "provide sufficient evidence that GE had policies and practices designed to or which resulted in service technicians working off-the-clock and not being paid overtime wages." (Plaintiffs' MOL, 2). Neither the declarations nor Plaintiffs' Memorandum of Law, however, actually identify any policies or practices that required or encouraged all service technicians nationwide to work off-the-clock.

15

Indeed, the suggestion that service technicians were discouraged from reporting overtime is refuted simply by reference to payroll records of the six declarants, which show, for example, that David Leppo reported overtime hours worked in 156 of the 167 weeks at issue, with a total of more than 780 hours of reported overtime.  (Mathers Decl. ¶ 20).  Similarly, Donald Maddy reported over 870 hours of overtime, logging overtime hours in 153 of the 167 weeks at issue. (Mathers Decl. ¶ 19). Further, Jacob Walters recorded as many as 16.2 hours of overtime in a single week, while Kurt Frederick and David Leppo recorded as many as 15.75 hours of overtime in one week.  (Mathers Decl. ¶¶ 23, 18 and 20).

In stark contrast to Plaintiffs' hollow allegations, GEA's policies and procedures specifically require service technicians to accurately report all their time worked.  Plaintiffs even admit they were fully aware of GEA's policies.  (Plaintiffs' MOL, 4).  GEA's work rules warn that technicians can be terminated for "[f]alsification of employment, medical, *time worked*, or work performed records."  (emphasis added) (Mathers Decl. ¶ 11, Exhibit E).  Further, when submitting time entries every day, each service technician certifies "the information I submitted is true and accurate, and reflects all the hours I have worked during the period for which I have entered my time.  I understand that entering false or inaccurate information may result in discipline, up to and including termination of my employment."  (Mathers Decl. ¶ 9, Ex. D).

In addition, CSMs remind their service technicians to report all time worked both at yearly meetings and routinely by email.  (Brinzer Decl. ¶ 19; Miller Decl. ¶ 5; Walsh Decl. ¶ 15). Service technicians confirm that GEA and their CSMs repeatedly told them to report all of the time they worked.  (McDermott Decl. ¶ 3; Pruiett Decl. ¶ 4; Wolfe Decl. ¶ 4).  CSMs are not aware of any service technicians who have recorded less time than they worked.  (Walsh Decl. ¶ 15).

Perhaps most importantly, Plaintiffs do not even so much as allege that anyone encouraged or directed them to disregard the requirement that they accurately record all of their working time.  Thus, Plaintiff's concede that there is no nationwide policy or practice promoting off-the-clock work, as is required to support conditional certification.  *See Hall v. Guardsmark, LLC*, No. 11-213, 2012 WL 3580086 (W.D. Pa. Aug. 17, 2012) at *6 (noting that at first stage of certification process plaintiffs must make a factual showing that they were subject to the same policy or plan that violated the law); *Postiglione v. Crossmark, Inc.*, No. 11–960, 2012 WL 5829793, at *8 (E.D. Pa. Nov. 15, 2012) (denying conditional certification and concluding that because plaintiffs "failed to demonstrate that there was a common policy or plan denying overtime compensation required under the FLSA, Plaintiffs have not demonstrated any common transaction or occurrence.")

2.      *A lawful policy is not rendered unlawful merely because a handful of technicians claim they chose not to follow the policy*

The most Plaintiffs can muster is a feeble argument that GEA expects them to be hard working and efficient.  Plaintiffs complain that GEA has established a Revenue Per Day ("RPD") goal for its service technicians.  RPD is nothing more than a revenue target for a day's work.  Admittedly, the RPD goal is not intended to encourage lackadaisical performance, or to reward inefficiency.  Instead, as one might expect in the business world, the RPD goal is designed to set a challenging, yet attainable, standard for performance.  (Pruiett Decl. ¶ 10; Mathers Decl. ¶ 14).  For technicians who are struggling to meet their RPD goal, CSMs assist them through coaching and one-on-one "ride along" sessions.  (Nelson Decl. ¶ 12).  When informal coaching fails, more formal Performance Improvement Plans ("PIPs") can be implemented.  (Nelson Decl. ¶ 12).  Through these techniques, the vast majority of service technicians are able to meet and exceed their RPD goals.  (Andre Decl. ¶ 13; Mathers Decl. ¶ 13;

17

Nelson Decl. ¶ 11).

For example, CSM Bobby Nelson manages service technicians in eight zones in North Carolina, South Carolina, and Georgia.  (Nelson Decl. ¶ 1).  His technicians typically handle up to 10 calls per day, and many of those are "out-of-warranty" calls that generate over $200 in revenue each.  (Nelson Decl. ¶ 11).  His technicians are meeting or exceeding their RPD goal, and he has no reason to believe that they are under-reporting their time in order to do so.  Likewise, other CSMs are not aware of technicians inaccurately recording their time in order to meet the RPD goals.  (Brinzer Decl. ¶ 17; Urbin Decl. ¶ 12).  The bottom line is that there is absolutely nothing unlawful about setting and enforcing productivity measures, just as there is nothing inconsistent with telling employees to be both productive AND record all of their working time.

But Plaintiffs cite RPD as the basis for their claim, pointing out that six (out of 900) service technicians claim they chose to skew their RPD numbers by under-reporting their working time.   There is no reason that a hard-working, efficient technician would have to under-report his or her time to meet the RPD goal.   (Brinzer Decl. ¶ 17; Nelson Decl. ¶ 11).  Regardless, the fact that six technicians chose to do so provides absolutely no basis for concluding that any others, let alone 900 others, did so.  There simply is no basis for certifying a class of any size, let alone a nationwide class.

3.  *The theoretical existence of other data provides no basis on which to certify a class*

Even though technicians individually submit daily time entries that they certify as accurate, Plaintiffs claim that a class should be certified because GEA has access to information other than the time entries.  It is well settled, however, that an employer is only obligated to pay for unreported work time "if the employer knows or has reason to believe the employee is

continuing to work and the duties are an integral and indispensable part of the employee's principal work activity." *Hertz v. Woodbury County Iowa*, 566 F. 3d 775, 781 (8th Cir. 2009) (quoting *Mumbower v. Callicott*, 526 F. 2d 1183, 1188 (8th Cir. 1975)); *Guenzel v. Mount Olive Bd. of Educ.*, No. 10–4452, 2011 WL 5599717, at *3 (D.N.J. Nov. 16, 2011), *motion for reconsideration granted by* No. 10–4452, 2012 WL 556256 (D.N.J. Feb. 16, 2012) ("Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA.").

In other words, to prevail on an overtime claim for unreported hours worked, plaintiffs must "present evidence that they worked above their scheduled hours without compensation and that the [employer] knew or should have known that they were working overtime." *Hertz*, 566 F. 3d at 781. This "constructive knowledge" standard is one of "reasonable diligence" on the part of the employer – "[t]he FLSA's standard for constructive knowledge in the overtime context is whether the [employer] 'should have known,' not whether it could have known." *Id.* at 782 (citing *Reich v. Stewart*, 212 F. 3d 400, 407 (8th Cir. 1997)).

Plaintiffs apparently suggest that GEA should have ignored technicians' time records, which technicians certified as accurate, and instead should have gone sifting through other data in an effort to independently discern when and how much technicians worked. Such a suggestion cannot serve as the basis for certifying a nationwide class for several reasons.

First, courts repeatedly have rejected the argument that employers must go on daily scavenger hunts to verify the accuracy of time clock records. For example, in *Hertz*, the officers reported their working time by signing in on a sheet that listed their scheduled hours. 566 F. 3d

at 779.  Officers also could submit slips to report any overtime worked.  *Id.*  The county where the officers worked used a Computer Aided Dispatch (CAD) system to track whether the officers were available for calls.  *Id.*  Officers transmitted one code when they began their tour of duty and were ready to receive calls and another code when they completed their tour of duty or were otherwise unavailable to receive calls.  *Id.* at 778-79.  The payroll office had access to the CAD records, but did not use them for payroll purposes.  *Id.* at 782.

At trial, the court directed the jury that the county had no duty to consult the CAD records when determining the officers' pay.  *Id.* at 781.  The plaintiffs appealed and argued that the jury instruction was erroneous.  The Eighth Circuit rejected the plaintiffs' argument, explaining "It would not be reasonable to require that the County weed through non-payroll CAD records to determine whether or not its employees were working beyond their scheduled hours. This is particularly true given the fact that the County has an established procedure for overtime claims that Plaintiffs regularly used." *Id.* at 782.

Similarly, in *Newton v. City of Henderson*, 47 F. 3d 746 (5th Cir. 1995), the plaintiff submitted written time reports to the city and the city paid him for all hours he reported.  *Id.* at 748.  However, after his resignation the plaintiff demanded payment for additional hours he allegedly worked.  *Id.*  The plaintiff claimed that he provided oral reports about his daily activities to his supervisors, and based on his activities, his supervisors should have known that he was working overtime.  *Id.*  The plaintiff's supervisors acknowledged that the plaintiff worked outside of his regular day, but assumed he was taking "flex time," and thus, did not work more than the hours he reported.  *Id.*  The city's police chief also had access to other task force records that showed the plaintiff's daily activities.  *Id.*

The Fifth Circuit held that the police chief's "access" to the task force information did

20

not constitute constructive knowledge that Newton was working overtime.  *Id*.  Instructively, the court stated, "[i]f we were to hold that the City had constructive knowledge that Newton was working overtime because [the police chief] had the ability to investigate whether or not Newton was truthfully filling out the City's payroll forms, we would essentially be stating that the City did not have the right to require an employee to adhere to its procedures for claiming overtime."  *Id.* at 749.

These cases stand for the proposition that an employer is generally entitled to rely on employee-created time records, especially in cases such as this where employees work remotely and are charged with responsibility of accurately reporting their hours worked.  Plaintiffs' argument here is an effort to turn this proposition on its head.  Plaintiffs essentially argue that GEA should have been required to exhaustively scour all electronic data to independently confirm the accuracy of technicians' self-reported time entries.  That is simply not what the law requires.[4]

Moreover, Plaintiffs' suggestion presupposes, with absolutely no evidentiary basis, that GEA would have discovered system-wide under-reporting of time if it had searched electronic data.  For example, Plaintiffs note that GE is able to "track the daily time that [they] log onto the GE computer system."  (e.g., Bergman Decl. ¶ 23).  But the time a technician chooses to push the power button on his/her computer means nothing.  Indeed, some technicians are permitted to use their computers for personal purposes.  (Walsh Decl. ¶ 8). Moreover, even when using computers for work, technicians often spend the few seconds it takes to power up their computers, and then

---

[4] Further, aside from the electronic time-keeping systems, GEA's electronic systems are not intended to keep track of the hours worked by service technicians.  For example, GEA's GPS system is used to locate service technicians and/or their vehicles.  (Brinzer Decl. ¶ 13).  It is not used to keep track of the hours that technicians work, nor is it used by GEA's payroll department.  (Brinzer Decl. ¶ 13; Miller Decl. ¶ 13; Wills Decl. ¶ 12).

go about taking care of personal matters so that their computers are up and running when they are ready to head off for work.  (McDermott  Decl. ¶ 6; Pruiett Decl. ¶ 6).  Further, some technicians do not turn on their computers before they leave home.  (Wolfe Decl. ¶ 5).  CSMs do not receive information documenting when technicians log onto their computers, nor do they have immediate access to such information.  (Brinzer Decl. ¶ 18; Jones Decl. ¶ 10; Miller Decl. ¶ 15; Walsh Decl. ¶ 14).  Thus, the suggestion that GEA's computer archives may contain log-on times does nothing to suggest that GEA had reason to know of unreported hours worked.

This is especially true in the unique circumstances of this case.  Special rules apply to employees like Plaintiffs who drive a company vehicle to and from work.  By virtue of the Portal-to-Portal Act (29 U.S.C. § 254), as amended by the Employee Commuter Flexibility Act ("ECFA"), an employer need not compensate employees for:

> *traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and . . . activities which are preliminary to or postliminary to said principal activity or activities, . . . which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.* For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

(emphasis added).

The applicability of ECFA to this case is best illustrated by *Chambers v. Sears Roebuck and Co*., 428 Fed. Appx. 400 (5th Cir. 2011).  There, Sears employed service technicians who were nearly identical to GEA's service technicians. The Sears service technicians commuted

22

from home to work in company vans to perform service on appliances for residential customers. The service technicians received parts shipments at their homes, and used a computer to receive job assignments and to record their working time.  The plaintiffs sought compensation for time they spent logging into their computers, receiving work assignments, removing trash from their vehicles, conducting pre-trip safety inspections, loading boxes of parts into the vans, transporting parts to customer homes, and refueling and servicing the vehicles. The Fifth Circuit found that each of these activities was non-compensable by virtue of ECFA. *Id*. at 415-21.

Here, Plaintiffs make much of the fact that they were not compensated for the few minutes it took them to turn on their computers and receive their list of calls for the day.  But as the *Sears* case makes clear, Plaintiffs are seeking to be compensated for time spent on activities that are indisputably not compensable.  Because Plaintiffs do not challenge any practice that violates the FLSA, there is no legal or factual basis upon which to certify a class.

In short, all of Plaintiffs' unsupported speculation about what may come from mining electronic data is nothing more than wishful thinking.   The reality is that CSMs periodically audit available electronic data, and have found no systemic under-reporting of time.  (Brinzer Decl. ¶¶ 15-16; Urbin Decl. ¶ 13; Walsh Decl. ¶ 13).  In the absence of contrary evidence, Plaintiffs' hopes or dreams of something different are insufficient to certify a class.

### 4.    *The fact that six declarants may have falsified time entries related to lunch breaks provides no basis for certifying a class*

Plaintiffs also invite this Court to certify a class on the basis that six declarants allegedly falsified time entries regarding some (but not all) of their lunch breaks.  GEA does not have a general lunch policy that applies to all service technicians.  (Mathers Decl. ¶ 12).  Instead, CSMs are charged with ensuring that their service technicians take lunch breaks (and other breaks) in accordance with applicable state and local laws, CBAs, and past practices.  (Mathers Decl. ¶ 12).

In some zones, technicians are expected to take a lunch break unless unusual circumstances preclude a technician from getting a lunch break.  In other zones, technicians are free to decide whether or not to take a lunch break.  (Walsh Decl. 12; Mathers Decl. ¶ 12).  The only lunch practice common to all service technicians is that they must report if they do not take their lunch so that they may be paid accordingly.  (Mathers Decl. ¶ 12).

As with GEA's other time reporting policies, service technicians are repeatedly reminded about the requirement that they accurately report their lunch hours.  Here, again, Plaintiffs do not contend that they were instructed otherwise.  Instead, they claim they falsely, and surreptitiously, misreported some of their lunch breaks to artificially skew their RPD.  For the same reasons discussed above, the fact that a handful of technicians chose to violate established practice some of the time is no basis for certifying a class.

5.    *The fact that six declarants allegedly chose to process parts deliveries off-the-clock provides no basis for certifying a class*

Plaintiffs also claim that six declarants chose to process parts deliveries off-the-clock.  As with the other matters discussed above, the choice allegedly made by the six declarants was directly contrary to established practice.  Service technicians receive parts in plastic totes at their homes or at local courier locations, such as UPS stores.  (Miller Decl. ¶ 10; Walsh Decl. ¶ 9).  Service technicians are instructed that, when they arrive home from work to find a plastic tote waiting for them, or they pick up a tote at a courier location, they are to simply place the tote into their vans for safe-keeping and then unload the tote during their work day, between their first and last calls.  (McDermott Decl. ¶ 7; Miller Decl. ¶ 10; Walsh Decl. ¶ 9; Wolfe Decl. ¶ 7).  And, service technicians do in fact follow this directive.  (McDermott Decl. ¶ 8; Pruiett Decl. ¶ 7; Wolfe Decl. ¶ 8).  For the same reasons discussed above, there is no basis for certifying a class simply because a handful of technicians claim they chose to violate established, lawful practice.

**C.    The Need For Endless Individualized Inquiries Demonstrates Plaintiffs Are Not Similarly Situated And Confirms That No Class Should Be Certified**

As demonstrated above, this case involves a handful of individuals who claim they disregarded GEA's lawful policies and practices.  Plaintiffs invite this Court to assume, without supporting evidence, that other service technicians made the same choice.  But to determine if that is in fact the case, this Court would have to evaluate each service technician's situation on its own.  The need to inquire into hundreds of individual experiences is contrary to the purpose of class certification, and further demonstrates that conditional certification is improper in this case. *See, e.g., Banks v. Radioshack Corp.*, No. 13–0685, 2014 WL 1724856, at *3 (E.D. Pa. Apr. 25, 2014) (denying conditional certification in part because claims would have required individualized calculations for each employee's alleged FLSA violations); *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *8-9 (D. Minn. July 12, 2006) (collecting cases, and noting same).

Moreover, the need for individualized inquiries pervades every aspect of this case.  For instance, the six declarants provided the following accounts of their work on their computers in the evening:  Mr. Bergmann alleges he spent about 30 minutes on his computer three times a week (Bergmann Decl. ¶ 32); Mr. Leppo claims he spent 20-30 minutes two to three times a week (Leppo Decl. ¶ 32); Mr. Maddy claims he spent 15-20 minutes three to five times a week (Maddy Decl. ¶ 31); Mr. Frederick alleges he spent 30 minutes daily (Frederick Decl. ¶ 30); and Mr. Walters asserts he spent 30 minutes to one hour daily.  (Walters Decl. ¶ 30).  In contrast, Mr. Chelpaty does not allege that he worked on the computer at all.  (Chelpaty Decl.).

Individualized inquiries would also be required to determine each service technician's experience with morning activities, lunch, parts management, and vehicle maintenance.  In short, absolutely nothing about this case would be amendable to class treatment.  Every aspect of every

25

claim by every technician would require a searching, individual inquiry.  Accordingly, this Court should deny Plaintiffs' motion.

       **D.**     **A Nationwide Class Cannot Be Certified**

          1.    *Plaintiffs' limited evidence does not support certification of a nationwide class*

Even if Plaintiffs could satisfy the requisites for conditional certification of a class of some size (which they cannot), Plaintiffs' Motion and evidence in support thereof do not establish a basis upon which to certify a *nationwide* class.

GEA's service technicians work across the country and work under 20 different CSMs. (Mathers Decl. ¶ 6).  Currently, GEA employs approximately 900 service technicians, and has employed approximately 1,200 service technicians over the past three years.  (Mathers Decl. ¶ 3).  Of these hundreds of putative class members, Plaintiffs' Motion purports to document the experiences of only six service technicians.  And, those six declarants can speak to only two of the 20 CSM-supervised areas.  Declarants Frederick, Maddy, and Chelpaty were supervised by CSM Mike Andre; and declarants Bergmann, Leppo, and Walters were supervised by CSM Chris Miller (and Bergmann and Leppo were also supervised by Miller's interim successor, John Wills).

Neither Plaintiffs' Motion nor the supporting declarations reference, in any way, the experiences of any other service technicians or the practices of any other CSMs.  Plaintiff's Motion is void of any evidence that the declarants' experiences are representative of other service technicians in their own zones, let alone service technicians nationwide.  As a result, Plaintiffs cannot establish that they are similarly-situated to service technicians nationwide.  This is particularly true where Plaintiffs acknowledge that GEA's timekeeping practices and policies are consistent with the FLSA.  Plaintiffs' dearth of evidence is fatal to their request for

conditional certification of a nationwide class.

In *Rogers v. Ocean Cable Group, Inc.*, this Court denied plaintiffs' motion for certification based on circumstances similar to those present in this case.  No. 10-4198, 2011 U.S. Dist. LEXIS 149197 (D.N.J. Dec. 29, 2011).  In *Rogers*, the plaintiffs were employed as technicians who performed installation and maintenance of television, cable, and telephone equipment.  *Id.* at *1.  Among other allegations, Plaintiffs contended that they were not paid overtime, were limited to the amount of time they could record for time spent working in the morning and evening before their first job, and they worked through lunch.  *Id.* at *3.  Applying the applicable Third Circuit standard, the Court determined class certification was improper because, given the autonomous work of the technicians, the technicians did not have any knowledge about other technicians and also did not observe other technicians at work.  *Id.* at *11.  The plaintiffs' affidavits merely stated that the other putative class members did not receive overtime "'as far as they [knew],'" but did not provide any further evidence of similarities between them.  *Id.* at *12.  The Court reasoned the technicians were essentially asking the Court "to assume that because they worked in excess of 40 hours in a workweek that the other technicians must have as well."  *Id.*  The Court held that the plaintiffs' evidence was insufficient to determine that the plaintiffs' situations were representative of all other technicians' experiences.  *Id.* at *11-12.

The same is true here.  For all of the reasons set forth above, this Court should deny Plaintiffs' request to certify a nationwide class.

      2.    *To the extent any class is certified, the scope of the class must be limited to zones where the declarants worked*

As discussed above, this Court should deny Plaintiffs' motion in its entirety.  But if the Court finds some basis on which to find certification is proper, the scope of the class must be

limited to service technicians who worked in the same zones as the declarants. *See Pomareda v. Moeding*, No. 06-61864, 2007 U.S. Dist. LEXIS 12572, at *6 (S.D. Fla. Feb. 22, 2007) (recognizing that affidavits did not allege basis for personal knowledge about employees in other offices, and therefore, limiting class to one office where plaintiffs worked); *West*, 2006 WL 1892527, at *6 (plaintiffs failed to demonstrate company-wide violations resulting from a common policy when they offered evidence relating to only six of 240 shift managers); *Trezvant v. Fidelity Employer Servs. Corp.*, 434 F. Supp. 2d 40, 51 (D. Mass. 2006) (limiting notice to employees from New Hampshire office where all affidavits were from employees in New Hampshire office, employees did not purport to know policies of other office locations, and employees did not show that company's policies regarding classification were company-wide); *Bernard v. Household Int'l., Inc.*, 231 F. Supp. 2d 433, 435-36 (E.D. VA. 2002) (concluding plaintiffs did not satisfy similarly-situated requirement beyond the two offices about which plaintiffs submitted evidence).

Here, the six declarants worked in zones in South Jersey, Philadelphia, Delaware, and Southeastern Florida. There is absolutely no basis to consider certification of a class beyond the zones in which the six declarants worked.

3. *Notice should not be sent to employees who have agreed to arbitrate their claims*

Certification would further be improper with respect to the non-union service technicians who work in 54 of GEA's 96 zones and who are subject to binding arbitration agreements. (Mathers Decl. ¶ 5). Two of the individuals who already have opted-into this action have agreed to arbitrate their claims, and Defendant intends to file motions to compel arbitration of those individuals' claims. Pursuant to their agreements with GEA, these service technicians have agreed not to litigate their claims in court or participate in a class or collective action. Therefore,

even if the Court otherwise were inclined to conditionally certify a class, the Court should not authorize notice to non-union employees, only to have them excluded later in this litigation. *See Salazar v. Agriprocessors, Inc.*, No. 07-CV-1006, 2008 U.S. Dist. LEXIS 40363, at *22 (N.D. Iowa 2008) ("Both the court and litigants would waste time and resources to notify a potentially overly large and overly diverse class only to later determine the matter should not proceed as a collective action.").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiffs' Motion for Conditional Certification.

Respectfully submitted,

s/ Nina K. Markey
Nina K. Markey
Rachel Fendell Satinsky
**LITTLER MENDELSON, P.C.**
A Professional Corporation
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (t)
267.402.3131 (f)
nmarkey@littler.com
rsatinsky@littler.com

Aaron Reed (*pro hac vice*)
Florida Bar No. 0557153
LITTLER MENDELSON, P.C.
333 S.E. 2nd Avenue, Suite 2700
Miami, Florida  33131
Tel:  (305) 400-7500
Fax: (305) 603-2552
areed@littler.com

Daniel B. Boatright (*pro hac vice*)
Missouri Bar No. 38803
LITTLER MENDELSON, P.C.
1201 Walnut Street, Suite 1450
Kansas City, Missouri  64106
Tel: (816) 627-4401
Fax: (816) 817-7703
dboatright@littler.com

Attorneys for Defendant General Electric
Company

Dated: July 7, 2014

## <u>CERTIFICATE OF SERVICE</u>

I, Rachel Fendell Satinsky, hereby certify that I caused to be served the foregoing

Opposition to Plaintiffs' Motion to Conditionally Certify as Collective Action via ECF upon the

following:

Justin Swidler
Swartz Swidler, LLC
1878 Marlton Pike East, Ste. 10
Cherry Hill, NJ 08003
jswidler@swartz-legal.com

*<u>s/ Rachel Fendell Satinsky</u>*
Rachel Fendell Satinsky

Dated: July 7, 2014