# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, et al,<br>Plaintiffs,<br>v.<br><br>GENERAL ELECTRIC COMPANY,<br>a New York corporation<br>Defendant. | Civil Action No. 1:14-cv-00490-JEI-KMW |

## DECLARATION OF KRISTIN MATHERS

My name is Kristin Mathers. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.    I served as the Human Resource Manager – Consumer Home Services for GE Appliances beginning August 15, 2011 and ending in May 2014. In that role, I was a custodian of personnel records, and I also was responsible for providing human resources support to Consumer Service Managers and their service technicians. I currently work for the General Electric Company ("GE") as a member of the Corporate Labor Relations team.

2.    Among its various business operations, GE operates an appliance division: GE Appliances ("GEA"). Within GEA is a business segment known as GE Consumer Home Service, which employs service technicians to service and repair GE appliances in residential customer homes.

3.    The appliance repair work is performed through 96 different "zones," each of which is assigned to one of two regions (East or West). There are presently 50 zones in the East, 46 in the West. Each zone employs approximately 1 to 36 service technicians. In all 96 zones, GEA presently employs approximately 900 service technicians. In the last three years (June 2011 to June 2014), GEA has employed approximately 1,200 service technicians in the 96 zones.

4.      In 42 of the zones, service technicians are represented by various unions through a collectively bargained agreement.  Each of the unionized zones is subject to its own collective bargaining agreement, and there are six different unions, and 26 different locals, that represent GEA's service technicians.

5.      In the 54 non-union zones, service technicians are participants in GE's "Solutions" alternative dispute resolution program.  As part of the Solutions program, non-union employees have agreed to resolve all disputes with GE only through arbitration and not in court.  Moreover, GE and the non-union employees have agreed that any claims must be brought only in an individual capacity, not as a representative or member of a class or collective action.  A copy of "Solutions" is attached as Exhibit A.

6.      The zones are under the immediate management of a Consumer Service Manager (CSM).  Each CSM typically manages three to eight zones.  There are presently 20 CSMs.

7.      GEA and its service technicians are parties to van custody agreements.  In most of the country, the van custody agreement is a "Safe Driving Policy and Agreement Covering Custody and Maintenance of Company Trucks/Fleet Vehicles and Technician Portable Terminal."  A copy of this agreement is attached as Exhibit B.  Service technicians in California are subject to a similar, but somewhat different, van custody agreement.  A copy of the California agreement is attached as Exhibit C.

8.      Service technicians' primary job function is to travel to each customer's residence, determine the cause of the customer's concern, and perform the appropriate service.  Service technicians perform their work using GEA-provided vans and portable computers.

9.      Under GEA's current electronic time card system, when a service technician submits a daily time entry by way of the electronic time card, a "pop up" notice appears, which

2

states, "By clicking the submit button, I am certifying that the information I submitted is true and accurate, and reflects all the hours I have worked during the period for which I have entered my time. I understand that entering false or inaccurate information may result in discipline, up to and including termination of my employment." An overview of the electronic time card system is attached as Exhibit D.

10.     Based on their self-reported time entries, service technicians are paid an hourly wage, plus overtime for hours worked in excess of 40 per week or as otherwise required by local law or the applicable collective bargaining agreement.

11.     GEA's work rules warn that technicians can be terminated for "[f]alsification of employment, medical, *time worked*, or work performed records." A copy of GEA's work rules are attached as Exhibit E.

12.     GEA does not have a general lunch policy that applies to all service technicians. Instead, CSMs are charged with ensuring that their service technicians take lunch breaks (and other breaks) in accordance with applicable state and local laws, CBAs, and past practices. In some zones, technicians are free to decide whether or not to take a lunch break. The only lunch practice common to all service technicians is that they must report if they do not take their lunch so that they may be paid accordingly.

13.     GEA monitors service technicians' performance through certain objective measures. For example, GEA measures efficiency and productivity through metrics such as Revenue Per Day ("RPD"). RPD is simply a measure of revenue produced by service technicians relative to their number of hours worked. For example, a service technician with an RPD goal of $750 would be expected to generate $750 of revenue in an eight-hour workday. The dollar figure of the RPD varies from zone to zone based on pricing in the zones and other factors.

Presently, the RPD ranges from $700-$815. The vast majority of service technicians are able to meet and exceed their RPD goals.

14.    The RPD goal is designed to set a challenging, yet attainable, standard for performance.   Service technicians are reminded that under-reporting hours worked is not acceptable, and cannot be seen as an "escape" to artificially increase RPD.

15.    GEA has terminated the employment of service technicians who do not abide by its work rules related to time records.

16.    I understand that Plaintiffs in this lawsuit have referred to a "Service Mobility System," and have submitted a document that they use as their support for their references to the "Service Mobility System."   GEA makes use of various individual features described in the document, including GPS, dispatching, e-mail, and networked laptop computers.   However, GEA personnel do not refer to these various features collectively as a "Service Mobility System." Moreover, none of those features was intended for use by, or is actually used by, GEA for payroll purposes.   Instead, service technicians self-report their working time, and certify the accuracy of those time reports.

17.    To further limit the possibility of technicians performing work outside the normal workday, on May 16, 2014, GEA adjusted Crystal Ball so that it could only be accessed between 7:00 a.m. and 6:00 p.m. in each time zone Monday through Friday.   On May 31, 2014, GEA again adjusted Crystal Ball so that it also could be accessed from 8 a.m. to 1 p.m. in each time zone on Saturdays for the benefit of the few technicians who typically work partial days on Saturday.

18.    Plaintiff Kurt Frederick last worked for GEA in September 2011.   GEA's payroll records reflect that, from March to September 2011, Frederick reported more than 190 hours of

4

overtime, an average of 7.9 hours of overtime per week.  He had eight weeks in which he recorded 10 hours or more hours of overtime, with a high of 15.75 hours of overtime in one week.

19.    Plaintiff Donald Maddy is presently employed by GEA.  GEA's payroll records reflect that, from March 2011 to May 2014, Maddy reported more than 870 hours of overtime. He reported overtime in 153 of 167 weeks during that span, with 26 weeks of more than 9 hours of overtime, and a high of 12.5 hours of overtime in one week.

20.    Plaintiff David Leppo is presently employed by GEA.  GEA's payroll records reflect that, from March 2011 to May 2014, Leppo reported more than 780 hours of overtime. He reported overtime in 156 of 167 weeks during that span, with 17 weeks of 9 or more hours of overtime, and a high of 15.75 hours of overtime in one week.

21.    Plaintiff Anthony Chelpaty is presently employed by GEA.  GEA's payroll records reflect that, from March 2011 to May 2014, Chelpaty reported more than 245 hours of overtime.  He reported overtime in 83 of 167 weeks during that span, with no weeks in which he reported more than 8 hours of overtime.

22.    Plaintiff Lance Bergmann is presently employed by GEA.  GEA's payroll records reflect that, from March 2011 to May 2014, Bergmann reported more than 560 hours of overtime.  He reported overtime in 125 of 167 weeks during that span, but only two weeks in which he reported more than 9 hours of overtime.

23.    Plaintiff Jacob Walters last worked for GEA in November 2011.  GEA's payroll records reflect that, from October 2010 to November 2011, Walters reported 149.2 hours of overtime, with a high of 16.2 hours of overtime in one week.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___7___ day of July, 2014.

Kristin Mathers

# EXHIBIT A TO DECLARATION OF KRISTIN MATHERS

# SOLUTIONS

*An Alternative Dispute Resolution Procedure*

Version 9-17-10

# SOLUTIONS

## I. PURPOSE

Solutions provides The General Electric Company ("GE" or "the Company") and Covered Employees a fair, quick and efficient process to resolve certain claims arising out of or related to their employment relationship with the Company.

This Procedure is not a guarantee of employment for any fixed period of time and does not alter any employee's at-will status. This Procedure, however, creates a binding obligation on Covered Employees and the Company for the resolution of employment disputes.

## II. GENERAL

### A. Summary of the Solutions Procedure

Employees are encouraged to resolve issues informally, either through discussions with their immediate manager, others in the management chain, a human resources (HR) representative, or other Company Compliance representative. Occasionally, however, informal efforts do not resolve an employee's concern, and in such cases an employee may submit his or her concern to Solutions.

Solutions is a structured dispute resolution procedure that consists of two internal levels of review followed by, if necessary and applicable, outside mediation (Level III) and arbitration (Level IV). Levels III and IV apply only to Covered Claims, as defined herein. The levels of Solutions are in a logical sequence, and employees must complete each level of the process before proceeding to the next level.

At Levels I and II, an employee and the management team meet in an attempt to address the employee's concern. If the employee is not satisfied with the outcome of Levels I and II, and the concern is a Covered Claim, the employee may submit the claim to Level III. Similarly, if the Company has a Covered Claim against an employee, it would be submitted initially at Level III. At Level III, an external mediator helps the employee and the Company open lines of communication in an attempt to facilitate resolution.

If there is no resolution at Level III and the party wishes to pursue the concern, the next step is Level IV arbitration. At Level IV, an external arbitrator provides the employee and

2

the Company with a binding decision on the merits of the Covered Claim(s).  Both mediation and arbitration under Levels III and IV will be administered by a nationally recognized **dispute resolution organization ("DRO")**.  Employees may obtain information regarding which DRO has been designated to handle proceedings at Level III and IV and the DRO's rules governing such proceedings from the Solutions Administrator or the local HR manager.

### B. Solutions' Relationship to Other Appeal Procedures

Employees are encouraged to use informal means to resolve an issue -- day-to-day discussions with their manager, another manager or Human Resources -- before formally submitting their concerns to Solutions.  Employees may also contact the office of the Ombudsperson or other Company Compliance representative.

If an employee does not resolve his or her concerns with the Company by using these other procedures, or if the employee elects not to use these procedures, the employee may submit his or her concerns to Solutions.

Where the Company has implemented a peer review program and an employee has submitted a concern to it, the peer review program will replace Levels I and II of Solutions.  After the conclusion of the peer review procedure, a Covered Employee (as defined below) may pursue a Covered Claim through Solutions, starting at Level III.

### C. Modification

The Senior Vice President of Human Resources for the General Electric Company (or his or her designee) may modify or discontinue the Solutions procedure in the future so long as the Company gives affected employees sixty (60) calendar days[1] advance notice.  Any such change shall be prospective, and shall not affect previously filed claims.

### D. Applicable Procedure

All concerns/claims shall be processed under the terms of the program in effect at the time the concern/claim is first submitted to the program.

Employees not bound by Solutions but who are otherwise covered by a pre-existing alternative dispute resolution procedure with a GE business or component that provides for final and binding resolution of Covered Claims remain bound by the pre-existing procedure.

### E. Entire Agreement

This procedure constitutes the sole agreement between the Company and its employees concerning the requirements of Solutions and may not be modified by written or oral statements of any Company representative except as set forth in Section II.C above.  If there are conflicts between the requirements of this procedure and other Company policies, procedures, publications or statements by Company representatives regarding matters addressed by this procedure, the requirements of this procedure control.

---

[1] Any deadline that falls on a weekend or holiday will be extended to the next business day.

### F. Covered Employees; Applicability of the Solutions

Covered Employees are U.S.-based (or U.S. expatriates working outside the United States) current, or former employees who left the Company after the effective date of Solutions, not represented by a labor union who are or were employed by the Company (including any of its subsidiaries or affiliates that have adopted the procedure), as identified by your business or component in Appendix A.[2]

Covered Employees continue to be obligated to use Solutions (including Level IV) following termination of their employment with respect to any and all Covered Claims they may have.  The Company also must use Levels III and IV of Solutions to address Covered Claims the Company may have against a Covered Employee, consistent with the definitions of "Covered Claims" and "Excluded Claims" set forth below.

**Special Note:  Registered Employees**
For regulatory reasons, registered employees have different options available to them for resolving claims past the mediation stage.  Registered employees are bound by the rules of the Financial Industry Regulatory Authority (FINRA), as described in the U-4 agreement, which states that certain claims must be brought to mandatory arbitration before FINRA.  Covered Claims that are not compelled to mandatory FINRA arbitration must be addressed through Solutions.

### G. Non-Covered Employees

Employees not otherwise bound by a Company alternative dispute resolution procedure (*e.g.*, certain former employees) may request the Company's agreement to resolve Covered Claims through Solutions beginning at Level III.

### H. Company

The Company includes GE, any subsidiaries, affiliates, joint ventures, and parents thereof that have adopted the procedure, and, as to each of these, their officers, directors, agents, supervisors/managers acting within the scope of their employment and any of its or their successors or assigns.

### I. Filing Charges with Government Agencies

Nothing in this procedure is intended to discourage or interfere with the parties becoming familiar with and or taking advantage of their rights to file administrative claims or charges with government agencies or authorities, such as the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp), and law enforcement authorities.  Either party may request that an administrative agency or authority with which the other party has filed a claim or charge defer processing that claim or charge pending exhaustion of the Solutions process.

---

[2] Universal Parks and Resorts and Universal Orlando operations and employees covered by the Open Door Plus program are not covered by Solutions.

## J. Solutions Administrator

The Solutions Administrator will:

- Coordinate the receipt and processing of employees' claims with managers and with HR representatives;
- Answer questions about Solutions;
- Monitor the Company's and employee's compliance with all time requirements;
- Confirm scheduling of Level I and Level II meetings, as well as schedule mediation meetings and arbitration hearings at Levels III and IV;
- Process requests for production of information;
- Schedule the Company's participation in pre-arbitration communications with arbitrators and with employees regarding specific discovery issues;
- Work with Company representatives, employees, their attorneys, and the DRO to select and schedule mediators and arbitrators;
- Function as the Company's administrative liaison with the DRO; and
- Process requests for extensions of Solutions deadlines.

## K. Covered Claims

While employees may submit to the appropriate Solutions Administrator any employment-related concern at Levels I and II, only Covered Claims will be accepted and processed at Levels III and IV.  Covered Claims include all claims that arise out of or are related to an employee's employment or cessation of employment (whether asserted by or against the Company), where a court in the jurisdiction in question would otherwise have the authority to hear and resolve the claim under any federal, state or local (e.g., municipal or county) statute, regulation or common law.  Covered Claims do not include Excluded Claims (as defined in Section II.L.).

**Covered Claims** must involve legally protected rights and may include the following:

- Claims relating to compensation, promotion, demotion or other employment actions;

- Claims relating to leaves of absence provided by law;

- Claims relating to involuntary terminations, such as layoffs and discharges (including constructive discharges), notice of mass layoffs and/or plant closings;

- Employment discrimination and harassment claims, based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, handicap/disability, or other characteristic protected by law;

- Retaliation claims for legally protected activity and/or for whistleblowing;

- Claims of breach of contract including but not limited to breach of a personal services contract or other written employment contract, confidentiality agreement or restrictive covenant (express or implied) and/or promissory estoppel;

- Tort claims (such as intentional torts, negligence, defamation, invasion of privacy,

5

inflection of emotional distress, etc.);

- Claims of violation of public policy;

- Claims of violation of this procedure; and/or

- Claims that the employee and the Company expressly agree in writing should be treated as Covered Claims.

## L. Excluded Claims

**Excluded Claims,** which are excluded from Levels III and IV of Solutions, are claims that allege concerns such as the following:

- Claims that do not allege legally protected or enforceable rights in the jurisdiction in question;

- Claims for benefits under a Company benefit plan covered by the Employment Retirement Income Security Act of 1974 (ERISA), or any other claims covered by ERISA; including claims of service miscalculation to the extent such calculations determine eligibility for, or level of benefits under, a plan governed by ERISA;

- Claims for workers' compensation or unemployment compensation benefits;

- Claims under the National Labor Relations Act;

- Intellectual property claims (for example, and without limitation, those relating to patents, trademarks and copyrights) that may be conclusively determined through the use of proceedings in any governmental patent, trademark or copyright or other intellectual property agency or office in any country.

- Claims based on alleged violations of the GE Policy on Working with Governments including, but not limited to, alleged violations of the federal False Claims Act (except retaliation claims) or federal procurement laws or regulations (These should be reported to the Office of the Ombudsperson or Company Compliance representative); and

- Claims brought by or against Covered Employees, where a third party would be necessary to the resolution of any claims or where the absence of the third party could subject the Company or the Covered Employee to inconsistent obligations, and all parties do not agree to participate in Level III and to be bound by an arbitration under Level IV of Solutions.

**Excluded Claims, which are excluded from Level IV of Solutions**:
In addition, claims which, by applicable statute, regulation or other legal requirement are precluded from mandatory coverage under a pre-dispute binding arbitration agreement are considered Excluded Claims insofar as they are excluded from Level IV of Solutions, but not excluded from Levels I, II or III of Solutions. (See Appendix C for further information.)

The exclusion of Company benefit plans above precludes a claim alleging a violation of such plans but does not prevent an arbitrator from including in an award, in connection with a Covered Claim, the monetary value of lost Company benefits caused by a wrongful termination of employment or other violation of law.

## M. Exclusivity of Arbitration for Covered Claims; Injunctive Relief; Individual Nature of Covered Claims

Covered Employees and the Company are not allowed to litigate a Covered Claim in any court. However, a provisional remedy (e.g., a temporary restraining order or a preliminary injunction) to preserve or reinstate the status quo pending the resolution of the Covered Claim pursuant to Solutions may be sought at any time in a court of competent jurisdiction.

Covered Employees and the Company waive their right to bring any Covered Claims as, or against, a representative or member of a class or collective action (whether opt-in or opt-out) or in a private attorney general capacity, unless all parties agree to do so in writing. All Covered Claims must be brought on an individual basis only in Solutions. Without waiving the Company's right to enforce this Procedure's provisions regarding class and collective action waivers, nothing in this Procedure prohibits employees from acting concertedly to challenge the terms of Solutions by pursuing class or collective actions and they will not be subject to discipline or retaliation by the Company for doing so.

If a court or arbitrator determines in a final non-appealable ruling that the waiver in the prior paragraph is unenforceable, any claims brought as putative collective, class or private attorney general actions will be considered Excluded Claims that must be pursued (if at all) in court. If at any point a court finds that claims addressed in this section are not appropriate for treatment as a class, collective or private attorney general action, the claims must proceed (if at all) through Solutions as individual claims.

## N. Exhaustion of Resolution Levels

Covered Employees and the Company must satisfy the requirements at each level of Solutions before proceeding to the next level, except when the parties have mutually agreed to skip a Solutions Level(s) as discussed below. Any Covered Claim that the Company may wish to assert against an employee, whether as an original claim or counterclaim, must be initiated at Level III, unless the parties agree to a preliminary internal meeting to attempt to resolve the matter. In that case, if no resolution is accomplished in the preliminary internal meeting, the Company's Covered Claims shall proceed at Level III.

While the Company encourages employees to attempt to resolve issues at Level I, the Company recognizes that there may be appropriate situations where employees would prefer to initiate their concerns at Level II. When an employee submits a concern initially to Solutions, the employee may request on the Submission Form to skip Level I. The Solutions Administrator will advise the employee before the first scheduled meeting whether the Company agrees to discuss the concern initially at Level II. In all appropriate cases, however, employees will be encouraged by the Solutions Administrator to engage in initial discussions with his or her direct manager prior to engaging in Level I or Level II proceedings. Where circumstances warrant, the parties also may agree to skip Solutions Level II.

The failure to submit Covered Claims at all levels of Solutions within the deadlines established by this procedure constitutes a failure to complete the Solutions process, unless the parties agree to an extension of deadlines or the arbitrator (where Level IV applies) rules that such failure was the result of excusable delay.

O. **Statutes of Limitations and Administrative Agency Filing Deadlines**

A statute of limitations is the time period within which a person must file a claim in court. The length of the applicable statute of limitations is determined by the legal nature of the claim. Different statutes of limitations apply to different claims. Courts do not have authority to decide claims or grant relief with respect to claims filed after the expiration of applicable statutes of limitations. The time period for filing a claim in court normally begins with the occurrence of the event or conduct that is the basis of a person's claim, but may begin at a later time, depending on the circumstances. The time period for filing the claim in court ends upon the expiration of the time period established by the applicable statute of limitations.

Administrative agency filing deadlines can affect an employee's legal rights in different ways. Some statutes require individuals to file administrative claims with government agencies (e.g., the Equal Employment Opportunity Commission - EEOC) as a prerequisite for filing such claims in court. In this context, administrative agency filing deadlines are the time periods within which individuals must file administrative claims with, for example, a federal agency. Such deadlines also may apply to the time period for filing a claim in court after a government agency has discontinued its investigation of the claim.

In order to submit Covered Claims to Level III and Level IV of Solutions, employees must have submitted such claims to Level I (and the Company must have submitted to Level III) before the expiration of the applicable statutes of limitations and/or administrative agency filing deadlines for such Covered Claims. Where an employee files a Covered Claim with an administrative agency or in a court that has (or, absent Solutions, would have) jurisdiction over the Covered Claim before the expiration of the applicable limitations period, the Company agrees to stop the further running of the limitations period as to that Covered Claim while it is pending before the agency or court until ninety days from the time a decision is made by the court regarding the appropriate forum for resolution, or the agency process has been concluded.

Where a party's initial submission of a Covered Claim to Solutions occurs before the expiration of the applicable statute of limitations for filing in court, the opposing party agrees to stop the further running of the statute of limitations while the parties complete the Solutions process. In the case of administrative agency filing deadlines, the Company agrees to request that the agency treat the running of filing deadlines as having been stopped. Nothing in this paragraph is intended to interfere with the right of administrative agencies to investigate and otherwise process claims or relieve a party with Covered Claims that, under Solutions, must be arbitrated at Level IV, from adhering to the deadlines established by Solutions in accordance with Section II.P. below.

Each party shall be solely responsible for determining the correct statutes of limitations and/or administrative agency deadlines applicable to their Covered Claims. Either party's failure to reject a Covered Claim that has been submitted to Level III of Solutions after the

expiration of the applicable statutes of limitations or administrative agency deadlines shall not waive the party's right to assert as a defense at a later time the untimeliness of the Covered Claim.

## P. Deadlines Established by this Procedure

This procedure establishes deadlines for certain actions. Examples include, but are not limited to, deadlines for submitting claims to different levels of Solutions and the Company's issuance of written responses. Deadlines are established by this procedure rather than by law and are different from statutes of limitation.

The parties agree they will make a good faith effort to comply with the deadlines in this procedure. The Company's failure to respond at any level of Solutions to the submission of an employee claim by the expiration of the applicable deadline will be considered a denial of the claim and enable the employee either to submit his/her claim at the next level or demand a response from the Company before proceeding to the next level.

A Covered Employee who fails to adhere to the stated deadlines in Levels I through III and who wishes to proceed with his or her Covered Claim at Level IV must provide the Solutions Administrator with the reasons for such failure. In the event the Solutions Administrator does not excuse the Covered Employee's failure to adhere to the deadlines, the parties agree to submit to an arbitrator selected in accordance with the Level IV procedures the limited issue of whether the employee had good and sufficient cause for his or her failure. If the arbitrator so finds, he or she will preside over the arbitration of the Covered Employee's claim(s) in accordance with the Level IV procedure. If not, the claim will be deemed abandoned and the Covered Employee will have no further right to proceed on such claim in any forum. These rules apply equally to a Company failure to adhere to stated deadlines in Level III with respect to any claim it may bring against a Covered Employee.

The effect of the failure by either party to adhere to the deadlines at Level IV, including whether such failure will be excused or may result in sanctions or other penalties, shall be determined by the arbitrator in accordance with the DRO's rules.

## Q. Severability

In the event that any provision of this procedure is determined to be legally invalid or unenforceable, and cannot be modified to be enforceable, the affected provision shall be stricken from the Agreement. The remaining terms of the Agreement and its enforceability shall remain unaffected.

## R. Rules of Administration for Mediation and Arbitration

For each location covered by Solutions, the Company has designated a DRO which shall handle any and all proceedings at Level III and Level IV for employees based in such location. Employees may obtain information regarding the DRO designated to handle their Covered Claims, including the name and location of the DRO and the DRO's current rules of procedure, from the Solutions Administrator, or the local HR manager. Except as provided otherwise by this procedure, the mediation and arbitration of Covered Claims will be administered by the designated DRO under its current rules for mediation and for

arbitration, as may be amended, without notice by the DRO.

**S. Agreement to Arbitrate in Interstate Commerce**

For all Covered Employees, this procedure is an agreement to arbitrate pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. Sections 1-14, or if that Act is held to be inapplicable for any reason, the arbitration law in the state in which the arbitration hearing is held. The parties acknowledge that the Company is engaged in transactions involving interstate commerce and that the employees eligible to participate in Solutions are not employed by the Company as seamen, railroad employees, or other class of worker engaged in foreign or interstate commerce as provided in the FAA.

**T. Retaliation is Prohibited**

Company employees at all levels are strictly prohibited from retaliating against anyone for submitting a concern or claim to, or otherwise participating in, Solutions. Any concern that retaliation has occurred must be reported promptly to the employee's supervisor, local HR representative, the Company Ombudsperson or other Company Compliance representative, and may be submitted as a concern to Solutions. Any employee who engages in retaliatory conduct will be subject to discipline, up to and including discharge.

**U. Consolidation of Additional Covered Claims**

The parties are solely responsible for including in the Solutions Submission Forms all Covered Claims arising from substantially the same set of facts and circumstances. Consequently, if a party wants to raise, or raises in any manner at any time during the Solutions process, new Covered Claims or new facts which give rise to new Covered Claims, the party shall include such claims and/or facts in a new Submission Form at the appropriate level. The responding party at its sole discretion may consolidate new Covered Claims at the level of the other party's pending claims, or may elect to address the new Covered Claims at the applicable level for a new Covered Claim.

**V. Finality of Solutions**

Any resolution of a concern or claim reached through Solutions is final. This means that neither an employee nor the Company can bring forward a concern or claim in Solutions or in court that is based on substantially the same set of facts and circumstances as one that has been processed in accordance with the terms of Solutions.

**W. Governing Law**

This Agreement shall be construed, interpreted and applied in accordance with the law of the State of New York, without regard to choice of law principles.

## III. PROCEDURE AND RESPONSIBILITY

<u>Preliminary note</u>: In all appropriate instances, employees are encouraged to first discuss their concern with their direct manager and/or HR representative before submitting it to Solutions.

**A. Level I – Direct Manager Meeting**

1. <u>Submission of Claims</u>.  Using the Solutions Level I Submission Form,[3] the employee shall submit his/her claims to the Solutions Administrator, who will provide copies to the employee's manager and/or to his/her HR representative.  The employee should keep a copy of the completed Level I Submission Form.

2. <u>Statutes of Limitations for Submission of Claims</u>.  There are no time limits for employees' submission of claims at Levels I and II.  However, the Company shall not accept Covered Claims at Level III, unless the employee has submitted his/her Covered Claims at Level I (or at Level II if Level I is skipped) before the expiration of the statutes of limitations applicable to such claims.

3. <u>Scheduling of Level I Meeting within 30 Days</u>.  The Solutions Administrator will confirm that the manager and the employee have scheduled a Level I meeting on a date not later than 30 calendar days after the Company's receipt of the employee's written submission.

4. <u>Attendees at Level I Meeting</u>.  The employee meets with his/her manager (or designee).  Either the employee or manager may require the attendance of the employee's HR representative (or designee) at the Level I meeting.  No one may attend the meeting other than the employee, his/her manager and, if requested by either party, the employee's HR representative.  If the employee's manager was not directly involved with the events which form the basis of the employee's concerns, the appropriate Company representatives who were involved in the events also may participate in the meeting.  While this procedure is not intended to prevent either party from seeking legal advice regarding the employee's concerns, neither party may have an attorney present at the Level I meeting.

5. <u>Requests for Documents</u>.  By request to the Solutions Administrator, an employee may gain access to documents from his/her personnel and medical files in the Company's possession that are relevant to the employee's concern.  Upon request and to the extent possible, the Solutions Administrator will make such documents available to the employee in advance of the Level I meeting.

6. <u>Meeting Length and Format</u>.  Level I will consist of a single meeting not to exceed two hours, unless the employee and manager agree to extend the meeting or to hold additional meetings.  At the meeting, the employee shall state the basis for his/her claim and the nature of the resolution he/she is seeking.  In addition to the discussion, the employee may present written information or documents to assist in his or her explanation of the claim.

7. <u>Recording of the Proceedings</u>.  No formal record or transcript may be made, nor electronic recording device used, at the Level I meeting.  However, the parties may make notes during the meeting.

8. <u>Confidentiality and Inadmissibility of Discussions</u>.  Statements made in the meeting are understood to be solely for the purpose of reaching a resolution of the employee's claim and shall be kept confidential by the employee except as provided below, and

---

[3] See Appendix "B" for sample Solutions claim forms.

11

conveyed on a need-to-know basis by the Company. However, either party may gather information in support of the effort to resolve the claim as long as it is not done in violation of Company policy or law.

Neither party, unless compelled by law, shall attempt to use statements made by the other party at the meeting in any arbitral, judicial or other proceeding to impeach the testimony of the other party's witnesses, or as evidence of: (a) views expressed or suggestions made by another party with respect to a possible settlement of the dispute; (b) admissions made by a party in the course of meeting; (c) proposals made or views expressed by a party; or (d) the fact that a party had or had not indicated willingness to accept a proposal for settlement. The employee may disclose the contents of the meeting to his/her spouse and attorney, however, provided they first agree not to disclose such information to others.

Notwithstanding this provision or any other confidentiality requirement of this procedure, nothing in this procedure shall prevent employees from communicating or cooperating with any government agency investigation into matters that occurred during the Solutions procedure or during their employment with the Company.

9. <u>Company Response within 21 Days</u>. The Company will provide the employee with the Company's written response within 21 calendar days of the conclusion of the Level I meeting.

## B. Level II – One-Over-One Manager Meeting

1. <u>Submission of Claims</u>. If the employee is not satisfied with the resolution at Level I, he/she may proceed to Level II by submitting the Solutions Level II Submission Form within 21 calendar days of the date of the Company's written response to the employee at Level I to the Solutions Administrator. The employee must provide on the form any additional information regarding his/her claims not provided at Level I that may be helpful in reaching a resolution. The Solutions Administrator shall immediately forward copies of the employee's concerns at Level II to the appropriate higher-level manager (or designee) and HR representative.

2. <u>Statutes of Limitations for Submission of Claims</u>. Same as Level I.

3. <u>Scheduling of Level II Meeting within 30 Days</u>. The Solutions Administrator will confirm that the higher-level manager (or designee) and the employee have scheduled a Level II meeting on a date not later than 30 calendar days after the Company's receipt of the employee's written submission.

4. <u>Attendees at Level II Meeting</u>. The Level II meeting shall include the employee, a higher-level manager (or designee) than the manager who attended the Level I meeting, and the appropriate HR representative (or designee). In addition, either the employee or higher-level manager (or designee) may require the attendance of any Company representative who attended the Level I meeting. The Company may also involve, as necessary, other Company representatives at the Level II meeting. No one else may attend the meeting other than those identified in this paragraph. While this procedure is not intended to prevent either party from seeking legal advice concerning the employee's concerns, neither party may have an attorney present at the Level II

meeting.

5. <u>Requests for Documents</u>.  Same as Level I.

6. <u>Meeting Length and Format</u>.  Same as Level I.

7. <u>Recording of the Proceedings</u>.  Same as Level I.

8. <u>Confidentiality and Inadmissibility of Discussions</u>.  Same as Level I.

9. <u>Company Response within 21 Days</u>.  Same as Level I.

## C. Level III – Mediation

If the employee is not satisfied with the Level II resolution of his/her concern, he or she may proceed to Level III mediation as provided below.  However, only Covered Claims shall be processed at Level III.  Any Covered Claim that the Company may wish to assert against an employee, whether an initial claim or a counterclaim, must be asserted at Level III, unless the employee requests that an internal meeting between the employee and Company representatives occur first to attempt to resolve the matter.  The term Claimant as used in Sections III.C. and in Section III.D. below shall mean either the employee or the Company, whichever party is bringing the claim at Level III or IV.

1. <u>Description</u>.  Mediation involves an attempt by the parties to find common ground on which to voluntarily resolve their dispute with the aid of a neutral third party not employed by the Company.  The mediator's role is advisory.  The mediator may offer suggestions, but resolution of the dispute rests with the parties themselves.  As a result, the mediator or either party may end the mediation whenever, in his/her judgment, further efforts at mediation would not contribute to a resolution of the dispute.

2. <u>Submission of Claims to Level III – Covered Claim Determination and Time Limits</u>.  The employee shall use the Solutions Level III Submission Form to submit his/her Covered Claims to the Solutions Administrator at Level III, within 30 calendar days of the date of the Company's written response at Level II.  The Company shall use the same form to submit its Covered Claims to the employee and the Solutions Administrator.  Claimants are required to identify on the Level III Submission Form all legal claims that arise out of the same facts and to include all facts that support the Claimant's legal claims, including, in the case of an employee's claim, facts which conflict with the Company's stated reasons for denying the employee's claims at Level II.  In addition, the Claimant must include the dates of each alleged legal violation, the names of individuals who have knowledge about each alleged legal violation and the nature of their involvement, and any documents or other evidence that support the claims.

The Solutions Administrator, within 30 calendar days of receipt of the Level III submission, will determine whether the claim is a Covered Claim.  If it is not a Covered Claim, the Solutions Administrator will notify the Claimant that the claim has been rejected, which will end the Solutions process.  If it is a Covered Claim, the Solutions Administrator will work with the parties to file a joint request for mediation with the DRO previously designated by the Company.  The request for mediation shall contain a brief description of the nature of the Covered Claims and the names, addresses, and

13

telephone numbers of all parties to the dispute and their representatives, if any. The fact that a claim is allowed to proceed at Level III (and, if applicable, later at Level IV) is not a waiver of any defense to such claim, including without limitation that such claim is untimely or fails to state a claim upon which relief may be granted.

3.  Selection of a Mediator.  The employee and the Company may select a mediator by agreement.  Absent such agreement, the parties will follow the DRO process for mediator selection.  (Typically, a DRO will provide an initial list of mediators for both parties to consider.)

    If acceptable mediators are unable to serve, or if for any other reason an appointment cannot be made from the initial list, the DRO shall submit a second list to the parties. The parties shall repeat the same process of selection.  However, if for any reason the DRO cannot make an appointment from the second list, the DRO shall make the appointment from other members of its panel of mediators without the submission of additional lists.

4.  Qualifications of Mediators.  In addition to not having any financial or personal interest in the result of the mediation, mediators shall be licensed attorneys or former judges with a minimum of five years' relevant experience in the area of law at issue.

    For claims relating to intellectual property (for example, and without limitation, those relating to patents, trademarks, copyrights and trade secrets), mediators shall have a minimum of ten years experience as an attorney practicing in the relevant area of intellectual property law.

5.  Date, Time, and Place of Mediation.  If the parties fail to agree on a date, time and place for mediation, the mediator shall schedule the mediation on a normal business day during normal business hours, no later than 90 calendar days after the date of the pre-mediation meeting/call.  Unless the parties agree otherwise, or the mediator directs otherwise, the parties shall use the DRO office nearest to the employee's work location to mediate the dispute.  If the DRO's office is unavailable, the mediator shall select a convenient, neutral site.

6.  Length of Mediation.  Either of the parties or the mediator may end the mediation at any point.  However, the length of the mediation shall not exceed one 8-hour day, unless both parties and the mediator agree to an extension.

7.  Requests for Documents.  Same as Level I, unless the parties agree otherwise.

8.  Identification of Matters in Dispute.  Unless otherwise ordered by the mediator, each party shall provide to the mediator a brief written summary of the dispute setting forth the party's position concerning all claims and defenses at least 14 calendar days prior to the scheduled mediation.  This summary shall be for the mediator only, shall not be shared with the other party and shall not be admissible as evidence in any other proceeding.

9.  Attendees at Mediation.  Either party may be assisted or represented by counsel.  The mediation shall be a private meeting of the parties and the mediator. Without the written agreement of both parties, no one may attend the mediation except the

mediator, the employee, Company representatives and each party's attorneys.

10. <u>No Stenographic Record or Electronic Recording</u>.  No formal record or transcript may be made, nor electronic recording device used, at the mediation.  However, the parties may make notes during the mediation.

11. <u>Confidentiality and Inadmissibility of Mediation Discussions</u>.  The mediator shall not disclose to anyone outside the mediation any information provided by the parties in the course of the mediation.  The mediator shall not be compelled to disclose any information related to the mediation or to testify in regard to the mediation in any other proceeding or judicial or arbitral forum.

The parties shall maintain the confidentiality of the mediation.  On or before the date of the mediation, the mediator and the parties shall sign a mediation confidentiality agreement.  Statements by the parties at the mediation are understood to be solely for the purpose of reaching a resolution of the claims and shall be kept confidential by the employee except as provided below, and conveyed by the Company on a need-to-know basis.  Either party may gather information in support of the effort to resolve the concern, however, as long as it is not done in violation of Company policy or law.

Neither party shall, unless compelled by law, attempt to use statements of the other party or the other party's representatives in any arbitral, judicial or other proceeding to impeach the testimony of the other party's witnesses, or as evidence of: (a) views expressed or suggestions made by another party with respect to a possible settlement of the dispute; (b) admissions made by another party in the course of the mediation proceedings; (c) proposals made or views expressed by the mediator; or (d) the fact that the other party had or had not indicated willingness to accept a proposal for settlement made by the mediator.  The employee may disclose the contents of the mediation to his/her spouse and attorney, however, provided they first agree not to disclose such information to others.

Notwithstanding this provision or any other confidentiality requirement of this procedure, nothing in this procedure shall prevent employees from communicating with or cooperating with any government agency investigation into matters that occurred during the Solutions process or during their employment with the Company.

12. <u>Costs and Fees</u>.  The Company will pay (1) the DRO filing and other administrative fees; (2) the mediator's fee and his/her reasonable travel and living expenses; and (3) the cost of renting mediation rooms.  The Company also will pay for the time spent at the mediation by a Claimant still employed by the Company as follows:  1) non-exempt employees will be paid at their regular base rate for time in mediation that occurs during their regularly scheduled hours; and 2) exempt employees will continue to receive their regular salary.

The Company shall pay the fees and expenses of the mediator by making such payments directly to the DRO.  The DRO shall then pay the mediator without disclosing the source of such payments.  To avoid disclosing to the mediator the source of the payment of his/her fees and expenses and other costs of mediation, all references to the "costs and fees" of the Solutions shall be redacted from copies of this procedure which are provided to the mediator.

The parties shall each pay their own attorneys' fees and costs.  However, in the event that the parties agree to a settlement at Level III and execute a settlement agreement and release, the Company will reimburse the employee up to $2,500, for his/her reasonable attorneys' fees directly related to the mediation.  The employee will be expected to provide valid proof of such fees.  The Company will not reimburse employees for attorneys' fees for Levels I or II.

13. <u>Conclusion</u>.  If the mediation has been successful, Level III proceedings will conclude with the execution of a settlement agreement and release, or other arrangement as agreed to by the parties and/or the mediator.  If the mediation is unsuccessful, as determined by the mediator and/or a party, Level III will conclude at the time of this determination.

## D. Level IV – Arbitration

1. <u>Description</u>.  Arbitration is a dispute resolution process in which the employee and the Company present their respective positions concerning the Covered Claims to an impartial third-party arbitrator who determines the merits of the claims.  An arbitration hearing resembles a court proceeding in certain ways.  Both parties have the opportunity to be represented by an attorney, to make opening statements, to present the testimony of witnesses and to introduce exhibits through witnesses, to cross-examine the other party's witnesses and to make closing statements.  Arbitration differs from mediation in that the arbitrator renders a final and binding decision on the merits of the Covered Claim and can impose remedies.  The procedures below contain certain guidelines on discovery and witnesses in an effort to further the interests of simplicity and expedition of arbitration.  These guidelines will apply unless the arbitrator determines that they will prevent the party from obtaining information and/or presenting evidence that will assist the party in proving a claim or defense, in which case the arbitrator shall have authority to make reasonable alterations to such guidelines.

2. <u>Submission of Claims to Level IV and Time Limits</u>.  The Claimant shall use the Solutions' Level IV Submission Form to submit Covered Claims to the Solutions Administrator within 30 calendar days of the date a party and/or the mediator determines that the mediation at Level III has not been successful.  The Level IV Submission Form requires the provision of any available additional information regarding the Covered Claim.

3. <u>Initiation of Arbitration</u>.  The Solutions Administrator and the employee and/or the employee's attorney shall file a joint request for arbitration with the DRO previously designated by the Company within 30 calendar days of the Solutions Administrator's receipt of the Claimant's submission at Level IV.  The arbitration request shall comply with the DRO's arbitration rules and, at a minimum, shall contain the Claimant's statement of the nature of the Covered Claims, the amount of damages, if any, alleged and the nature of any other remedy sought.  The Solutions Administrator will forward the joint request to the DRO.  Failure to cooperate in the submission of the joint request may result in the forfeiture of a claim, as determined by an arbitrator selected by the DRO for this purpose.

4. <u>Selection of an Arbitrator</u>.  The parties may select an arbitrator by agreement.  In the

event of agreement, the Company will notify the DRO of the name of the selected arbitrator and the DRO will appoint the arbitrator. However, if the parties cannot agree to the selection of an arbitrator before the submission of their joint request for arbitration, the parties will follow the DRO process for arbitrator selection. (Typically, a DRO will provide an initial list of arbitrators for both parties to consider.)

If requested by the employee, the Company will make a good faith effort to identify any arbitrators on the DRO's arbitrator selection list who have rendered an arbitration award in Solutions disputes between the Company and any of its employees within the last five years and, without divulging the identity of any employee involved or compromising the confidentiality of the proceeding, will inform the employee whether the decision was in favor of the Company or the employee in such arbitrations.

If acceptable arbitrators are unable to serve, or if for any other reason an appointment cannot be made from the initial list, the DRO shall submit a second list to the parties and the parties shall repeat the same selection process, as provided by the DRO. However, if for any reason the DRO cannot appoint an arbitrator from the second list, the DRO shall make the appointment from other members of its panel of employment arbitrators without the submission of additional lists.

5. <u>Qualifications of a Neutral Arbitrator.</u>  In addition to not having any financial or personal interest in the result of the arbitration, arbitrators shall be (a) licensed attorneys with a minimum of either ten years' experience in the practice of employment law and five years acting as an arbitrator of employment law claims or fifteen years acting as an arbitrator of employment claims, or (b) former judges with a minimum of ten years on the bench.

For claims relating to intellectual property (for example, and without limitation, those relating to patents, trademarks, copyrights and trade secrets), arbitrators shall have a minimum of ten years experience as an attorney practicing in the relevant area of intellectual property law.

6. <u>Strictly Private Nature of Proceedings.</u>  Unless otherwise provided herein and as allowed by law, information compiled, shared, exchanged and generated as a result of the arbitration process shall be treated as strictly private and confidential. The arbitrator shall have the authority to make appropriate rulings to safeguard that privacy and confidentiality.

7. <u>Discovery.</u>  Discovery is the process by which parties to a pending Covered Claim obtain certain non-privileged information in the possession, custody or control of the other party, which is relevant to the proof or defense of the Covered Claim, including information concerning the existence, description, nature, custody, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any such matter. Promptly after appointment, the arbitrator shall hold an initial conference with the parties to discuss matters pertinent to the proceedings including a plan for discovery. The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, requests for admission or otherwise, as the arbitrator considers necessary for a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration. Discovery is subject to certain presumptive guidelines set forth below,

including the requirement that the parties shall complete all discovery no later than 14 calendar days prior to the start of the arbitration hearing.  The arbitrator may depart from these guidelines by increasing or decreasing the amount of discovery based on the facts of the particular claim.

a.  Initial Disclosures.  Within 30 calendar days following submission of Covered Claims to the DRO, each party shall provide the other with copies of all documents which they intend to present at the arbitration hearing in support of their claims or defenses, but not including documents that are privileged, attorney work product or subject to a protective order.  Each party also shall provide to the other within such period a list of the names of individuals who possess information or documents relevant to their claims or defenses, the categories of information that such individuals possess, a computation of any damages claimed by the disclosing party and the identity of any individual who may be used in the arbitration hearing to present expert testimony.

b.  Protective Orders.  The arbitrator may issue protective orders in response to a request by either party or by a third-party witness.  Such protective orders may provide that requested discovery not be had, that it be had only on specified terms and conditions, that certain matters not be inquired into, that discovery be conducted with no one present except those designated by the arbitrator, that a trade secret or other proprietary or confidential information not be revealed or be revealed only in a designated way, or any other limitation that the arbitrator deems warranted in the interests of justice, to protect the privacy, trade secrets, proprietary information and/or other legal rights of the parties or the witnesses.

c.  Guidelines on Discovery.  Either party may seek from the other party discovery of the types described below to the extent relevant to claims or defenses before the arbitrator.  The arbitrator shall have the authority to modify the discovery guidelines set forth below in consideration of the interests of simplicity and expedition of arbitration balanced against value of the information in establishing a claim or defense.

   i.  Interrogatories.  Interrogatories are written questions that must be answered by the responding party under oath.  Each party may submit up to 20 separately numbered interrogatories to the other party.  Subparts to interrogatories will count as separate interrogatories.  Answers and objections to interrogatories must be served on the inquiring party within 30 calendar days of receipt.

   ii.  Document Requests.  Each party may serve up to 15 requests for documents or things.  Responsive documents or things, not including those that are privileged, attorney work product or subject to a protective order, in the responding party's possession, custody or control and/or objections to the requests must be served on the inquiring party within 30 calendar days of receipt.  The requesting party shall bear the reasonable cost of compliance with the request, subject to paragraph 22 below.

   iii.  Requests for Admission.  Each party may serve up to 15 requests for admission related to the pending Covered Claim.  The requests shall seek the responding

18

party's admission of the truth of any matter that is not privileged and that is relevant to the Covered Claim or defenses.  Responses and/or objections to the requests must be served on the inquiring party within 30 calendar days of receipt.  The subject of the requests shall be deemed conclusively admitted if the responding party fails to respond or object within the 30 calendar days, unless the arbitrator permits withdrawal or amendment of the admission.

iv.  <u>Depositions</u>.  A deposition is an oral statement under oath that is given in response to specific questions asked by one of the parties and that usually is recorded or transcribed by a court reporter.  Each party shall be entitled to take the deposition of up to three individuals after having given the other party reasonable notice of the identity of the individual to be deposed and the time and place of the deposition.  The party taking the deposition shall be responsible for all costs associated therewith, such as the cost of the court reporter and/or transcript.

v.  <u>Duty to Supplement Disclosures and Discovery Responses</u>.  A party who has made an initial disclosure or who has responded to a request for discovery is under a continuing duty to timely supplement or correct the disclosure or response to include information learned or acquired after the initial disclosure or response was made.

vi.  <u>Time for Initiation and Completion of Discovery</u>:  In order to expedite the arbitration, the parties may initiate discovery prior to the appointment of the arbitrator.  Unless the arbitrator determines that additional time is necessary, the parties shall complete discovery within 90 calendar days of the appointment of the arbitrator, and neither party shall be required to provide information or documents or otherwise respond to a discovery request received less than 30 calendar days before the date for completion of discovery.

vii.  <u>Expert Witnesses</u>:  If scientific, technical or other specialized knowledge will assist the arbitrator to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto.  A party wishing to use expert testimony at the arbitration hearing must disclose to the other party the identity of such expert.  The party also must provide an expert report containing a complete statement of all opinions to be expressed, the reasons therefore, the data or other information considered in forming the opinions, and exhibits to be used in support of the opinions, the expert's qualifications, the compensation to be paid to the expert and a list of any other cases in which the expert has testified as an expert in the prior four years.

When the mental or physical condition of a party is in controversy, the arbitrator may order the party to submit to a physical or mental examination by a licensed or certified examiner of the other party's choosing.  The examiner will produce to both parties a report containing his or her findings.

Where a party decides to use an expert witness, the disclosures (described in the first paragraph under vii.) must be made within 60 days of the appointment

of the arbitrator.  Further, the arbitrator will postpone the hearing date by 30 calendar days or such time as is necessary to permit the parties to complete expert discovery (including the taking of the initial expert's deposition and receipt of transcript, disclosure of any rebuttal expert and deposition of such rebuttal expert and receipt of transcript) no less than 14 calendar days prior to the hearing.

viii.  Discovery Disputes:  The parties will make a good faith attempt to quickly resolve any discovery disputes between themselves prior to seeking a decision from the arbitrator.  The arbitrator shall have the authority to resolve any remaining disputes pursuant to the Rules of the DRO.  The arbitrator will resolve all discovery disputes no less than 14 calendar days before the arbitration hearing.

8.  Subpoenas:  A subpoena is a command to an individual or a company representative to appear at a certain place and time and give testimony and/or furnish documents.  A party may ask the arbitrator to issue a subpoena and such subpoena must be served on the other party no less than 10 calendar days prior to the start of the hearing, deposition or time for production of documents contemplated by the subpoena.  The arbitrator shall have the authority to enforce, limit, modify, and/or cancel such subpoenas once they are issued.  The party asking the arbitrator to issue the subpoena shall be responsible for the fees and expenses associated with the issuance of and compliance with the subpoena.

9.  Pre-Hearing Disclosures and Motions:  No less than 10 calendar days before the hearing, each party shall provide, in writing, the names of all witnesses (including any expert witness already disclosed in accordance with the discovery guidelines) that the party intends to call to testify at the hearing in support of its case in chief, copies of all exhibits it intends to introduce at the hearing, a brief summary of any preliminary issues the party intends to raise before the arbitrator, and any pre-hearing motions (e.g., motions in limine, motions for summary judgment).

10.  Date and Time of Arbitration Hearing.  The arbitrator, in consultation with the parties, shall set the time and date of the arbitration hearing to occur no later than 120 calendar days after the appointment of the arbitrator.  This date will be extended only by agreement of the parties or by the arbitrator in accordance with the principles in Section III.D.1.

11.  Length of Hearing.  The arbitrator shall control the duration of the arbitration hearing and shall seek to limit the length of the arbitration hearing to two 8-hour days (16 hours total); provided, however, that the arbitrator shall provide each party an adequate opportunity to present its case, considering the nature and complexity of the Covered Claims at issue.

12.  Place of Hearing.  Unless the parties agree otherwise, or the arbitrator directs otherwise, the parties shall use the DRO office nearest to the employee's work location to arbitrate the Covered Claims.  If the DRO's office is unavailable, the DRO will arrange for the rental of an arbitration hearing room that is mutually convenient.

13.  Arbitration Hearing Attendees.  The parties may be assisted or represented by an

attorney at the arbitration hearing. The arbitration hearing shall be a private hearing. Without the written agreement of both parties, no one may attend the arbitration hearing except the arbitrator; an official recorder (if any); the employee, attorneys, experts, and witnesses; and the Company's attorneys, representative(s), experts, and witnesses, provided, however, that the arbitrator shall have authority to sequester or separate the witnesses upon request of a party.

14. <u>Recording of the Arbitration Hearing</u>. Either party may request a qualified court reporter to make a stenographic record and transcript of the arbitration hearing. If only one party requests that a record be made, then that party shall pay for the entire cost of the record and shall have exclusive access to the record. If both parties want access to the record, the parties shall share the cost equally.

15. <u>Evidence</u>. The parties may offer such evidence at the hearing as is relevant and material to the determination of the Covered Claim(s) at issue. The arbitrator shall determine the weight and relevance to be afforded the evidence offered by the parties. This procedure does not require conformity to legal rules of evidence, except for the law applicable to attorney-client privilege, attorney work product and compromise and offers to compromise. However, the arbitrator shall not receive or consider evidence by affidavit or evidence submitted to the arbitrator after the arbitration hearing has concluded.

16. <u>Witnesses</u>. Subject to the arbitrator's authority to increase the number in accordance with the principles in Section III.D.1. above, neither party may call more than 5 witnesses, including expert witnesses, during the presentation of its case-in-chief. Either party may present expert witness testimony to the arbitrator, provided the party has complied with subparagraph III.D.7.c.vii. above.

17. <u>Briefs and Arbitrator's Opinion</u>. Each party will have the opportunity, if desired, to submit a written brief to the arbitrator within 30 calendar days of the close of the arbitration hearing (or receipt of the transcript, if applicable). The parties waive their right to file a brief, unless they notify the arbitrator by the close of the arbitration hearing of their intention to file a brief. The arbitrator shall be responsible for forwarding a copy of the opposing brief to the other party. The arbitrator will have the discretion to accept and consider responsive briefs.

The arbitrator shall issue a written opinion to the parties not more than 30 calendar days after the close of the arbitration hearing, or 30 calendar days after the arbitrator's receipt of the parties' briefs, whichever is later. The opinion shall be signed by the arbitrator and shall contain: (a) the names of the parties and their representatives; (b) the date(s) and place of the hearing; (c) a summary of the Covered Claims arbitrated and decided; (d) the factual and legal reasons for the opinion; and (e) the damages and/or other remedies/relief, if any.

18. <u>Authority of the Arbitrator</u>. The arbitrator may, in connection with the Covered Claim of a specific employee, decide whether the Company has complied with its policies, procedures, rules or practices, and/or whether such policies, procedures, rules, and/or practices are in violation of applicable state or federal law, and where a violation is found, the arbitrator may, solely with respect to the claimant, order the Company to change the application of its policies, procedures, rules, or practices. The arbitrator

shall not, however, change, require the Company to establish, nor diminish the Company's authority to establish or revise its policies, procedures, rules and/or practices. The arbitrator shall decide all Covered Claims in accordance with the substantive law of the state or the federal circuit, or both, in which the claim arose, or the applicable law pursuant to any contractual agreement. The Arbitrator, and not any court or agency, shall have exclusive authority to resolve any dispute relating to the applicability, interpretation, formation or enforceability of this Agreement including, but not limited to, any claim that the entirety or any part of this Agreement is voidable or void.

Under no circumstances shall the arbitrator have the authority to consider any putative class, collective or private attorney general claims.

The arbitrator also shall have the authority to determine issues of timeliness of the Covered Claim(s). The arbitrator further shall have the power to sanction a party for that party's failure to comply with these procedures, the DRO's Rules or the arbitrator's rulings. These sanctions may include assessment of costs, adverse inferences, prohibitions of evidence or, if justified by a willful disregard of any of the above, an adverse ruling in the arbitration.

19. <u>Scope of Award</u>. The arbitrator shall interpret and apply the law of remedies of the state or the federal circuit, or both, in which the claim arose, or the applicable law pursuant to any contractual agreement. Except as provided by this procedure above (Authority of the Arbitrator) and below (Front Pay Option), the arbitrator may grant any remedy or relief that would have been available had the claim been asserted in court.

20. <u>Front Pay Option Instead of Reinstatement</u>. If the arbitrator orders the reinstatement of an employee whose employment has been involuntarily terminated, there may be situations where either the employee does not want to return to work or the Company does not wish to reinstate the employee. In such situations, the arbitrator, at the request of either party, shall accept additional evidence or argument on that issue and shall issue a supplementary award. Such an award will grant the employee reasonable front pay instead of reinstatement in accordance with applicable state or federal law.

21. <u>Effect of Arbitrator's Decision</u>. An arbitrator's award rendered under Solutions shall be a final, binding, and exclusive determination of Covered Claims.

The arbitrator's award will not be subject to review or appeal, except as provided by the Federal Arbitration Act, 9 U.S.C. Sections 1-14, or by the applicable state arbitration statute.

Neither party shall publish or disseminate the arbitrator's award or arrange for publication or dissemination of the award. The award shall have no legal effect on the claims of employees who are not party to the arbitration. Neither party may cite the arbitrator's decision as precedent in any other arbitration, or in any administrative or court proceeding. However, either party may cite the decision to appeal or enforce the arbitrator's award and/or to seek dismissal of claims in litigation arising from substantially the same set of facts and circumstances.

22. <u>Costs and Fees</u>. The Company will pay: (1) the DRO filing and other administrative fees;

(2) the arbitrator's fee and his/her reasonable travel and living expenses; and (3) the cost of renting an arbitration hearing room.  The Company also will pay for necessary time spent at the arbitration by a Claimant or witness currently employed by the Company as follows:  1) non-exempt employees will be paid at their regular base rate for time in the arbitration hearing that occurs during their regularly scheduled hours; and 2) exempt employees will continue to receive their regular salary for such time.

The Company shall pay the fees and expenses of the arbitrator by making such payments directly to the DRO, which shall then pay the arbitrator without disclosing the source of such payments.  To avoid disclosing to the arbitrator the source of the payment of his/her fees and expenses or other costs of arbitration, all references to the "costs and fees" of the Solutions procedure shall be redacted from copies of this procedure which are provided to the arbitrator.

Each party shall pay its experts' and/or attorneys' fees, unless the arbitrator awards reasonable experts' and/or attorneys' fees to a "prevailing party" under applicable law.

23. <u>Settlement Prior to Award</u>.  If the parties reach an agreement to resolve the Covered Claims prior to the issuance of the arbitrator's decision, the arbitrator will retain jurisdiction of the matter until the parties have executed a written settlement agreement and release of claims and such agreement has become effective.

# APPENDIX A

Executive Band and above employees in all GE businesses who are either working in the United States or who are U.S. citizens working outside the United States are covered by this Solutions procedure.

<u>In addition to the above</u>:

GE Healthcare

GE Healthcare employees who are either working in the United States or who are U.S. citizens working outside the United States and who are classified by the company as exempt employees are covered by this Solutions Procedure.

In addition, all GE Healthcare employees, regardless of band, who (a) are not already covered by the preceding paragraphs, and (b) are provided and asked to acknowledge the Solutions procedure at any time on or after July 1, 2008, are covered by the Solutions procedure.

GE Transportation and Affiliates:

1)  All exempt and salaried non-exempt U.S. employees who are either working in the United States or who are U.S. citizens working outside the United States
2)  All hourly employees at Transportation's Las Vegas and Kansas City locations (but not the Global Signaling locations in Missouri).
3)  All Transportation employees (regardless of band) asked to acknowledge the Solutions procedure on or after July 1, 2008.

GE Energy (Including Water) ; and Oil & Gas

All employees, regardless of band, who (a) are not already covered by the first paragraph, and (b) are provided with the Solutions Procedure and told they will be covered by the Solutions procedure at any time on or after September 1, 2008, are covered by the Solutions procedure.

GE Home & Business Solutions

All GE Home & Business Solutions employees* in Senior Professional band positions and below who are classified by the Company as exempt, non-exempt salaried, and all non-represented hourly employees, who are either working in the United States or who are U.S. citizens working outside the United States are covered by this Solutions procedure effective on the date of their acknowledgement of the program.  All former GE Consumer & Industrial employees and employees formerly with GE Enterprise Solutions in the Intelligent Platforms business, remain covered by Solutions.  The following categories of employees will continue to be covered by the former GE Consumer & Industrial Alternative Dispute Resolution Program applicable to their employment: (1) former GE Consumer & Industrial hourly employees who were employed by GE Consumer & Industrial  prior to November 30, 2008;  (2) employees in Senior Professional band and below positions who were employed by the Company prior to December 1, 2008, and who (a) are notified in writing, by the Company, that the employee can opt out of Solutions between April

29, 2009 and June 30, 2009 and; (b) do opt out of Solutions pursuant to the Company's procedures between April 29, 2009 and June 30, 2009.

*Except for those employees who opted out of Solutions in 2009.

GE Aviation and Its Applicable Affiliates

Executive Band and above employees in Aviation and its affiliates, who are either working in the United States or who are U.S. citizens working outside the United States are covered by this Solutions procedure.

Exempt employees below Executive Band in Aviation and its affiliates, who are either working in the United States or who are U.S. citizens working outside the United States are covered by this Solutions Procedure, except those who opt out of this Solutions procedure, with or without consequences, in response to written notice from the company that they may opt out of this Solutions procedure. Employees that do opt out of this Solutions procedure and are covered by the company's Dispute Resolution Program (DRP) remain covered by DRP.

In addition, all employees, regardless of band in Aviation and its affiliates, who (a) are not already covered by the preceding paragraphs, and (b) are provided and asked to acknowledge the Solutions procedure at any time after July 1, 2008, are covered by the Solutions procedure, except those who opt out of this Solutions procedure, with or without consequences, in response to written notice from the company that they may opt out of this Solutions procedure. Employees that do opt out of this Solutions procedure and are covered by the company's Dispute Resolution Program (DRP) remain covered by DRP.

GE Corporate

Employees of GE Corporate in SPB and below positions are covered by this Solutions procedure if they were notified of their participation in this Solutions procedure at any time on or after July 1, 2008.

GE Capital

Employees of all General Electric Capital Corporation businesses, subsidiaries and affiliates are covered by this Solutions procedure if they were notified of their participation in Solutions at any time on or after July 1, 2008.

GE Global Research:

All other Employees who are either working in the United States or who are U.S. citizens working outside the United States and who are classified by the Company as exempt employees are covered by the Solutions Procedure.

NBC Universal

All non-represented employees in the US or US citizens outside the United States unless their employment contract or local law provides otherwise.

APPENDIX B

# SOLUTIONS
## Issue Resolution Procedure
## Level I - Submission Form

| Name: | SSO ID Number: | Phone Number:<br><br>Fax  Number: |
|---|---|---|
| Job Title/Career Band: | Business Address: | HR Manager's Name: |
| Manager's Name: | Component Name: | Billing Unit Code (BUC #):<br><br>ADN  #: |

| Have you previously discussed this concern/claim with your Manager?  YES ☐          NO ☐ |
|---|

**LEVEL I**        | DATE YOUR CONCERN(S)/CLAIM(S) FIRST AROSE:

Provide a detailed explanation of your concern(s)/claim(s), individuals involved, and what you believe is necessary to resolve the concern(s).  You may attach additional pages if needed.

| I request to skip Level I and submit concern(s)/claim(s) initially at Level II<br>(must still enter description above and indicate reasons for request to skip Level I): | YES ☐   NO ☐ |
|---|---|
| At the request of the employee or the manager, an HR representative may participate in the Level I meeting.<br>Do you request the attendance of the HR representative/manager at the Level I meeting? | YES ☐      NO ☐ |

| Employee Signature: | Date: |
|---|---|

Forward this form to the SOLUTIONS Administrator, Pam Baker, at Solutions.administrator@ge.com and provide a copy to your manager and/or HR manager.  You may contact the Administrator at 502.452.7414.

Revised June 2011

# SOLUTIONS
## Issue Resolution Procedure
## Level II - Submission Form

| Name: | SSO ID Number: | Phone Number: |
| | | Fax Number: |
| One-Over-One Manager: | Business Address: | Phone Number: |
| | | Fax Number: |

## Level II

Submit concern(s)/claim(s) at Level II within 21 calendar days of the date of the Company's written response at Level I.

Provide any additional information regarding your concern(s)/claim(s) including information that conflicts with the Company's stated reason for not resolving your concern(s)/claim(s) at Level I.  You may attach additional pages if needed.

| Employee Signature: | Date: |

Forward this form to the SOLUTIONS Administrator, Pam Baker, at Solutions.administrator@ge.com and provide a copy to your manager and/or HR manager.  You may contact the Administrator at 502.452.7414.

Revised June 2011

27

# SOLUTIONS
# Issue Resolution Procedure
# Level III - Mediation
# Submission Form

| Name: | SSO ID Number: | Phone Number: |
|-------|----------------|---------------|
|       |                | Fax Number:   |

## LEVEL III – MEDIATION

Submit covered claim(s) at Level III within 30 calendar days of the date of the Company's written response at Level II.

Include all legal claim(s) that arise out of the same facts and include all facts that support your legal claim(s), including facts which conflict with the Company's stated reasons for denying your concern(s)/claim(s) at Level II. Include the dates of each alleged legal violation, names of individual(s) who have knowledge about each alleged legal violation and the nature of their involvement, and any documents or other evidence which support your claim(s). You may attach additional pages if needed.

| Employee Signature: | Date: |
|---------------------|-------|

Forward this form to the SOLUTIONS Administrator, Pam Baker, at Solutions.administrator@ge.com and provide a copy to your manager and/or HR manager. You may contact the Administrator at 502.452.7414.

Revised June 2011

# SOLUTIONS
## Issue Resolution Procedure
## Level IV - Arbitration
## Submission Form

| Name: | SSO ID Number: | Phone Number: |
|---|---|---|
| | | Fax Number: |

## LEVEL IV - ARBITRATION

Must submit covered claim(s) at Level IV within 30 calendar days of the date the both parties and/or the mediator determines that the mediation at Level III has not been successful.

Provide any additional information regarding your claim(s), including information that conflicts with the Company's stated reason for denying your claim(s) at Level III.  You may attach additional pages if needed.

*I understand and agree that the arbitrator's decision at Level IV is final and binding.*

Employee Signature:                                              Date:

Forward this form to the SOLUTIONS Administrator, Pam Baker, at Solutions.administrator@ge.com and provide a copy to your manager and/or HR manager.  You may contact the Administrator at 502.452.7414.

Revised June 2011

29

## Appendix C

In addition to the descriptions in Sections K ("Covered Claims") and L ("Excluded Claims") of the Solutions Procedure, claims that are considered "Excluded Claims" with respect to Level IV of Solutions, because by applicable statute, regulation or other legal requirement they are precluded from mandatory coverage under a pre-dispute binding arbitration agreement, include:

- Claims arising under section 1514A of the Sarbanes Oxley Act of 2002, as amended,

- Claims arising under section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act,

- Claims arising under Section 748 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (relating to Section 23 of the Commodity Exchange Act).

# EXHIBIT B TO DECLARATION OF KRISTIN MATHERS

**Safe Driving Policy and Agreement Covering Custody and Maintenance of Company Trucks / Fleet Vehicles and Technician Portable Terminal**

I.    POLICY NEED AND SCOPE

Improving safe driving practices by GEA employees while driving on company business can reduce work related injuries, including fatalities, consistent with Company Policy 20.3. This policy sets forth programs and practices to be adopted and followed in GEA to promote safer driving practices by GEA employees.

I.    REQUIRED SAFE DRIVING PRACTICES

I understand that:

1.    Company trucks may not be driven by employees other than those of the General Electric Company. Also, the Technician Portable Terminal may not be used by employees other than General Electric Company employees.

2.    Company trucks and Technician Portable Terminals are to be used only for the purpose of Company business.
   -    Personal use is not authorized.
   -    Unauthorized passengers are not to be carried in Company trucks.
   -    Unauthorized software may not be installed on Technician Portable Terminal.
   **Violation of rules 1 or 2 may result in immediate discharge under the third category of the GEA Consumer Service Rules of Conduct.**

3.    Company insurance does not cover or protect operators of Company trucks or the Technician Portable Terminal when being used in violation of No. 1 and No. 2 above. I personally will be responsible for all damage to said vehicle or Technician Portable Terminal incurred while knowingly operating in violation of No. 1 and No. 2 above.

4.    I will be expected to observe applicable state and local laws when operating a Company vehicle. FINES OR ATTORNEY'S FEES IN CRIMINAL ACTION AND TRAFFIC VIOLATIONS, ETC. WILL BE MY RESPONSIBILITY. In addition, parking violations will be my responsibility unless incurred as a result of following specific instructions of my supervisor.

5.    I will not consume alcohol or substances that could impair driving ability

6.    I agree to utilize seat belt/shoulder harness when driving a Company owned, leased, or rented vehicle **and require all passengers to do the same.**

7.    **The Company will not be responsible for any loss or damage to my personal property.**

8.    I will not leave a vehicle unattended with the engine running (winter or summer) or fail to remove the ignition key.

9.    I will ensure that my vehicle is not overloaded or overcrowded so as to make it unsafe. Also, I will place all tools, equipment, and other materials that could cause injury during a sudden stop, in the trunk or in a secured condition.

10.   I will promptly participate in company-provided defensive driver safety training classes as scheduled.

11.   In the event of an accident, traffic violation, fine or damage involving a Company truck, its accessories, or the Technician Portable Terminal, I shall immediately submit a complete report to my supervisor.

12.   A Company vehicle is not to be used for towing or pushing any other vehicle.

13.   I will be responsible to see that necessary preventative maintenance is performed on the company truck in accordance with the maintenance schedule as defined in the GE Capital Driver's Maintenance Management Program Schedule.

14.   I will be responsible to see that the appearance (interior and exterior) of my assigned Company truck is maintained in accordance with local Company instructions.

15.   I will be responsible to properly safeguard and protect all Company property (inventory, tools, Technician Portable Terminal, etc.) contained in the truck. All valuable items, including the Technician Portable Terminal, are to be stored out of sight in the cargo area. This includes locking the doors at all times when I am away from the truck.

16.   I will be responsible for bringing the Technician Portable Terminal into my home at the end of the work day in order to safeguard it from cold and warm temperatures or any other weather damage.

17.   Company truck operating expenses will be paid for or reimbursed in a manner outlined by local Company instructions. If a gasoline credit card is issued to me, I understand that it is to be used only for Company truck expenses and, if the card is lost or stolen, I will immediately report such loss to my supervisor. In the event my employment with the Company is terminated, I will surrender the credit card immediately.

18.   I agree to pursue reasonable effort in order to purchase gasoline at the most attractive price. Further all gasoline purchases will be made on a "self-service" basis.

19.   No attempts to alter fuel distribution of fuel components to permit use of fuels that will violate Federal Government environmental law will be tolerated. Only fuels for which the vehicle is certified are to be purchased/used.

20.   I will be responsible to maintain a valid driver's license at all times when operating a Company-owned vehicle. If at any time my license is suspended or revoked, I shall immediately notify my supervisor.

21.   I agree to operate the two-way radio in accordance with all FCC rules and regulations and will be responsible to have the radio turned to the "ON" position at all times the vehicle is in use and attended.

22.   I agree never to operate the Technician Portable Terminal **or a cellular telephone (without a hands free device)** while the vehicle is in motion. I will use the Technician Portable Terminal only for Company business.

23.   I will report to my supervisor any vehicle condition I find to be unsafe which may be detrimental to my safety or that of others.

24.   I realize that failure to follow any and all of the above policies and procedures may result in disciplinary action, up to and including discharge.

III. MANAGER'S REPONSIBILITY

1.    The General Manager for Environmental Health and Safety will assist in the development of driver safety programs for routine drivers and assure consistency of programs across the business.

2.    Function managers will assign responsibility within their function for development and implementation of a conforming driver safety program.

3.    Each manager will take appropriate actions, including disciplinary measures, to drive compliance with this Policy by his or her reports and to fulfill any additional responsibilities outlined in a driver safety program applicable to his or her organization or operation.

REVIEWED: _____          SIGNED: _____
         (Manager)

                                            DATE: _____

# EXHIBIT C TO DECLARATION OF KRISTIN MATHERS



GE Appliances
Home & Business Solutions

**Safe Driving Policy and Agreement Covering Custody and Maintenance of Company Trucks / Fleet Vehicles and Technician Portable Terminal**

I.    POLICY NEED AND SCOPE

Improving safe driving practices by GE Appliances employees while driving on company business can reduce work related injuries, including fatalities, consistent with Company Policy.  This policy sets forth programs and practices to be adopted and followed in GE Appliances to promote safer driving practices by GE Appliances employees.

II.    REQUIRED SAFE DRIVING PRACTICES

I understand that:

i.    Company trucks must be operated safely and in accordance with applicable local, state, and federal traffic laws.    Also, the Technician Portable Terminal my not be used by individuals  other than General Electric Company employees.

ii.    Company trucks and Technician Portable Terminals are to be used only for the purpose of Company business.
-    Personal use is  authorized during commute time to the first service call and from the last service call to your residence or location where you customarily park the truck.
-    .
-    Unauthorized software may not be installed on Technician Portable Terminal.

iii.     I will be responsible personally for all damage to the vehicle issued to me or to the Technician Portable Terminal incurred while operating the vehicle for personal use. Further, I understand that there may be local, state, or federal tax consequences related to my personal use of the company vehicle and I agree to be responsible for any tax liabilities associated with my personal use.

iv.     FINES OR ATTORNEY'S FEES IN LEVIED AGAINST ME IN ANY CRIMINAL ACTION AND FOR ANY TRAFFIC VIOLATIONS RESULTING FROM MY IMPROPER, NEGLIGENT, OR INTENTIONAL OPERATION OF THE COMPANY VEHICLE AT ANY TIME WILL BE MY RESPONSIBILITY.  In addition, parking violations will be my responsibility, unless incurred as a result of following specific instructions of my supervisor.

v.    I will not operate the company vehicle while impaired.

Revised 11/1/2013



GE Appliances
Home & Business Solutions

vi.    I agree to utilize the seat belt/shoulder harness when driving a Company owned, leased, or rented vehicle **and require all passengers to do the same.**

vii.    The Company will not be responsible for any loss or damage to my personal property contained in a Company vehicle.

viii.    I will ensure that my vehicle is not overloaded or overcrowded so as to make it unsafe.  Also, I will place all tools, equipment, and other materials that could cause injury during a sudden stop in the side or rear cargo areas or in a secured condition.

ix.    I will promptly participate in company-provided defensive driver safety training classes as scheduled.

x.    In the event of an accident, traffic violation, fine or damage involving a Company truck, its accessories, or the Technician Portable Terminal, I shall immediately submit a complete report to my supervisor.

xi.    I will not alter, deface or otherwise modify the "How is My Driving" text and phone number located on the rear of the van.

xii.    My van is equipped with a GPS system.  I will not alter, cover or render inoperable that system.

xiii.    I will report service van mileage accurately when filling the service van with gas and will not enter inaccurate mileage figures when prompted at the gas pump after swiping the company gas card.

xiv.    I will be responsible to see that necessary preventative maintenance is performed on the company truck in accordance with the maintenance schedule as defined in the GE Capital Driver's Maintenance Management Program Schedule.

xv.    I will be responsible to see that the appearance (interior and exterior) of my assigned Company truck is maintained in accordance with local Company instructions.

xvi.    I will store Company property out of sight in the cargo area of the vehicle and lock the doors when I am away from the truck.

Revised 11/1/2013



GE Appliances
Home & Business Solutions

xvii.    Company truck operating expenses will be paid for or reimbursed in a manner outlined by local Company instructions. If a gasoline credit card is issued to me, I understand that it is to be used only for Company truck expenses and, if the card is lost or stolen, I will immediately report such loss to my supervisor. In the event my employment with the Company is terminated, I will surrender the credit card immediately.

xviii.    I agree to pursue reasonable effort in order to purchase gasoline at the most attractive price. Further all gasoline purchases will be made on a "self-service" basis, when workable.

xix.    I will be responsible to maintain a valid driver's license at all times when operating a Company-owned vehicle. If at any time my license is suspended or revoked, I shall immediately notify my supervisor.

xx.    I agree never to operate the Technician Portable Terminal while the vehicle is in motion **and I agree to operate a cellular telephone** only using hands-free capability. .

xxi.    I will report to my supervisor any vehicle condition I find to be unsafe which may be detrimental to my safety or that of others.

xxii.    I will not damage the interior of the Company vehicle through the use of tobacco products.

xxiii.    I understand that I am not required to take the Company vehicle to my residence and may park the vehicle in another location, provided that I inform and secure approval from my supervisor.

xxiv.    I realize that failure to follow any and all of the above policies and procedures may result in disciplinary action, up to and including discharge.

## III. MANAGER'S REPONSIBILITY

1.    The Manager for Environmental Health and Safety will assist in the development of driver safety programs for routine drivers and assure consistency of programs across the business.

2.    Function managers will assign responsibility within their function for development and implementation of a conforming driver safety program.

Revised 11/1/2013



GE Appliances
Home & Business Solutions

Each manager will take appropriate actions, including disciplinary measures, to drive compliance with this Policy by his or her reports and to fulfill any additional responsibilities outlined in a driver safety program applicable to his or her organization or operation.

REVIEWED: _____    SIGNED: _____

          (Manager)

                                         DATE: _____

Revised 11/1/2013

# EXHIBIT D TO DECLARATION OF KRISTIN MATHERS

**IMPORTANT** ⓘ                    ✖

By clicking the submit button, I am certifying that the
information I submitted is true and accurate, and
reflects all the hours I have worked during the period
for which I have entered my time. I understand that
entering false or inaccurate information may result in
discipline, up to and including termination of my
employment.

Submit          Cancel

# FS Technician Time Card



imagination at work

GE0000247

# Brief overview

- Technician can report own time to payroll systems

- Eliminates daily email to CSS

- Technician has line of site to entire week of pay from one system



imagination at work



Presenter and Event

2

GE0000248

# Entry Points

Technician can enter payroll via:

- <u>www.gefactoryservice.com</u>

- TPTP Ribbon Bar Link

- TPTP Pop-Up during STAR closeure


imagination at work

Presenter and Event

3

GE0000249

# www.gefactoryservice.com



Presenter and Event

4

GE0000250

# TPTP Ribbon Bar



GE0000251

# TPTP Pop-Up STAR Closure



Presenter and Event

6



imagination at work

GE0000252

# Timecard



Welcome Christopher E Weiler

The Region-Zone-Tech Number is 'T24 - 01 - 103'

**TECHRCJAI TIME CARD DETAILS**

SAVE TIME CARD

Select Region-Zone-tech     T24 - 01 - 103

Enter Time for     01/10/2012

Start Time     0730

End Time     1600

Lunch     00:30

Enter your reason here (required) . . .

Save

Cancel

COMPARE ENTERED DETAILS

Select Date To Compare     01/10/2012

VIEW ENTERED DETAILS

From Date     01/10/2012

Compare

imagination at work

Presenter and Event

# Data Entry

Choose Tech #

Enter Date

Enter Start Time

Enter End Time

Enter Lunch Length





imagination at work

GE0000254

# Data Entry

If lunch is not taken or length differs from schedule – enter reason here



Presenter and Event

9

imagination at work

GE0000255

# Save – Legal Notice

## After entering data – click "SAVE"

## Once clicked – following legal notice will pop:



By clicking the submit button, I am certifying that the information I submitted is true and accurate, and reflects at the hours I have worked during the period for which I have entered my time. I understand that entering false or inaccurate information may result in discipline, up to and including termination of my employment.

Submit     Cancel

## User must submit on this screen to get paid.



imagination at work

GE0000256

# Compare Results

## Choose date and click compare

## Tech can view entered time vs. approved time. Any changes and notes will be viewable.






imagination at work

GE0000257

# Week View

On main screen enter begin and end date for "VIEW ENTERED DETAILS" – Tech then can see entire week.

Search Results for the fiscal week

| DATE | START TIME | END TIME | OVER TIME | VACATION CODE | VACATION TIME | BENEFIT CODE | BENEFIT TIME | TRUCK TIME | OFFICE TIME | TRAINING TIME | WORK TIME | LUNCH DURATION | DATE SENT TO PAYROLL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/04/2012 | 08:44 | 16:00 | 00:00 | | | | | | | | 06:56 | 00:20 | Not Sent to Payroll |
| 01/05/2012 | 07:15 | 17:30 | 01:30 | | | | | | | | 09:00 | 00:45 | Not Sent to Payroll |

Legend

**Vacation Code**

F - Floating Holiday;
H - Regular Holiday;
V - Vacation

**Benefit Code**

C - Call Out
J - Jury;
D - Death

I - Illness   U & S - Union
M - Military;
P - Personal

BACK TO TIME CARD



imagination at work

12

Presenter and Event

GE0000258

# Downtime Entry

Use this note field to enter all Training, Meeting, Truck, or other downtime.



Presenter and Event

13

imagination at work

# Alerts

System will alert the following via email:

- Missing hours – via email to CSM, CSS, and Tech

- CSS/CSM Changed Hours – via email to tech

- Over 10 hours worked – via email to CSM

- Modified lunch – via email to CSM

- Future Time Entry – pop on screen

- Vacation Hours Present – pop on screen

imagination at work

Presenter and Event

14

GE0000260

# EXHIBIT E TO DECLARATION OF KRISTIN MATHERS

Revised 01/2010

# GENERAL ELECTRIC
# GEA CONSUMER SERVICE
# RULES OF CONDUCT AND
# CORRECTIVE ACTION PROCEDURE

What GE and YOU May Expect

The Company expects you to give your full skill, care and effort in your work.  Simply stated, this means a good day's work for a good day's pay.  In return, the Company provides a job package which includes salary, benefits, working conditions, and employee rights policies that are among the best in American industry.

By far the vast majority of GE Employees realize the value of their jobs and conduct their behavior in a mature and responsible fashion.  However, to avoid possible misunderstandings, employees should fully understand common sense rules of conduct for our business and the disciplinary procedure utilized to ensure these rules are adhered to.

**Corrective Action Procedure**

The Company tries to keep rules and regulations to a minimum.  However, when groups of people work together, there must be some guidelines to provide direction and protect the rights and interests of the company and its employees.  Therefore, the following guidelines have been established to ensure the necessary work behavior.  They are designed to permit work to proceed efficiently while maintaining the freedom and dignity of each employee.

Depending on circumstances, at the first indication that an employee is having difficulty complying with a rule of conduct, the employee's manager may discuss the situation with him or her to ensure a clear understanding of what is expected and to help the employee correct the problem.

Should the employee fail to correct the situation, the manager may then decide to take formal corrective action. Formal corrective actions generally fit into one of three categories depending on the seriousness of the offense. These are: 1) Warning Notice cases; 2) Disciplinary Suspension (or Discharge) cases; and 3) Discharge cases.

The primary purpose of a Warning notice is to impress upon the employee the need for corrective action on his or her part. The accumulation of two Warning Notices for the same **or different** offenses will normally result in a disciplinary suspension without pay.   Accumulation of three Warning Notices for the same **or different** offenses will result in discharge.  The cumulative effect of Warning Notices, for discharge or suspension purposes, will be negated after a period of **12** months has lapsed without any further infractions by the employee.

The offenses that follow are not intended to be all inclusive and the company reserves the right to suspend or discharge employees for any single act of misconduct if severe enough in the judgment of management.  However, the following do indicate the types of behavior which cannot be condoned in a modern workplace.

In determining the appropriate discipline, each case will be evaluated on its own merits and discipline for the same type of offense may vary depending on the circumstances of each case.

**Work Rules**

The following are examples of **first category** offenses for which a Warning Notice may be issued.

1)  Repeated tardiness, or excessive absences.

2)  Failure to notify management of absence or tardiness.

3) Carelessness or negligent workmanship.

4) Loafing, or other abuse of Company time.

5) Failure to comply with operating instructions or procedures, including the Safe Driving Policy and Agreement Covering Custody and Maintenance of Company Trucks/Fleet vehicles and Technician Portable Terminals.

6) Refusal to work reasonable overtime in accord with local policies & procedures.

7) Disregard of safety rules, including Personal Protective Equipment (PPE), Job Safety Analysis (JSA), horseplay or other disruptive or unsafe behavior

8) Failure to submit invoices, remittances and other required Company paperwork on a timely basis in accord with established procedures.

9) Unauthorized absence from work.  (An employee who needs time off to attend to personal business must obtain permission in advance.)

10) Display by word, deed, or attitude, rudeness or improper action toward a customer or consumer.

11) Causing an accident with minor vehicular damage and no injuries.

12) Making contact with the customer/consumer but outside the committed time span.

13) Failure to bring the laptop computer into each customer/consumer property

The **second category** of offenses are of a more serious nature than Warning Notice cases and a violation may result (in addition to a Warning Notice) in a disciplinary suspension (or discharge, depending on the seriousness of the violation) for the first offense.  A second incident by an employee with an already existing Warning Notice may result in the employee's discharge.  Examples of such conduct are:

1) Carelessness or negligent damage to company, consumer, or customer property.

2) Use of abusive language to any customer, consumer, employee or manager.

3) Sleeping during working hours.

4) Being insubordinate.  This includes deliberately refusing to do a job assignment, disobeying instructions or deliberately failing to perform a job assignment properly.

5) Gambling during working hours or on company premises, including Company vehicles.

6) Making or publishing false, vicious, or malicious statements concerning other employees, managers. Consumers, customers, the Company, or its products.

7) Early quitting, including leaving the job during working hours without management approval.

8) Participation in illegal concerted work interference including such things as strikes, walkouts, slowdowns, sit-downs, or refusal to perform work.

9) Causing an accident that results in major vehicular damage and /or minor injury.

10) Operating the Technician Portable Terminal while the Company vehicle is in motion.

11) Reckless driving or similar aggravated driving offense in a Company vehicle.

12) Calling the customer/consumer but not going to the customer/consumer appointment date.

Discharge cases make up a **third category** of offenses. These are extremely serious violations of company rules. Commission of an offense in this category is grounds for immediate dismissal. Offenses such as the following, subject to careful consideration of all the facts of the situation, fall into this category:

1) Fighting, scuffling, assaulting or threatening another employee, a customer, consumer, or manager.

2) Possession, use, or being under the influence of intoxicants during working hours, on company or consumer/customer property, in company vehicles, or while engaged in company business.

3) Immoral conduct, indecent behavior, or a violation of law.

4) Falsification of employment, medical, time worked, or work performed records; falsification of insurance claims, invoices, credits or other Company records; generating unnecessary additional service calls or invoices by reporting repairs or other services not made or not requested by the consumer; recording others' time record; or having others record your time record.

5) Possession or use of firearms, ammunition, explosives or other weapons during working hours or on Company or customer/consumer property, in Company vehicles, or while engaged in Company business. This rule includes use of a knife, tool, or other objects as a weapon on Company, customer/consumer property, in Company vehicles or while engaged in Company business.

6) Unauthorized use of Company vehicles, having unauthorized passengers in a Company vehicle, or permitting others to use Company vehicles without authorization.

7) "Moonlighting" or engaging in any activity which conflicts with the business interests of GE. This includes the selling, repairing, servicing, and/or installing of any brand of major appliance products (GE or otherwise) for personal benefit, or solicitation of any such work from consumers or customers, including property management firms. Questionable activities should be reviewed, in advance, with your manager to determine whether there is a conflict of interest.

8) Theft, misappropriation or unauthorized use, possession or removal of Company property or the property of others.

9) Deliberate damage to company, consumer or customer property.

10) Negligent loss of Company tools and equipment; or negligent use of Company tools and equipment, or Company goods which could result in loss to the Company.

11) Threatening, intimidating, coercing, or interfering with other employees, managers, customers, or consumers, including harassment on the basis of race, sex, age, national origin, religion, disability, or any other category protected by law.

12) Instigating, starting, leading, or encouraging illegal interferences with work.

13) Reckless driving or similar aggravated driving offense in a Company vehicle resulting in serious injury.

14) Willful or flagrant disregard of safety or pollution control compliance rules or regulations (including recovering CFC's, H.C.F.C.'s, Refrigerants, and other required environmental substances).

15) Not calling the customer/consumer or going to the customer/consumer appointment date.

16) Failure to utilize lockout and tagout procedures when servicing an appliance.

17) Causing an accident that results in major vehicular damage and /or major injury.

The service of a probationary employee may be terminated during his/her probation period without recourse to the provisions of the Corrective Action Procedure.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
                Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
                Defendant.

Civil Action No. 1:14-cv-00490-JEI-KMW

## DECLARATION OF JOHN WILLS

My name is John Wills. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been the East Region Manager for GE – Appliances & Lighting ("GE") for between five and six years. Prior to assuming this title, I was Operations Leader for Southeast Region from 2003 to 2008 and Customer Service Manager (CSM) for GE – Appliances & Lighting from approximately 1996 to 2002 As acting CSM, I was responsible for overseeing and managing the performance of over 42 service technicians in four different zones in Florida.

2.      As East Region Manager, I supervise ten CSMs in over 48 different zones. At the beginning of this year there were a total of 480 service technicians reporting to the CSMs in the zones that I supervise. Each zone is like its own little business. They all run independently of each other despite having the same general guidelines from GE. Some of the practices and procedures in each zone also depend on whether the service technicians are a member of a union, and if so, what union and what the particular collective bargaining agreement ("CBA") for that union establishes for the service technicians. I can't micromanage my CSMs, I give them the discretion to manage each of their zones as they see fit.

3.      I supervised the service technicians in Eastern Florida from January 2014 through May 2014 while GE was without a CSM in these zones. During this time period I reiterated the

relevant GE policies and procedures regarding taking a lunch and time keeping guidelines. I also met with Union stewards and Union leadership regarding timekeeping requirements to make sure they understand GE's applicable policies and procedures.

4.     Two service technicians in Eastern Florida were terminated in 2014 for improper timekeeping - Gus Fernandez (West Palm) and Mario Garcia (Miami). Mr. Fernandez and Mr. Garcia were recording more time than what they were actually working.

5.     When I was the CSM, this past January while I was covering the service technicians in Eastern Florida, I held Fast Start meetings with all of my service technicians. During the meeting, we discussed company policies and guidelines; work rules; time keeping; and the van custody agreement.

6.     All of the service technicians are repeatedly told by me and their CSMs that they need to perform all of their work-related activities after they arrive at their first call and before they leave their last call. There is no reason to be doing any other work at home in the morning or in the evening. They should be doing all of their computer-related work during the course of the day between their first and last call.

7.     Service technicians must take at least a full 30 minute lunch break. Whether a service technician gets longer than a 30 minute paid lunch depends on applicable state laws, and if the service technician is a member of a union, what the CBA provides. Both I and the CSMs repeatedly communicate the requirement that service technicians take a lunch and that they cannot work through lunch.

8.     I conducted GPS audits as acting CSM in Eastern Florida. As East Region Manager I make sure CSMs who conduct GPS audits to make sure there are no discrepancies

between the service call records and the service technicians recorded time ask appropriate questions and evaluate correctly.

9.     The procedure for service technicians notifying CSMs about overtime work and/or obtaining permission from CSMs to work overtime varies by region and areas. It is up to my CSMs how they go about this; some require their service technicians to ask permission before working overtime, while others just ask for oral or written notice after a service technician has worked overtime.

10.     It is up to each CSM to approve additional time outside of a service technician's first and last calls for putting away inventory and how to allocate that time.  Whereas some service technicians have to ask their CSMs for permission to log time before their first trip or after their last trip to deal with inventory, other service technicians do not because the additional time is provided for in their CBAs.

11.     A service technician's Revenue Per Day ("RPD") should not be affected by his or her time spent on inventory or van servicing.  I am not aware of service technicians inaccurately recording their time to meet RPD goals.

12.     The GPS system is not designed or intended to record hours worked, and is not utilized by the payroll department.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this __3___ day of July 2014.

John Wills

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

DONALD MADDY, KURT FREDRICK, et al,
                    Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
                    Defendant.

Civil Action No. 1:14-cv-00490-JEI-
KMW

## DECLARATION OF ROSA WALSH

My name is Rosa Walsh.  Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been a Customer Service Manager (CSM) for GE – Appliances & Lighting for twelve years.  The first four years I was based in New Jersey.  The last eight years I have been based in New York.  I am currently responsible for overseeing and managing the performance of service technicians in five different zones in New York and Connecticut.

2.      In all five of my zones, the service technicians are represented by unions.  Four of my zones are subject to one union contract, and one zone (Albany) is under a different union contract.

3.      My technicians have company-issued vans that they drive to and from work each day.  Most of my technicians park their vans at their homes at night, but some of them are unable to do that, so they have made arrangements for secure parking near their homes.  My technicians also have company-issued laptop computers and company-issued smart phones.

4.      I conduct Fast Start training at the beginning of each year, where we go over company work rules and the van custody agreement.  During Fast Start training, I emphasize that service technicians need to report their working time accurately, and record all of their working time.  I also instruct them to perform all of their work-related activities after they arrive at their

first call and before they leave their last call. My service technicians can access e-mails on their laptop computers, so they can easily keep up with e-mails during their work day.

5.    My technicians are instructed to begin their day by putting the computer into their van, and logging in to get their list of calls for the day. They can either remain parked and wait for the computer to boot up and display their list of calls for the day, or begin travelling toward their designated work zone while the computer boots up. While en route to their first call, they make contact with the customer by cell phone or by the computer's IVR system, which automatically calls the customer and confirms if the customer is home.

6.    In compliance with the union contracts, my service technicians get paid for morning and evening drive time (to their first call and home from their last call) to the extent the drive time in the morning or evening exceeds 30 minutes. Many of my service technicians have to drive more than 30 minutes each way every day, so they get paid for some of their drive time every day. Otherwise, my service technicians do not get paid to drive to their first call or home after their last call.

7.    I tell service technicians that, if they need to perform any work before their first call or after their last call, they should contact me to get my approval. They can do the work if I approve, but I also tell them they need to include the time in their time report. For example, in 2012, someone broke into one of our vans. I was away, so two service technicians went to the van to secure it. When they told me about that, I reminded them to record their working time.

8.    I tell my service technicians that they can use their laptop computers for personal reasons when they are not working. I know that many of my service technicians use their computers to access the internet for banking and other personal use. Just because a technician is using the computer does not mean he/she is doing work for GEA.

2

9.      Currently, all of my service technicians participate in the Direct-to-Tech (DTT) program, where they receive parts in plastic totes a couple of times a week.  Some of them receive the parts at their homes.  Others have their parts shipped to a UPS store.  If the UPS store is near their home, we typically block out some time twice a week for the technician to be able to stop by the UPS store in the morning or evening, before or after the days' calls.  But if the UPS store is near their assigned work zone, they pick up the parts at some point during their work day. No matter how they receive their parts, I tell my service technicians that they are only allowed to put the parts away in their vans during the work day, before the first and last call.  If they receive the parts at home or at a UPS store in the evening, they are required to put the totes in their vans for safe keeping overnight, and put the parts away the following day.

10.     Before January 2012, my service technicians sent an e-mail to a dispatcher at the end of each day to report their time worked.  The dispatcher entered the time into the payroll system, and I reviewed it and approved it.

11.     Since January 2012, my service technicians have directly entered their time using electronic time sheets.  They are basically recording their time the same way, only they now do it for themselves rather than have the dispatcher do it.

12.     According to a letter of understanding with the union in four of my zones, service technicians are free to decide whether or not to take a lunch break.  Most of my service technicians in those zones do not take a lunch break, or skip lunch several times a week.  Many of them bring a sandwich to work and eat quickly during one of their allotted rest breaks.  If they do not take a full lunch break, they are paid for all of their time.  But if/when they report a lunch break of at least 30 minutes, they are not paid for that time.  I do not get any daily reports telling me if technicians did or did not take a lunch break.

3

13.     I have access to GPS data on the vans.  If I see something unusual in time records, I can access the GPS data to try to figure out what happened.  Also, on a quarterly basis, two technicians are randomly selected, and I compare their time records, sales call records, and GPS data for a day or two to see if they are consistent.  If they are not consistent, I can expand the review and talk to the technician about it.  Based on these random audits and my day-today work with the technicians, I don't have any reason to believe my technicians are falsifying their time entries.  I believe that all of my service technicians have been fully and properly paid for all time worked.

14.     I do not have access to anything that shows me when technicians have logged onto their computers.  I might be able to get that information from the IT department, but I have never tried that.

15.     I repeatedly emphasize to service technicians that they must accurately record their working time.  I have had at least one service technician who claimed more time than what he had worked, and he was discharged for that.  But I don't know of any service technician who has recorded less time than he/she worked.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2__ day of July, 2014.

_____
Rosa Walsh

4

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
                Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
                Defendant.

Civil Action No. 1:14-cv-00490-JEI-KMW

## DECLARATION OF ROBERT BRINZER

My name is Robert Brinzer. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been the Director of Service with GE Healthcare for approximately ten months.  Prior to holding this title, I was a Customer Service Manager (CSM) for GE – Appliances & Lighting for just over seven years.  As a CSM I was responsible for overseeing and managing the performance of 50-85 service technicians in a number of different zones covering Northern California and the Reno and Tahoe regions of Nevada.

2.      *About half of my service techs were represented by unions.  There were at least* three different Collective Bargaining Agreements (CBAs) for my unionized service technicians.

3.      My technicians had company-issued vans that they drove to and from work each day.  All of my technicians parked their vans at their homes at night.  My technicians also had company-issued laptop computers and company-issued smart phones.

4.      I conducted Fast Start training in January of each year, where I reviewed the company's various policies with the service technicians.  I told the service technicians that they had to report all of their working time accurately.  I also instructed them to perform all of their work-related activities after they arrive at their first call and before they leave their last call.

5.      My technicians were instructed to begin their day by putting the computer into their van, and logging in to get their list of calls for the day.  While en route to their first call, they made contact with the customer by cell phone or by the computer's IVR system.

6.      Most of my service technicians took 30 minutes for lunch but if they wanted they could take up to 45 minutes with my permission.  I had one service technician who took 45 minutes for lunch every day and we scheduled his service calls accordingly.  If I saw that a service technician did not take a lunch when I reviewed their time card, I discussed the issue with the service technician and reiterated that all service technicians are required to take a lunch break and not to work during this lunch break.

7.      Some of service technicians were paid for morning and evening drive time (to their first call and home from their last call) to the extent that drive time exceeded 30 minutes.  For example, the service technicians in the Bay Area (approximately. 30 service technicians) had a letter of understanding in their CBA that they would be paid for any part of their drive in excess of the first 30 minutes.

8.      If they were not in a union with a drive time agreement in their CBA, my service technicians did not get paid to drive to their first call or home after their last call.

9.      I told service technicians that, if they need to perform any work before their first call or after their last call, or on their off day(s), they should contact me to get my approval.  If the service technicians needed to work overtime to complete service visits, what I referred to as "casual overtime," they didn't need to get my approval.

10.     All of my techs participated in the Direct-to-Tech (DTT) program, where they received inventory parts in plastic totes a couple of times a week.  Some of the service technicians received the parts at a local UPS store while others had them delivered to their house.

Regardless of whether they received the parts, I told my service technicians that they are only allowed to put the parts away in their vans during the work day, before the first and last call. If they receive an unusually large inventory order, such as one that exceeds the normal tote size, I would grant them additional time outside of the time between their first and last service call to sort and put away their inventory.

11.     Before January 2012, my service technicians sent an e-mail to a dispatcher at the end of each day to report their time worked. The dispatcher entered the time into the payroll system, and I reviewed it and approved it.

12.     Since January 2012, my service technicians directly entered their time using electronic time sheets, which I reviewed and approved weekly.

13.     The GPS system is used to locate service technicians and/or their vehicles, such as when a service technician needs assistance on a call or if a service technician's vehicle is stolen. The GPS system is not used to keep track of hours worked by the service technicians or utilized by the payroll department.

14.     I would typically take a "surface level review" of service technicians' time entries on a daily basis to make sure everything looked OK. For a period of time in 2012 I did a weekly audit of randomly selected service technician's time entries, which involved comparing their daily invoices and GPS records to make sure everything matched up. I rarely found discrepancies. The few times that I found what appeared to be small discrepancies, they were explained by the service technician making an unplanned or unaccounted for stop to get a snack or gas.

15.     I eventually only did audits if a service technician had an unusually high amount of overtime or poor performance issues that indicated a potential abuse of time. Otherwise, I

3

stopped doing the audits stopped because I felt the service technicians were accurately reporting their time.

16.     Based on these random audits and my day-today work with the service technicians, I do not believe that any of my service technicians falsified their time entries. I believe that all of my service technicians have been fully and properly paid for all time worked.

17.     The average amount of time service technicians have to spend on inventory or vehicle maintenance should not negatively affect their revenue per day ("RPD"). In fact, the biggest impact to RPD goals is a service technician's incomplete percentage – the percentage of jobs not completed during the first service call. I am not aware of any of my service technicians inaccurately recording their time or working off the clock to increase their RPD.

18.     As a CSM I did not receive information documenting when technicians have logged onto their computers.

19.     I repeatedly emphasized to service technicians that they must accurately record their working time. I had at least two service technicians who claimed more time than what they had actually worked, and they were terminated. I do not know of any service technician who has recorded less time than he/she worked.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this _2ⁿᵈ_ day of July, 2014.

_____
Robert Brinzer

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, et al, <br> Plaintiffs, <br> v. <br><br> GENERAL ELECTRIC COMPANY, <br> a New York corporation <br> Defendant. | Civil Action No. 1:14-cv-00490-JEI-KMW |

## DECLARATION OF BOBBY NELSON

My name is Bobby Nelson.  Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been a Customer Service Manager (CSM) for GE – Appliances & Lighting since 2002.  I am currently responsible for overseeing and managing the performance of 46 service technicians in eight different zones in North Carolina, South Carolina, and Georgia.

2.      Each of my zones is non-union, and each of my service technicians is subject to GE's "Solutions" alternative dispute resolution program.

3.      Prior to January 2012, my service technicians sent an e-mail to a dispatcher each day to report their time worked.  The dispatcher entered the time into the payroll system.  Since January 2012, my service technicians have directly entered their time using electronic time sheets.

4.      All of my service technicians drive a company van, and take their vans home each night.  They also use company-provided laptop computers and cell phones.

5.      At the beginning of each year, I have a Fast Start meeting with all of my service technicians.  During the meeting, we discuss the prior year's numbers; goals for the coming year; company policies and guidelines; work rules; time keeping; and the van custody agreement.

6.    During Fast Start training and throughout the year, I emphasize that it is the technicians' responsibility to accurately report all of their working time so that we can pay them for all their hours worked.  I tell the service technicians that they absolutely cannot work off the clock.

7.    I tell my service technicians that they need to perform all of their work-related activities after they arrive at their first call and before they leave their last call.  The only thing they should be doing outside of that time is getting their list of calls in the morning.  They do that by turning on their computers and logging in, which takes just a few seconds.  The computer then takes several minutes to boot up, but they can do other things, like have breakfast or get ready for work, while that is happening.  When they are ready to leave, the computer has their list of calls ready and they can head for their first stop.   There is no reason to be doing any other work at home in the morning or in the evening.  They should be doing all of their computer-related work during the course of the day before their first and last call.

8.    Before finishing their last call of the day, my technicians can look ahead to see what calls are scheduled for the next day.  Sometimes the list of calls changes over night, but they can get a good feel for where they will be going the next day.

9.    All of my service technicians participate in the Direct-to-Tech (DTT) program, where they get parts shipped to their homes in plastic totes a couple of times a week.  I tell my service technicians to put the totes in their vans when they arrive home in the evening, and to put the parts away in their vans after their first call the next day.  About once a year, the technicians do a complete inventory, and we set aside time for them to do that work, and they record their time for doing it.  From time to time technicians have very busy weeks and are not able to handle the parts deliveries during the normal work day.  In those circumstances, I ask the technicians to

2

talk to me about, and I usually approve time in the evening or weekend to deal with the parts. I always insist that they record all of the time it takes to manage their parts.

10.     I tell my service technicians that they must take a full 30 minute lunch break unless something unusual prevents them from getting a break. I expect technicians to call or e-mail me if they are not going to be able to take a lunch break. I get a report every day that tells me when technicians did not record a lunch break. If someone shows up on the report who did not notify me of the missed break, I contact them to find out what happened. If they miss a lunch break, they get paid for that time, but I remind them that they need to take a lunch break whenever possible. I don't have any reason to believe that any of my technicians have entered a lunch break in their time sheet when they did not actually get a lunch break.

11.     My service technicians have a revenue per day (RPD) goal of $740. Almost all of my technicians are meeting or exceeding that goal. I understand that one of the claims in this lawsuit is that technicians worked off the clock to achieve their RPD goal. My technicians typically handle up to 10 calls per day, and many of those are "out-of-warranty" calls that generate over $200 in revenue each. There is no reason that a hard-working, efficient technician would have to under-report his or her time to meet the RPD goal.

12.     If a service technician is having trouble meeting any of our efficiency standards, like RPD, I talk with the technician to see if I can identify any particular problems or solutions. I also do ride alongs with technicians from time to time so that I can see how they are handling their workday. If informal coaching doesn't solve the problem, we can move to a more formal Performance Improvement Plan (PIP).

13.     For the last 10 to 12 months, I have been auditing two randomly selected technicians each month. Each time I do an audit, I pull the time records, call records, and GPS

data for a two or three day period. I compare each of the records to see if they all tell the same story. If I have a question about any of it, I can talk to the technician, or expand the audit to another day or two. For example, on a couple of occasions I have found that, at some point in the middle of the day, the technician did not close out a call before leaving the customer's house. When I asked the technician about it, there was usually a good explanation, like the technician had to go pick up a part to finish the job. I have not found anything in my audits to suggest that technicians are working off the clock. I have, however, found two instances where technicians were claiming more time than they actually worked. Both of those technicians were discharged for falsification of documents.

    14.    When I do one of these audits, it takes about one hour per technician per day. Since I have 46 technicians, it would take me about 46 hours each day to audit each of them. Obviously, I could not do that even if I wanted to.

    I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

    Executed on this 2ⁿᵈ day of July 2014.

Bobby Nelson

4

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
                    Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
                    Defendant.

Civil Action No. 1:14-cv-00490-JEI-
KMW

## DECLARATION OF CHRIS MILLER

My name is Chris Miller. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I am currently a Program Director for Scrap Reduction with GE – Appliances & Lighting.  Prior to holding this title, I was a Customer Service Manager (CSM) for GE – Appliances & Lighting from 2007 through the end of 2013.  As a CSM I was responsible for managing the day to day activities of service technicians in four different zones on Florida's East Coast: Miami, Ft. Lauderdale, West Palm Beach and Daytona Beach.  I managed approximately 57 service technicians when I started in the position and approximately 33 service technicians when I left the CSM position.

2.      All of my service technicians were represented by unions.

3.      My technicians had company-issued vans that they drove to and from work each day.  Nearly all the technicians kept their vans at home unless for some reason they could not, such as home owner association restrictions that prohibit commercial vehicles.  In that case, the vans were kept at another location near their home, such as a repair shop like Tires Plus.  There were very few service technicians who didn't keep their vans at home.

4.      My technicians also had company-issued laptop computers and company-issued smart phones.

5.     I conducted Fast Start training in January of each year, where I reviewed the company's various policies with the service technicians.  I told the service technicians that they had to report all of their working time accurately.  I also instructed them to perform all of their work-related activities after they arrive at their first call and before they leave their last call.  I also held mid-year refresher meetings to review all of these policies.

6.     My technicians are instructed to begin their day by putting the computer into their van, and logging in to get their list of calls for the day.  While en route to their first call, they can make contact with the customer by having the computer system auto-call the customer to let him or her know that the service technician is on their way.

7.     Most of my service technicians took 30 minutes for lunch.  If I saw that a service technician did not take a lunch when I reviewed their time card, I discussed the issue with the service technician and reiterated that all service technicians are required to take a lunch break and not to work during this lunch break.

8.     My technicians were paid for any driving time to their first job, or driving time home from their last job, in excess of thirty minutes.  This was pursuant to an informal agreement with the Union that was in place before I started as CSM.

9.     I felt that overtime was part of the job for service technicians and I didn't concern myself too much with managing overtime.  If service technicians needed to change their time card or need to work past 5:00 on a regular basis, I would coach them that overtime needed to be the exception, not the rule, but I always approved the overtime.

10.     All of my techs participated in the Direct-to-Tech (DTT) program, where they received inventory parts in plastic totes a couple of times a week.  Some of the service technicians received the parts at a local UPS store while others had them delivered to their house.

Regardless of whether they received the parts, I told my service technicians that they are only allowed to put the parts away in their vans during the work day, before the first and last call.  If they receive an unusually large inventory order, such as one that exceeds the normal tote size, I will grant them additional time outside of the time between their first and last service call to sort and put away their inventory.

11.   Before January 2012, my service technicians sent an e-mail to a dispatcher at the end of each day to report their time worked.  The dispatcher entered the time into the payroll system, and I or the dispatcher reviewed it and approved it.

12.   Since January 2012, my service technicians directly entered their own time using electronic time sheets, which I reviewed and approved weekly.

13.   The GPS system is not used to keep track of hours worked by the service technicians or utilized by the payroll department.

14.   I do not believe that any of my service technicians falsified their time entries.  I believe that all of my service technicians have been fully and properly paid for all time worked.

15.   As a CSM I did not receive information documenting when technicians have logged onto their computers.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of July, 2014.

Chris Miller

3

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
               Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
               Defendant.

Civil Action No. 1:14-cv-00490-JEI-KMW

## DECLARATION OF BENNY PRUIETT

My name is Benny Pruiett. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.     I have been a Service Technician for GE Appliances in Houston, Texas since January 2000. Since 2011, I have been a team lead. Prior to May 2013, my manager was Dennis Rogers, Consumer Service Manager (CSM). Now my CSM is Mark Urbin.

2.     Before January 2012, I reported my time worked by sending an e-mail each day to a dispatcher. I would report my start time and my end time. If I had any down time, like to get my truck fixed or to spend extra time receiving parts into inventory, I would report the amount of time that took. I got paid for the down time, but by recording it as down time it did not drag down my production numbers.

3.     Since January 2012, I have directly entered my time using an electronic time card on my computer. I basically report the same information, but now I just put it in the time card instead of an e-mail.

4.     Dennis Rogers and Mark Urbin have sent us e-mails from time to time to remind us to make sure we record all of our time so that we get paid properly. They also told us during meetings that we must report all of the time that we work.

5.    I work overtime on a regular basis in the evenings and on some Saturdays. We now have a schedule where we work every third Saturday, but before that we worked every other Saturday. When I work on Saturday, I usually work about 8 to 10 hours of overtime that week.

6.    In the morning, I usually turn on my computer shortly after I get up. It usually takes two to three minutes for the computer to get through the log in screens where I enter my user name and password. After I log in, I usually go eat breakfast or do something else while the computer finishes booting up and loading all the information. When I am about ready to leave for work, I go back to the computer and check my list of calls for the day, and click quickly through them to see if there are any parts issues that I need to deal with. Then I take the computer to my van. Before I leave the driveway, I call my first customer to make sure they are home.

7.    I take a 30 minute lunch break each day. Mark Urbin encourages us to try to take our break in about the middle of the day so that we have a chance to rest a bit before the afternoon work.

8.    When I receive a parts shipment, I usually just put the tote of parts into my van and deal with it the following day between service calls. If I need to handle the parts outside the normal work day, I do that and then report the time it took me to do it on my time sheet.

9.    I don't normally turn my computer on in the evenings. Occasionally as team lead, I get calls from other technicians, and spend a little bit of time on the computer to help them. When that happens, I record the time on my time sheet.

10.   Since I became team lead in 2011, I don't often meet my Revenue Per Day (RPD) goal because I do a lot of work that does not produce revenue. But before I became team lead, I

usually met my RPD goal. I definitely found it to be a reachable goal for me as a service technician. I never found the need to falsify my time sheet to try to reach my RPD goal.

11.     I always make sure that I record all of the time I work so that I can get paid for all of my work.

12.     Before I received my new computer it could sometimes take 15 minutes to log onto Computer. New computers were issued around 2012.

13.     Also in the past I used a program called Crystal Ball to intercept calls that needed Parts ordered to make my day more efficient. I and others used this program sometime after hours at our own leisure while watching TV and etc. I didn't consider it as work because sometimes there was nothing to order. After talking with our CSM we were told to stop accessing after hours because that was considered work, discontinued use after discussion in tech meeting or tech conference call.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this _30_ day of June, 2014.

Benny Pruiett

3

## VOLUNTARY INTERVIEW CONSENT FORM

1. My name is Dan Boatright. I am an attorney representing General Electric Company (the "Company") in a lawsuit that is being brought as a potential class action against the Company on behalf of current and/or former service technicians. The lawsuit claims that they did not record, and they were not paid for, time they spent on certain work activities at the beginning and end of their work day, and for working through lunch. At some point, you may be eligible to join this lawsuit and, if the lawsuit is successful, collect money and/or obtain other remedies. I am not your lawyer, and I do not represent you. I want you to know all of this so that you can make an informed decision about whether you want to talk to me.

2. Before we talk, please tell me if you have a lawyer regarding any matters involving the Company. You are free to hire one. If you are represented by, or consulting with, an attorney in any matter involving the Company, please tell me. If that is the case, the rules of professional ethics for attorneys do not allow me to interview you today. If you sign this document below, you will be confirming that you are not represented by an attorney regarding any issue involving the Company.

3. If you are not represented by an attorney, I want to talk to you about work-related issues, including your work and time-keeping practices, but you may refuse to talk with me and there will be no consequences if that is your decision. We are interviewing you and other employees about your work experiences so that we can effectively prepare the Company's defense to the claims in the lawsuit.

4. It is important that you understand that as the Company's lawyer, I represent only the Company. I do not represent you. I am not your lawyer, and I do not represent your interests. Because I represent the Company and not you, I cannot give you any legal advice about any questions or concerns that you may have regarding any claims you may believe you have or your relationship with the Company.

5. Also, because I represent the Company and not you, and because the lawsuit is a potential class action and you are a potential class member, information you share with me may be shared with the Company and used in the lawsuit in a way that could adversely affect any potential claim that you might have against the Company.

6. You do not have to talk to me. If you do talk to me and answer my questions, your decision to do so must be entirely voluntary. The Company assures you that it will not subject you to any adverse employment actions, discipline, termination, retaliation, harassment, threats, coercion or duress because of your decision whether or not to participate in this interview. Likewise, you will not receive any benefit from the Company of any kind based on your decision whether or not to participate in this interview. You can also choose to answer just some of the questions that I ask, or just part of them. It is entirely up to you. You can also end our discussion at any time you want; you simply need to tell me that you want to end the interview and it will end. If you sign this document below, you will be confirming that you have voluntarily decided to talk to me.

7. After the interview, I may ask you to sign a statement that describes some or all of what you have told me about issues including your work and time-keeping practices. It is very important that anything you sign be entirely accurate, so please make sure that you correct any information that is not correct in the statement. By signing this statement, you should understand that you may be affecting your rights in the lawsuit, including your right to participate in the class action or receive any money as a result of it.

8. If you decide to answer my questions, I want to emphasize that I only want to know the truth from you. There are no right or wrong answers. We only want to hear your honest, candid responses. Please do not give me an answer that you think I or the Company would like to hear. Just tell me the exact truth whether or not you think that the Company or I would like it.

## WITNESS ACKNOWLEDGMENT

I have read this Voluntary Interview Consent Form and I understand it. I confirm that I am not currently speaking to, or represented by, a lawyer regarding work-related issues at the Company or any claim that I believe I might have against the Company. I agree to be interviewed regarding the topics described above, and I fully understand that my answers may be used by the Company in a way that may adversely affect any claim I might pursue against the Company. I understand that the person interviewing me is not my lawyer. I agree to answer all questions truthfully and acknowledge that I am participating in this interview entirely of my own free choice and without any threats, intimidation, coercion or promises of benefits to me.

Dated: _7-1-2014_         _Benny Pruitt_
                                              Signature
                          _BENNY PRUITT_
                                              Print Name
                          _TEAM LEAD_
                                              Job Title

2

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

DONALD MADDY, KURT FREDRICK, et al,
                        Plaintiffs,
v.

GENERAL ELECTRIC COMPANY,                    Civil Action No. 1:14-cv-00490-JEI-
a New York corporation                                               KMW
                        Defendant.

**DECLARATION OF DAN MCDERMOTT**

My name is Dan McDermott. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.     I have been a Service Technician for GE Appliances for about 13 years. For the last ten years, I have worked in the Tampa, Florida zone. My manager is Dan Bramblett, Consumer Service Manager (CSM).

2.     Before January 2012, I reported my time worked by sending an e-mail each day to a dispatcher. Since January 2012, I have directly entered my time using an electronic time card on my laptop computer. I basically report the same information, but now I just put it in the time card instead of an e-mail.

3.     We have a work rule that says we have to record all of our time worked. We can get fired if we don't record all of our working time. Dan Bramblett has told us at meetings and on conference calls that we are not to do any work off-the-clock.

4.     There is plenty of work to do in my zone. I work overtime on a fairly regular basis in the evenings and on Saturday. I report all of my time worked, and I usually work about 8 to 10 hours of overtime each week. No one has ever said anything to me about working or reporting too much overtime.

5.     GE has a "Hall of Fame" for service technicians who are top scorers in certain performance numbers.  The extra overtime work I do helps my performance numbers so that I can stay in the Hall of Fame.

6.     In the morning, I usually turn my computer on about 7:00.  I then do other things, like feed the dog or get a cup of coffee.  After the computer has had a chance to boot up, I look at my list of calls for the day, figure out which call I will go to first, and then usually leave for my first call about 7:30.  If it takes longer than 30 minutes to get to my first call, I get paid for that additional time.

7.     A couple of times a week I receive a parts shipment in a plastic tote.  When I get home from work and find a tote, I put it in my van for safe keeping, and put the parts away the following day.  Dan Bramblett has told us that, if we can't get the parts put away during the day, we can do it after we get home as long as we record our time for doing that work.

8.     In the past, I sometimes spent a few minutes on my computer in the evening doing something called "parts intercepts," which is a way of looking at what parts might be needed later in the week.  It would usually be no more than about five minutes when I did that.  More recently, we have been told we can't do that in the evening.  In fact, the computer now locks us out in the evening and we can't do it.  So now I try to do that when I have a few minutes during the day, like when I am waiting on a customer to get home..

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this __3__ day of July, 2014.

                                          _Dan McDermott_
                                          Dan McDermott

2

## VOLUNTARY INTERVIEW CONSENT FORM

1. My name is Dan Boatright. I am an attorney representing General Electric Company (the "Company") in a lawsuit that is being brought as a potential class action against the Company on behalf of current and/or former service technicians. The lawsuit claims that they did not record, and they were not paid for, time they spent on certain work activities at the beginning and end of their work day, and for working through lunch. At some point, you may be eligible to join this lawsuit and, if the lawsuit is successful, collect money and/or obtain other remedies. I am not your lawyer, and I do not represent you. I want you to know all of this so that you can make an informed decision about whether you want to talk to me.

2. Before we talk, please tell me if you have a lawyer regarding any matters involving the Company. You are free to hire one. If you are represented by, or consulting with, an attorney in any matter involving the Company, please tell me. If that is the case, the rules of professional ethics for attorneys do not allow me to interview you today. If you sign this document below, you will be confirming that you are not represented by an attorney regarding any issue involving the Company.

3. If you are not represented by an attorney, I want to talk to you about work-related issues, including your work and time-keeping practices, but you may refuse to talk with me and there will be no consequences if that is your decision. We are interviewing you and other employees about your work experiences so that we can effectively prepare the Company's defense to the claims in the lawsuit.

4. It is important that you understand that as the Company's lawyer, I represent only the Company. I do not represent you. I am not your lawyer, and I do not represent your interests. Because I represent the Company and not you, I cannot give you any legal advice about any questions or concerns that you may have regarding any claims you may believe you have or your relationship with the Company.

5. Also, because I represent the Company and not you, and because the lawsuit is a potential class action and you are a potential class member, information you share with me may be shared with the Company and used in the lawsuit in a way that could adversely affect any potential claim that you might have against the Company.

6. You do not have to talk to me. If you do talk to me and answer my questions, your decision to do so must be entirely voluntary. The Company assures you that it will not subject you to any adverse employment actions, discipline, termination, retaliation, harassment, threats, coercion or duress because of your decision whether or not to participate in this interview. Likewise, you will not receive any benefit from the Company of any kind based on your decision whether or not to participate in this interview. You can also choose to answer just some of the questions that I ask, or just part of them. It is entirely up to you. You can also end our discussion at any time you want; you simply need to tell me that you want to end the interview and it will end. If you sign this document below, you will be confirming that you have voluntarily decided to talk to me.

1

7. After the interview, I may ask you to sign a statement that describes some or all of what you have told me about issues including your work and time-keeping practices. It is very important that anything you sign be entirely accurate, so please make sure that you correct any information that is not correct in the statement. By signing this statement, you should understand that you may be affecting your rights in the lawsuit, including your right to participate in the class action or receive any money as a result of it.

8. If you decide to answer my questions, I want to emphasize that I only want to know the truth from you. There are no right or wrong answers. We only want to hear your honest, candid responses. Please do not give me an answer that you think I or the Company would like to hear. Just tell me the exact truth whether or not you think that the Company or I would like it.

## WITNESS ACKNOWLEDGMENT

I have read this Voluntary Interview Consent Form and I understand it. I confirm that I am not currently speaking to, or represented by, a lawyer regarding work-related issues at the Company or any claim that I believe I might have against the Company. I agree to be interviewed regarding the topics described above, and I fully understand that my answers may be used by the Company in a way that may adversely affect any claim I might pursue against the Company. I understand that the person interviewing me is not my lawyer. I agree to answer all questions truthfully and acknowledge that I am participating in this interview entirely of my own free choice and without any threats, intimidation, coercion or promises of benefits to me.

Dated: _____7-3-14_____          _____Dan McDermott_____
                                              Signature
                                 _____Dan McDermott_____
                                              Print Name
                                 _____Service Tech._____
                                              Job Title

2

# EXHIBIT I

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, et al,<br>          Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY,<br>a New York corporation<br>                    Defendant. | Civil Action No. 1:14-cv-00490-JEI-<br>KMW |

## DECLARATION OF GARY WOLFE

My name is Gary Wolfe.  Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been a Service Technician for GE Appliances since 1999.  I work in the Tampa, Florida zone.  My manager is Dan Bramblett, Consumer Service Manager (CSM).

2.      Before January 2012, I reported my time worked by sending an e-mail to a dispatcher.  Since January 2012, I have directly entered my time using an electronic time card on my laptop computer.  I basically send the same information, but now I just put it in the time card instead of an e-mail.

3.      Dan Bramblett has told us at meetings many times that we must report all of our working time, and that we are not to do any work off-the-clock.

4.      I work overtime on a fairly regular basis, either in the evening or on Saturday.  No one has ever criticized me for working or reporting too much overtime.

5.      I do not usually turn my computer on at home.  In the morning, I put the computer into my van and leave my house.  I usually stop for gas every other day. On days I don't stop for gas, I usually stop at a grocery store. While I am at the gas station or grocery store, I turn on the computer.  It takes 10-15 minutes to boot up and get my list of calls for the day. I then head for my first call.

6.      After my last call, I usually turn off my computer, and I usually don't turn it on again until the next morning.  We were never asked to do any work in the evening, but other service technicians have told me that they used to turn on their computers and spend a little time looking ahead into the week using a program called Crystal Ball.  More recently we have been instructed that we absolutely cannot do any of that in the evening, and now the computer won't even allow us to access Crystal Ball after 6:00 pm.

7.      I get a blue tote of parts shipped to my house a couple of times a week.  There are usually only about 10 to 20 parts in the tote.  I have been instructed to just put the tote in my van in the evening, and unload the tote the next day between my first and last service calls.  It usually takes less than 10 minutes to unload the tote and put the parts in my van.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ day of June, 2014.


_____
Gary Wolfe

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
                Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
                Defendant.

Civil Action No. 1:14-cv-00490-JEI-KMW

## DECLARATION OF MIKE ANDRE

My name is Mike Andre.  Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.    I have been a Customer Service Manager (CSM) for GE – Appliances & Lighting since 2006.  I am currently responsible for overseeing and managing the performance of OVER 50 service technicians in six different zones in Delaware, Pennsylvania, New Jersey, and Maryland.

2.    Two of my zones are non-union (Allentown and Harrisburg), and each of my service technicians in those zones is subject to GE's "Solutions" alternative dispute resolution program.  In my other four zones, service technicians are represented by unions.  IBEW Local 1158 represents the technicians in Delaware, Allentown, and Philadelphia.  Steamfitters Local 449 represents the technicians in Pittsburgh.

3.    Prior to January 2012, my service technicians sent an e-mail to a dispatcher each day to report their time worked.  The dispatcher entered the time into the payroll system.  Since January 2012, my service technicians have directly entered their time using electronic time sheets.

4.    All of my service technicians drive a company van, and take their vans home each night.  They also use company-provided laptop computers and cell phones.

5.      Every year in January, I have a Fast Start meeting with all of my service technicians.  During the meeting, we discuss company policies and guidelines; work rules; time keeping; and the van custody agreement.

6.      During Fast Start training and throughout the year, I emphasize that it is the technicians' responsibility to accurately report all of their working time so that we can pay them for all their hours worked.  I tell the service technicians that they cannot work off the clock.  *See* "Tech Time Card Reporting" power point slide from 2014 Fast Start training, attached hereto as Exhibit A, and various emails attached hereto as Exhibit B.

7.      I tell my service technicians that they need to perform all of their work-related activities after they arrive at their first call and before they leave their last call.  The service technicians get their service calls for the day by turning on their computers and logging in, which takes just a few seconds.  The computer then takes several minutes to boot up, but they can do other things, like have breakfast or get ready for work, while that is happening.  When they are ready to leave, the computer has their list of calls ready and they can head for their first stop.  There is no reason to be doing any other work at home in the morning or in the evening.  They should be doing all of their computer-related work during the course of the day before their first and last call.

8.      For a couple of months in 2014 I was provided a report that shows me when the service technicians log on to Crystal Ball after 6:00 pm or on the weekends.  In the few months I have been provided this report, there have only been two occasions when my service technicians were logging onto the system after normal working hours.  On both occasions, I spoke with the service technicians to make sure they reported the time they spent doing so and reiterated that

they should wait to log onto the system until they are preparing to leave for their first call on Monday morning.

9.      Before finishing their last call of the day, my technicians can look ahead to see what calls are scheduled for the next day. Sometimes the list of calls changes over night, but they can get a good feel for where they will be going the next day.

10.     All of my service technicians participate in the Direct-to-Tech (DTT) program, where they get parts shipped to their homes in plastic totes a couple of times a week. I tell my service technicians to put the totes in their vans when they arrive home in the evening, and to put the parts away in their vans after their first call the next day. About once a year, the technicians do a complete inventory, and we set aside time for them to do that work, and they record their time for doing it. From time to time technicians have very busy weeks and are not able to handle the parts deliveries during the normal work day. In those circumstances, I ask the technicians to talk to me about it, and I usually approve time in the evening or weekend to deal with the parts. I always insist that they record all of the time it takes to manage their parts.

11.     I tell my service technicians that they must take a full 30 minute lunch break unless something unusual prevents them from getting a break. I require the service technicians to let me know if they have to work through lunch. The service technicians are expected to call or e-mail me if they are not going to be able to take a lunch break. For example, if a service technician has an unusual amount of work or a service call took longer than normal, I will approve them to work through lunch and they are paid for that time.

12.     I check that the service technicians have taken lunch breaks when I review their time entries each week. If the service technician did not record a lunch break I ask them what

happened. I don't have any reason to believe that any of my technicians have entered a lunch break in their time sheet when they did not actually get a lunch break.

13.   Most of my technicians are meeting or exceeding their Revenue Per Day ("RPD") goal. I understand that one of the claims in this lawsuit is that technicians worked off the clock to achieve their RPD goal. There is no reason that a hard-working, efficient technician would have to under-report his or her time to meet the RPD goal.

14.   I review my technicians time entries each week prior to giving timecard approval. In addition, my dispatchers review when the service technicians last service call occurred and their last time entry. The dispatchers send weekly report showing any discrepancies and I research the discrepancies for my technicians on the computer system and/or through talks to technicians. Most times the discrepancy is explainable. For example, often times the discrepancy arises when a customer is not home, and the technician couldn't record the service call since he rescheduled it for another date.

15.   I also perform GPS audits twice per week. I randomly select a few technicians and compare their activity recorded with consumer relations with their service calls for that day, and if something doesn't match up I will discuss what happened with the technician. As part of our discussion, I make sure that the technician records all of his hours worked.

16.   Almost all of my technicians work overtime hours during the busy summer season. On average, most techs work at least 1 hour per day of overtime during the busy season, and many also work on Saturdays. I instruct them that they must record all of this overtime and they do so.

I have read this declaration and declare under penalty of perjury that the foregoing is true

and correct.

Executed on this 3rd day of July 2014.

Mike Andre

5

# EXHIBIT A TO DECLARATION OF MIKE ANDRE

# Tech Time Card Reporting

## REPORTING TIME

All time worked must be reported via your time card; if your time card is not working, call or email me and dispatch.

You must report all time that you work; Your first compensable event of the day will be a service call

Your start time is the time you begin your first call; Your end time is the time you leave your last call

Drive time is reported as any time in excess of 30 minutes you spend driving from your home to your first call or 45 minutes from your last call to your home.  I do not need to know the total time of travel, just anything in excess of 45 minutes.

You are not authorized to conduct company business after your end time unless approved, in writing, by me.

- If you find blue totes or parts delivered to your home, secure them inside your van – this is considered de minimis time

- Securing your GPS and phone and carrying your laptop into your home is also considered de minimis time

- All other work related activities occur between your first and last calls, to include, but not limited to, prepping blue totes for pick-up

- Technicians who receive their parts at a UPS store will visit the UPS store between their first and last call

## LUNCH

Working through lunch must be approved, you must take your lunch by the end of your 6th hour of work.  If you work longer than 6 hours, you must take a lunch.

Your lunch will be taken between your first and your last call.  Taking a lunch as your first event of the day or your last event of the day is not permitted.

If you do not take a lunch, be sure to zero out the time that auto-populates on your timecard.

**You are expected to comply with the above unless you receive permission from me, in writing, to do something different.

imagination at work

# EXHIBIT B TO DECLARATION OF MIKE ANDRE

**From:** Andre, Mike (GE, Appl & Light)
**Sent:** Monday, March 04, 2013 5:11 PM
**To:** @AppLight FS Techs Delaware; @AppLight FS Techs Philadelphia; @AppLight FS Techs South Jersey
**Subject:** start times
**Importance:** High

A friendly reminder before it turns not friendly - your start time should reflect your actual start time which is when you arrive on your first call of the day.  If you start at 7 then be at your first stop by 7.  If it takes you longer than 30 minutes to get there then leave at 6:30 and your start time is still 7.  If it takes 15 minutes to get there then leave at 6:45 and your start time is 7.  This shouldn't need explained but some reported times don't match actual real world.  If you have a problem starting on time then dispatch and I need to know.  If it becomes a frequent occurrence then we have a problem.

February's numbers were not good.  Here's where the zones finished:

|    | RPD   | Productivity | INC% |
|----|-------|--------------|------|
| 38 | $697  | 5.8          | 24.2 |
| 40 | $572  | 4.9          | 25.6 |
| 44 | $658  | 5.5          | 28.6 |

We need to continue tightening up so that you have a chance to have a good day every day.


Mike Andre

Consumer Service Manager
Factory Service – Allentown, Delaware, Harrisburg, Philadelphia, Pittsburgh, South Jersey
GE Home Business Solutions – Appliances

Email: mike.andre@ge.com
Office: 610-385-0602
Fax: 610-385-0603
Mobile: 610-842-6070

**From:** Andre, Mike (GE, Appl & Light)
**Sent:** Wednesday, August 28, 2013 9:19 AM
**To:** @AppLight FS Techs Allentown; @AppLight FS Techs Delaware; @AppLight FS Techs Harrisburg; @AppLight FS Techs Philadelphia; @AppLight FS Techs Pittsburgh; @AppLight FS Techs South Jersey
**Subject:** time reporting
**Importance:** High

Time reporting should always be accurate and correct.  If you don't know if it is correct, then ask the question, don't assume.  Nothing has changed – your time starts at the first call and stops when you complete the last call.  Very few techs have a long drive time to their first call.  I know who does.  Make your time correct every day and if you have an issue, note it on your time card.  GPS audits don't lie so keep your time right.


**Mike Andre**

Consumer Service Manager
Factory Service – Allentown, Delaware, Harrisburg, Philadelphia, Pittsburgh, South Jersey
GE Home Business Solutions – Appliances

Email: mike.andre@ge.com
Office: 610-385-0602
Fax: 610-385-0603
Mobile: 610-842-6070

**From:** Andre, Mike (GE, Appl & Light)
**Sent:** Monday, October 21, 2013 10:18 AM
**To:** @AppLight FS Techs Delaware; @AppLight FS Techs Philadelphia; @AppLight FS Techs Pittsburgh; @AppLight FS Techs South Jersey
**Subject:** time reporting
**Importance:** High

Team, we have talked about this numerous times but here it is again.

This is a reminder and clarification of time reporting procedures and how you should be conducting your work day. **Read this ENTIRE email** and if you have any questions, you can call me. Much of this has been covered in the past. You are expected to comply with the contents of this email.

REPORTING TIME
- All time worked must be reported via your time card; if your time card is not working, call or email me and dispatch.
- You must report all time that you work
- Your first compensable event of the day will be a service call
- Your start time is the time you begin your first call
- Your end time is the time you leave your last call
- Drive time is reported as any time in excess of 30 minutes you spend driving from your home to your first call or 45 minutes from your last call to your home. I do not need to know the total time of travel, just anything in excess of 45 minutes.

- You are not authorized to conduct company business after your end time unless approved, in writing, by me.
    - If you find blue totes or parts delivered to your home, you simply secure them inside your van – this is considered de minimis time
    - Securing your GPS and phone and carrying your laptop into your home is also considered de minimis time
    - All other work related activities occur between your first and last calls, to include, but not limited to, prepping blue totes for pick-up
    - Technicians who receive their parts at a UPS store will visit the UPS store between their first and last call

LUNCH
- Working through lunch must be approved, you must take your lunch by the end of your 6th hour of work. If you work longer than 6 hours, you must take a lunch.
- Your lunch will be taken between your first and your last call. Taking a lunch as your first event of the day or your last event of the day is not permitted.
- If you do not take a lunch, be sure to zero out the time that auto-populates on your timecard.

You are expected to comply with the above unless you receive permission from me, in writing, to do something different.

**Mike Andre**

Consumer Service Manager
Factory Service – Allentown, Delaware, Harrisburg, Philadelphia, Pittsburgh, South Jersey
GE Home Business Solutions – Appliances

Email: mike.andre@ge.com
Office: 610-385-0602
Fax: 610-385-0603
Mobile: 610-842-6070

# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, et al,<br>Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY,<br>a New York corporation<br>Defendant. | Civil Action No. 1:14-cv-00490-JEI-<br>KMW |

## DECLARATION OF WINDY JONES

My name is Windy Jones. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.     I have been a Customer Service Manager (CSM) for GE – Appliances & Lighting for 28 years. I am currently responsible for overseeing and managing the performance of service technicians in two different zones in Virginia.

2.     Both of my zones are non-union, and each of my service technicians is subject to GE's "Solutions" alternative dispute resolution program.

3.     Prior to January 2012, my service technicians sent an e-mail to a dispatcher each day to report their time worked. Since January 2012, my service technicians have directly entered their time using electronic time sheets.

4.     All of my service technicians drive a company van. Most of them take their vans home each night, but one service technician has arranged to park his van a short distance away from his home because he is unable to park the van at his home. In Fast Start training at the beginning of each year, we go over the van custody agreement and also review the company work rules.

5.      During Fast Start training, I stress that service technicians need to fully and accurately record their working time. I also instruct them to perform all of their work-related activities after they arrive at their first call and before they leave their last call.

6.      I tell service technicians that, if they need an exception to allow them to work before their first call or after their last call, they should contact me to get my approval. For example, if a service technician gets a big shipment of parts, the service technician can request permission to put the parts into his/her van inventory at the end of the day, rather than trying to get it done between calls. They can do the work if I approve, but I also tell them to make sure they record their time.

7.      All of my service technicians participate in the Direct-to-Tech (DTT) program, where they get parts shipped to their homes in plastic totes a couple of times a week. I tell my service technicians to put the totes in their vans when they arrive home in the evening, and to put the parts away in their vans after their first call the next day.

8.      In the morning, most of my technicians turn on their computers, and then do other things like have breakfast or get ready for work while the computer boots up. That way, when they are ready to leave for work, the computer is up and running and they have their list of calls for the day. I instruct them that they are not to do any other work at home, but instead should be doing any computer-related work during the day, between their first and last calls.

9.      I have access to GPS records, and can use the GPS to compare to time cards and call records if I have some reason to question what a technician has been doing on a particular day. But I rely on my service technicians to accurately report their time. It would not be possible to try to sort through GPS and call records every day for every technician to try to verify every time entry.

10.     I do not have access to records of when technicians log into their computers.  I might be able to get that from IT, but I don't know.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___3___ day of July, 2014.

Windy Jones

# EXHIBIT L

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD MADDY, KURT FREDRICK, et al,<br>Plaintiffs,<br>v.<br><br>GENERAL ELECTRIC COMPANY,<br>a New York corporation<br>                    Defendant. | Civil Action No. 1:14-cv-00490-JEI-KMW |

## DECLARATION OF MARK URBIN

My name is Mark Urbin.  Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1. I have been a Customer Service Manager (CSM) for GE – Appliances & Lighting for a little more than one year.  I am currently responsible for overseeing and managing the performance of service technicians in five different zones in Texas.

2. All of my zones are non-union.  The service technicians are subject to GE's "Solutions" alternative dispute resolution program.

3. My technicians have company-issued vans that they drive to and from work each day and park at their homes at night.  My technicians also have company-issued laptop computers and company-issued smart phones.

4. I conduct Fast Start training in January, where I review the company work rules and the van custody agreement with the service techs.  I also conduct quarterly in person meetings, as well as additional teleconference meetings. During Fast Start training, quarterly meetings and teleconferences, I tell the service technicians that they have to report their working time accurately, and record all of their working time, including overtime.  I also instruct them to perform all of their work-related activities after they arrive at their first call and before they leave

their last call, and that they must take a thirty minute lunch break as well as two, 15 minute breaks. If their total work day is less than five hours, they do not have to take any breaks.

5.      My technicians are instructed to begin their day by putting the computer into their van, and logging in to get their list of calls for the day.  While en route to their first call, they make contact with the customer by cell phone or by the computer's IVR system, which automatically calls the customer and confirms if the customer is home.

6.      Service technicians must call me to get approval if they need to perform any work before their first call or after their last call.  If the service technicians need to work overtime to complete service visits they don't need to get my approval.  The service technicians also have to include a note in their time entries indicating when they have worked overtime due to unusual circumstances such as a service call running long or if they worked before leaving for their first service call or after returning from their last service call.

7.      Currently, all of my service technicians participate in the Direct-to-Tech (DTT) program, where they receive parts in plastic totes at their homes a couple of times a week. I tell my service technicians that they are only allowed to put the parts away in their vans during the work day, after the first call and before the last call.  If they receive the parts at home in the evening, they are required to put the totes in their vans for safe keeping overnight, and put the parts away the following day.

8.      My service technicians directly enter their time using electronic time cards.  I review these cards weekly and review any notes indicating overtime or other time worked before the first service call or after their last service call.

9.      I tell all of my service techs that they must take a lunch break.  If they do not take a full lunch break due to extenuating circumstances, such as a service call taking longer than

anticipated, they are paid for all of their time. When the service technicians report a lunch break of at least 30 minutes, they are not paid for that time.

10.    I conduct GPS audits to review the service technicians' start time, first call, end time and last call. A few service technicians are randomly selected on monthly basis. I pick one day and review the time entries for the selected technicians.. If the time entries and service call records do not entirely match up for that day, I follow up with the service technician to ask about any discrepancies, and audit additional days. I have never had any issues come up in an audit that were not resolved through a subsequent conversation with the service technician.

11.    Based on these random audits and my day-today work with the technicians, I don't have any reason to believe my technicians are falsifying their time entries. I believe that all of my service technicians have been fully and properly paid for all time worked.

12.    I am not aware of any of my service technicians inaccurately recording their time or working off the clock to increase their Revenue Per Day ("RPD").

13.    I repeatedly emphasize to service technicians that they must accurately record their working time. I do not know of any service technician who has recorded less time than he/she worked.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7<u>TH</u> day of July, 2014.

Mark Urbin

# EXHIBIT M

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK, et al,
Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
a New York corporation
Defendant.

Civil Action No. 1:14-cv-00490-JEI-KMW

### DECLARATION OF TIM COOPER

My name is Tim Cooper. Pursuant to 28 U.S.C. § 1746, and based on my personal knowledge, I declare as follows:

1.      I have been the Regional Manager for Local Delivery for GE – Appliances & Lighting ("GE") since March 2014.  I was a Customer Service Manager (CSM) for GE from April 2010 until I was promoted to my current title. As a CSM, I was responsible for overseeing and managing the performance of between 40 and 50 service technicians in four different zones in Nevada, Mexico, and Oklahoma.

2.      All of the service technicians in my zones were non-union except for Tulsa (Teamsters) and Oklahoma City (International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers ("IUE")).

3.      When I was a CSM all of my service technicians drove a company van, and took their vans home each night.  They also used company-provided laptop computers and cell phones.

4.      When I was a CSM, I held Fast Start meetings with all of my service technicians. During the meetings, we discussed company policies and guidelines; work rules; time keeping; and the van custody agreement.

5.      I repeatedly told all of my service technicians that they need to perform all of their work-related activities after they arrive at their first call and before they leave their last call. There is no reason to be doing any other work at home in the morning or in the evening. They should be doing all of their computer-related work during the course of the day between their first and last call.

6.      Service technicians must take at least a full 30 minute lunch break. Some of my technicians had as long as one hour for lunch. Whether a service technician had longer than a 30 minute paid lunch depended on applicable state laws, and if the service technician was a member of a union, what the CBA provided.   All of my service technicians were told numerous times that they have to take a lunch and that they cannot work through lunch. I explained to them that it was a safety issue, and that even if they did not want to eat they had to take a break.

7.      When I was a CSM I conducted GPS audits CSM to make sure there were no discrepancies between the service call records and the service technicians recorded time. The first thing I did every morning was go through the drivers' statistics from the day before to make sure everything looked generally OK.

8.      Prior to January 2012, my service technicians sent an e-mail to a dispatcher each day to report their time worked. The dispatcher entered the time into the payroll system. Since January 2012, my service technicians directly entered their time using electronic time sheets.

9.      During Fast Start training and throughout the year, I emphasized that it is the technicians' responsibility to accurately report all of their working time so that we can pay them for all their hours worked. I told the service technicians that they cannot work off the clock.

10.      I did not require my service technicians to get approval from me before they worked overtime hours. I figured it was the nature of the work that some service jobs could take

longer than planned (just as some could also take a shorter amount of time).  I told the service technicians to make sure to enter all of their overtime on their timecards and to my knowledge they always did so.

I have read this declaration and declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of July, 2014.

Tim Cooper