UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DONALD MADDY, KURT FREDRICK,
FREDRICK R. SHELLHAMMER, III,
FRANK MICHIENZI, MARIO
LAUREANO, ANOTHONY CHELPATY,
WILLIAM MADDEN, STEVEN LE
BLANC, JEFFREY SCOTT WILKERSON,
JEFFREY NACARETTE, PHILLIP ERIC
BENSON, BRADLEY PALMER, THOMAS
KISS, Individually, and on
behalf of all others similarly
situated,

        Plaintiffs,

   v.

GENERAL ELECTRIC COMPANY, a New
York corporation,

        Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 14-0490
(JEI/KMW)

**OPINION**

**APPEARANCES:**

SWARTZ SWIDLER, LLC
By:  Justin L. Swidler, Esq.
     Richard S. Swartz, Esq.
1878 Marlton Pike East, Ste. 10
Cherry Hill, New Jersey, 08003

ROBERT D. SOLOFF, P.A.
By:  Robert D. Soloff, Esq.
7805 S.W. 6th Court
Plantation, Florida 33324

ALLEN EICHENBAUM
Allen Eichenbaum, Esq.
10059 Northwest 1st Court
Plantation, Florida 33324
    Counsel for Plaintiffs

1

```
LITTLER MENDELSON, P.C.
By:  Nina Markey, Esq.
     Rachel Fendell Satinsky, Esq.
     Aaron Reed, Esq. (pro hac vice)
     Daniel B. Boatright, Esq. (pro hac vice)
1601 Cherry Street, Suite 1400
Philadelphia, Pennsylvania 19102
     Counsel for Defendant General Electric Company
```

**IRENAS**, Senior District Judge:

Plaintiffs bring this putative collective action pursuant to § 216(b) of the Fair Labor Standards Act ("FLSA") to recover allegedly unpaid overtime compensation from Defendant General Electric Company ("Defendant" or "GE").

Currently pending before the Court is Plaintiffs' motion for conditional collective action certification.  For the reasons explained herein, Plaintiffs' motion is **GRANTED.**

## I.   FACTS

The Court recites those facts relevant to deciding Plaintiff's pending motion for conditional certification.

**Scope of Employment**

Plaintiffs in this case are currently, or have worked as, service technicians for GE's Appliances Division, in a business segment called GE Consumer Home Service, since January 2011. (Plaintiff's Statement of Facts ("P.S.F.") ¶ 1; Defendant's Opposition ("Def. Opp.") at 2)  GE's service technicians make

service calls to customers' homes to repair GE appliances in 96 different "zones." (Def. Opp. at 2)  These zones are further assigned to one of two regions – East or West. (Id.)  Zones are supervised by 20 Consumer Service Managers ("CSMs"), who typically manage three to eight zones. (Id.)  Defendant presently employs 900 service technicians. (Id.)  Over the last three years, Defendant has employed approximately 1,200 service technicians across the 96 zones. (Id.)

In 42 of the zones, service technicians are represented by various unions though collective bargaining agreements ("CBAs"). (Id.)  In the 54 non-union zones, service technicians participate in GE's "Solutions" alternative dispute resolution program. (Id.)  As part of the Solutions program, non-union service technicians agree to resolve all disputes with GE through arbitration and to bring any claims against GE in an individual capacity only. (Id. at 2-3).

Service technicians receive an hourly wage, plus overtime for hours worked in excess of 40 per week, or as otherwise required by local law or applicable CBAs. (Declaration of Kristin Mathers ("Mathers Decl."), Ex. A to Def. Opp., at ¶ 10)  The procedures for notifying CSMs about and obtaining permission for overtime work vary across the different CSMs. (Def. Opp. at 6)  Some CSMs require service technicians to ask for permission

3

beforehand, while others ask only to be notified after service technicians work overtime.  (Id.)

Service technicians self-report time worked on their company-issued laptops through an electronic time card system. (Id. ¶ 9)  They record when they arrive at each service call and when each service call is completed.  Defendant states that CSMs regularly direct service technicians to accurately report all working time.  (Def. Opp. at 10)

During the relevant time period, GE's service technicians have operated under what Plaintiffs refer to as the Service Mobility System.  Plaintiffs submitted an alleged "case study" of the system, which describes it as "management system for efficiently dispatching, scheduling, and communicating with operatives to boost efficiency and flexibility in delivering field services."  (Service Mobility System Case Study, Ex. A to P.'s Memorandum of Law ("P.M.L."))  Service technicians connect to the system through their laptops, from which technicians can make and receive service calls, find information about the day's calls and necessary parts, and record work time.[1]  (P.M.L. at 1) GE also provides service technicians with company vans, which can be tracked by GPS.  (Def. Opp. at 12)  Service technicians

---

[1] Defendant does not dispute the features of the system Plaintiffs describe, but states that GE "does not typically refer to these various features collectively as a 'Service Mobility System.'"  (Def. Opp. at 12)

generally park these vans at their homes, though some use secure
parking spots near their homes.  (Def. Opp. at 4)

GE monitors the performance of service technicians through
a Revenue Per Day ("RPD") metric.  (Mather Decl. ¶ 13)  RPD
measures the revenue a service technician produces relative to
the number of hours the technician works each day.  (Id.)  GE
sets RPD goals in each zone, which service technicians are
expected to meet.  (Id.)  RPD goals vary from zone to zone, but
range from $700 to $815.  (Id.)  According to Defendant, RPDs
are designed to be challenging, but attainable.  (Def. Opp. at
8)  If a service technician does not meet his RPD goal, a CSM
may place him on a formal Personal Improvement Plan ("PIP").[2]
(Id. at 8-9)  Plaintiffs state that the failure to improve after
being placed on a PIP results in the termination of a service
technician's employment.  (P.S.F. ¶ 9)

John Wills, who manages the East Region of service
technicians, states in his Declaration that service technicians
are told that they need to perform all of their work-related
activities after they arrive at their first call and before they
leave their last call.  (Declaration of John Wills ("Wills
Decl."), Ex. B to Def. Opp., at ¶ 6)  On this basis, service
technicians' paid time generally begins when they arrive at

---

[2] According to Defendant, services technicians are placed on PIPs after less
formal measures do not succeed in improving performance.  (Id.)

their first service calls and ends when they complete their last calls.  Some CBAs permit service technicians to report driving time to the extent it exceeds a designated period of time (usually 30 minutes).  (Def. Opp. at 5)  Otherwise, non-union service technicians do not receive compensation for the time spent driving to their first call or home after their last call.  (Id.)

**Pre-Shift Computer Work**

Despite the rule that service technicians' paid work does not begin until they arrive at their first customer call, there are certain tasks they must complete beforehand.  Defendant submitted declarations from CSMs stating that service technicians are instructed to begin each day by putting their computers in their vans, and logging in to get their list of calls for the day.  (Declaration of Rosa Walsh ("Walsh Decl."), Ex. C to Def. Opp., at ¶ 5; Declaration of Robert Brinzer ("Brinzer Decl."), Ex. D to Def. Opp., at ¶ 5; Declaration of Chris Miller ("Miller Decl."), Ex. F to Def. Opp., at ¶ 6; Declaration of Mark Urbin ("Urbin Decl."), Ex. L to Def. Opp., at ¶ 5)  CSM Rosa Walsh states that service technicians can then either remain parked or begin driving while their computers boot up.  (Walsh Decl. ¶ 5)  Ms. Walsh states that, after their computers boot up, service technicians make contact with their first customer by cell phone or through the computer while en

route to that customer's home.  (Id.)  Other CSMs state in declarations that service technicians can boot up computers to get their list of calls at home while eating breakfast or getting ready for work.  (Declaration of Bobby Nelson ("Nelson Decl."), Ex. E to Def. Opp., at ¶ 7; Declaration of Mike Andre ("Andre Decl."), Ex. J to Def. Opp., at ¶ 7; Declaration of Windy Jones ("Jones Decl."), Ex. K to Def. Opp., at ¶ 8)

Declarations from service technicians submitted by both Plaintiffs and Defendants indicate that service technicians generally log onto their computers and check their list of calls for the day before they leave their homes.[3]  (Declaration of Benny Pruiett ("Pruiett Decl."), Ex. G to Def. Opp., at ¶ 6; Declaration of Dan McDermott ("McDermott Decl."), Ex. H to Def. Opp., at ¶ 6; Declarations of Lance Bergman ("Bergman Decl.") ¶¶ 16-17, Anthony Chelpaty ("Chelpaty Decl.") ¶¶ 16-17, Kurt Frederick (Frederick Decl.") ¶¶ 16-17, David Leppo ("Leppo Decl.") ¶¶ 16-17, Donald Maddy ("Maddy Decl.") ¶¶ 16-17, and Jacob Walters ("Walters Decl.") ¶¶ 16-17, all attached as Ex. B to P.M.L.)[4]  These service technicians also state that, upon

_____

[3] One service technician states that he performs such duties in the parking lot of a nearby grocery or gas station after he leaves his home but prior to arriving at his first call.  (Declaration for Gary Wolf ("Wolf Decl."), Ex. I to Def. Opp., at ¶ 5)
[4] Plaintiffs also submitted additional declarations in their reply papers from service technicians Juan Ramos, Thomas Kiss, Bradley Palmer, William Madden, Jeffrey Navarette, and Steve Le Blanc, each of whom also claims their general practice to be logging into their computers and checking calls from home

logging into their computers, they also check to see if there
are any issues with the parts they will need during the day's
calls.  (Id.)

In the declarations Plaintiffs submitted, service
technicians state that it takes approximately 10-15 minutes to
boot up and log into their computers, and another 15-30 minutes
to check their call lists, read emails and call their first
customers prior to heading out for the day.  (Id.)  Gary Wolfe,
a service technician who submitted a declaration on behalf of
Defendants, also admits that it takes 10-15 minutes to boot up
and get his list of calls.  (Wolfe Decl. ¶ 5)  Declarations from
CSMs acknowledge that service technicians' laptops need "several
minutes" to boot up.  (Nelson Decl. ¶ 7; Andre Decl. ¶ 7)

Plaintiffs claim that CSMs knew service technicians spent
time organizing their days before leaving for their first calls.
Plaintiffs Lance Bergman and David Leppo, both of whom work as
service technicians in Florida, state in their declarations
that, in December 2013, their new regional manager John Wills
told them they could no longer check email and parts needs
before leaving home for their first call.  (Bergman Decl. ¶ 20;
Leppo Decl. ¶ 20)  According to former California service
technician Bradley Palmer, his CSM Vince Guida told him that in

prior to leaving for their first call.  (Plaintiff's Reply Memorandum
("P.R.M."), at Exs. A-1 through A-6)

annual meetings, attended by all CSMs, the CSMs "knew and discussed" the time service technicians spent on their computers organizing their days.  (Palmer Decl. ¶ 19)

**Working Through Lunch**

Plaintiffs also state that they often work through their lunch period to meet the RPD goals, even though Defendant automatically deducts a 30-minute lunch from employee pay. (P.S.F. ¶ 26)  Plaintiffs are required to report whether or not they actually take lunch, but Plaintiffs claim that they do not note on their time logs that they regularly work through lunch because, if the lunch time were factored into their total hours worked, their RPDs would be lower.  (Id. ¶¶ 26-27)  Plaintiffs state that when service technicians report that they miss a lunch break, CSMs tell them that they must take lunch.  (Id. ¶ 28)  Plaintiffs vary in the number of days each week that they claim to work through lunch without notifying CSMs.  (*See, e.g.*, Bergman Decl. ¶ 27 (4-5 days); Frederick Decl. ¶ 26 (3-4 days); Leppo Decl. ¶ 27 (2-4 days); Maddy Decl. ¶ 26 (1-2 days))

Defendant states that the only nationwide policy is that service technicians must report if they do not take their lunch so that they can be paid for the time spent working. (Def. Opp. at 7)  Otherwise, lunch practices vary across different zones. (Id.)  For example, in four of CSM Rosa Walsh's zones, service technicians are free to decide whether or not to take a lunch

9

break according to a letter of understanding between Defendant and the union representing these technicians.  (Walsh Decl. ¶ 12)

**Post-Shift Work**

On top of work performed before their first calls and during lunch time, Plaintiffs state that, after returning home from their last calls of the day, service technicians use their laptops to check calls for the following day, read and respond to emails, and review lists of parts needed.  (P.S.F. ¶ 31-32) The amount of time Plaintiffs spend on this work ranges from 30 minutes one day each week (LeBlanc Decl. ¶ 30), to 30-60 minutes every day of the week (Walters Decl. ¶ 30).  Plaintiffs state that they were not compensated for post-shift work.  (P.S.F. ¶ 32)

Part of service technicians' post-shift computer use was apparently spent using a program called "Crystal Ball," which let them perform certain parts management functions.[5]  (Def. Opp. at 11)  Benny Pruitt, a service technician who submitted a declaration on behalf of Defendant, states that he used Crystal Ball while watching television and that he did not consider it as work.  (Pruitt Decl. ¶ 13)  Dan McDermott, another service

_____

[5] Plaintiffs do not refer to this program by name, but CSMs and service technicians who submitted declarations on behalf of Defendants state that service technicians occasionally used Crystal Ball outside normal working hours for this purpose.  (Def. Opp. at 12)

technician who submitted a declaration for Defendant, states
that it usually took no longer than five minutes each evening to
look for parts.  (McDermott Decl. ¶ 8)  In May 2014, Defendant
adjusted Crystal Ball to eliminate off-hours usage by
restricting access to the program outside 7:00 a.m. to 6:00 p.m.
during the week and 8:00 a.m. to 1:00 p.m. on Saturdays.  (Def.
Opp. at 12; Mathers Decl. ¶ 17)

**Other Unpaid Work**

    Plaintiffs state that service technicians were not paid for
additional "off the clock" work, including accepting and
organizing shipments of new parts, and vehicle maintenance.
(P.S.F. ¶¶ 33-35)  According to Defendant, service technicians
receive shipments of new parts each week in plastic totes and
are instructed to place the totes inside their vans and to
unpack the totes during the work day only, i.e. between their
first and last calls.  (Def. Opp. at 4-5)  Some Plaintiffs claim
to have spent around one and one-half hours each week unpacking
and organizing parts deliveries.  (Decls. of Bergman ¶ 30;
Walters ¶¶ 32-33; Frederick ¶ 32; Leppo ¶¶ 34-35; Ramos ¶¶ 34-
35; Palmer ¶¶ 36-38; and Navarette ¶¶ 28-29)  These Plaintiffs
state that they dealt with these deliveries "off the clock" both
to avoid recording work hours in which they were not bringing in
revenue, and to make the work day more efficient, thereby
increasing their RPD.  (Id.)  Defendants acknowledge that, from

11

time to time, technicians are too busy with service calls to handle parts deliveries during the normal work day.  (Def. Opp. at 5)  However, Defendants state that technicians can ask permission for overtime in these situations.  (Id.)

**Procedural Background**

On January 23, 2014, Plaintiffs filed suit against Defendant individually and on behalf of others similarly situated.  Plaintiffs have since amended their Complaint twice, once on May 29, 2014, and again on November 7, 2014.  In their Second Amended Complaint, Plaintiffs assert claims under the Fair Labor Standard Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the wage and hour laws of multiple states, including New Jersey, Pennsylvania, Massachusetts, Florida, Maryland, New York, Rhode Island, Michigan, California, and Illinois.  (Second Amen. Compl. ¶¶ 1-12)

Plaintiffs filed the instant motion to conditionally certify the lawsuit as a collective action on June 6, 2014.  In support of their motion, Plaintiffs have submitted declarations from twelve service technicians who work for eight of the 20 CSMs in various zones across the country.  None of the named plaintiffs are subject to the arbitration agreements.  (Nov. 12, 2014 Letter from Plaintiffs' Counsel, Docket No. 64)  At the time Plaintiffs submitted their reply to Defendant's opposition papers on July 17, 2014, 68 plaintiffs from 13 states had opted

into the lawsuit.  (P.R.M. at 14)  Discovery is ongoing.  At
this point, there are 100 named and opt-in Plaintiffs.  (Oct.
31, 2014 Letter from Plaintiffs' Counsel, Docket No. 54)

## II.   REQUIREMENTS FOR CONDITIONAL CERTIFICATION

Under the FLSA, employers must pay overtime compensation
for an employee's work in excess of 40 hours per week.  29
U.S.C. § 207.  Employees who feel their right to overtime
compensation has been violated may bring an action on behalf of
themselves and "other employees similarly situated."  *Id*. §
216(b).  To become parties to a collective action, employees
must affirmatively opt into a case.  *Id*.

The FLSA does not define the term "similarly situated."  As
a result, courts in the Third Circuit follow a two-step process
for deciding whether an action may properly proceed as a
collective action under the FLSA.  *Camesi v. Univ. of Pittsburgh
Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013)  As a first step,
"[a]pplying a 'fairly lenient standard' . . . the court makes a
preliminary determination as to whether the named plaintiffs
have made a 'modest factual showing' that the employees
identified in their complaint are 'similarly situated.'"  *Id*.
(citing *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 536 (3d
Cir. 2012)).  "If the plaintiffs have satisfied their burden,
the court will 'conditionally certify' the collective action for

the purpose of facilitating notice to potential opt-in
plaintiffs and conducting pre-trial discovery." *Camesi*, 729
F.3d at 243.  This "notice stage" occurs "early in the
litigation when the court has minimal evidence." *Adami v. Cardo
Windows, Inc.*, 299 F.R.D. 68, 78 (D.N.J. 2014).

As a second step, courts make "a conclusive determination
as to whether each plaintiff who has opted in to the collective
action is in fact similarly situated to the named plaintiffs."
*Symcyzk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir.
2011), *rev'd on other grounds*, *Genesis Healthcare Corp. v.
Symczyk*, 133 S.Ct. 1523, 1527 (2013).  At this "final
certification" step, which occurs after further discovery,
plaintiffs must establish by a preponderance of the evidence
that named plaintiffs and opt-ins are similarly situated.
*Adami*, 299 F.R.D. at 78.

The "modest factual showing" Plaintiffs must make here at
the first step in the process requires them to "produce some
evidence, beyond pure speculation, of a factual nexus between
the manner in which the employer's alleged policy affected
[them] and the manner in which it affected other employees."
*Symcyk*, 656 F.3d at 193 (internal quotations omitted).  Courts
in this Circuit consider all relevant factors and make a factual
determination on a case-by-case basis.  *Zavala*, 691 F.3d at 536.
Courts do not assess the merits of plaintiffs' underlying claims

14

at this stage.  *Goodman v. Burlington Coat Factory*, No. 11-4395 (JHR), 2012 WL 5944000, at *5 (D.N.J. Nov. 20, 2012).  "A showing that opt-in plaintiffs bring the same claims and seek the same form of relief has been considered sufficient for conditional certification."  *Pearsall-Dineen v. Freedom Mort. Corp.*, No. 13-6836, 2014 WL 2873878, at *2 (D.N.J. June 25, 2014).

Relevant factors include "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment."  *Zavala*, 69 F.3d at 536-37.  "Plaintiffs may also be found dissimilar based on the existence of individualized defenses."  *Id*. at 537. Finally, "courts consider whether collective treatment will achieve the primary objectives of a § 216(b) collective action," i.e. (1) lowering costs to plaintiffs through pooling resources; and (2) resolving common issues of law and fact that arose from the same alleged activity in one efficient proceeding.  *Adami*, 299 F.R.D. at 78-79.


### III. ANALYSIS

Plaintiffs ask this Court to conditionally certify Plaintiffs' FLSA claims as a collective action and approve

notice to the following similarly situated plaintiffs:  "Named
Plaintiffs, 'opt-in' Plaintiffs and all other individuals who
worked for Defendant in the United States as service technicians
in the General Electric Consumer Home Service from January 2011
to the present."  (P.M.L. at 2)

Plaintiffs allege two nationwide policies or procedures
instituted by Defendant that affected named Plaintiffs and all
other service technicians: (1) all service technicians are
required to perform the same required pre-shift computer work
off the clock and without payment; (2) Defendant's RPD and PIP
policies require and encourage service technicians to perform
work-related duties off the clock without compensation.
Plaintiffs provide factual support for these allegations in
declarations from twelve service technicians who work under
eight CSMs.

**Pre-Shift Computer Work**

In regards to the unpaid pre-shift computer use policy,
service technicians who submitted declarations on behalf of
Plaintiffs all state that they are instructed to log into their
computers each morning before arriving at their first calls, but
are also instructed not to perform any work-related activities
until they arrive at those calls.  Defendants downplay the scope
of the work service technicians must do before their first
calls, but admit that service technicians must begin each day by

16

logging into their computers and checking their calls for the day.  That Plaintiffs are similarly situated to all other service technicians in regards to this policy is clear – each must access his list of calls for the day before he can arrive at the first call.

Defendant argues that there is no policy in place requiring service technicians to do any pre-shift computer work, and that such work is not necessary.  Defendant submitted declarations from CSMs stating that they instruct service technicians to place laptops in their vans, log in (which takes only a few second), and make contact with their first client while en route to that call.  (Walsh Decl ¶ 5; Brinzer Decl. ¶ 5; Miller Decl ¶ 6; Urbin Decl ¶ 5)  Out of these CSMs, only Rosa Walsh acknowledges the time it takes for computers to boot up and she states that technicians can wait in their car or begin driving while their computers boot up.  (Walsh Decl. ¶ 5)

Yet, Defendant does not explain how a service technician can begin driving toward his first call before knowing the location of this call and whether the client is home.  It is clear that some unpaid work-related activity must necessarily occur before service technicians arrive at their first calls and that all service technicians across all zones are similarly situated in this regard.  Whether or not this activity actually satisfies the elements of a claim under the FLSA is a merits

question and thus inappropriate at this conditional certification stage.  However, Plaintiff has provided sufficient evidence for conditional certification as related to pre-shift computer work.

**Other Off-the-Clock Work**

Plaintiffs allege that they perform other work off the clock without compensation as well.  Declarations from Plaintiff service technicians state that the only way for them to meet Defendant's stringent RPD goals is to (1) work through lunch, even though lunch time is automatically deducted from paid time, (2) unpack and organize parts deliveries off the clock, (4) log into their computers after work in order to check on parts needed for future calls, and (3) take their work-issued vans for maintenance multiple times each year without recording time spent doing so.  Plaintiffs do not allege that they were denied overtime when they recorded overtime hours worked, but that the effect overtime would have on their RPD forced them, and all other service technicians, to perform work off the clock, and that Defendant knew or should have known they were doing so.

Defendant makes two primary arguments against Plaintiffs' assertion that all service technicians are similarly situated in regards to this alleged policy.  First and foremost, Defendant asserts that there is no actual "policy" to begin with that requires off-the-clock work.  Second, Defendant argues the

declarations from certain service technicians who present their individual experiences do not warrant nationwide certification.

In arguing there to be no policy in place that violates the FLSA, Defendant suggests that, for conditional certification to be proper, Plaintiffs must present evidence of an actual policy that requires or encourages all service technicians to work off the clock.  Defendant points out that GE Consumer Home Service technicians are actually required to report their time accurately.  (Def. Opp. at 9)  Further, Defendant emphasizes that its RPD requirements do not violate the FLSA and that Plaintiffs have not provided evidence that Defendant knew or should have known that Plaintiffs were working overtime without compensation.

In making these points, Defendant strays from the limited question at issue in this initial conditional certification stage and asks this Court to consider the merits of Plaintiffs' FLSA claims.  At this step in the litigation, Plaintiffs must only allege a policy and present facts showing that the alleged policy affected them and all other service technicians similarly.  That policy need not be written.  Courts in this Circuit have conditionally certified collective actions in many cases where plaintiffs allege that an unwritten policy or practice led to off-the-clock work, particularly where that unwritten policy related to certain time-based goals set by

19

employers. *See, e.g.*, *Vargas v. General Nutrition Ctrs., Inc.*, No. 2:10-cv-867, 2012 WL 3544733, at *8 (W.D.P.A. Aug. 16, 2012) ("An unwritten policy or practice resulting in unpaid overtime, such as making management pay dependent upon meeting hours targets may be actionable under the FLSA."); *Steinberg v. TD Bank, N.A.*, No. 10-cv-5600 (RMB-JS), 2012 WL 2500331, at *8 (D.N.J. June 27, 2012) ("Contrary to Defendant's contention, a written policy is not required, and an unwritten but companywide policy, as Plaintiffs offer here, is sufficient even where the unofficial policy is contrary to the official written policy"); *Sabol v. Apollo Group, Inc.*, No. 09-cv-3439, 2010 WL 1956591 (E.D.P.A. May 12, 2010) (conditionally certifying a collective action of enrollment counselors at a university even though the defendant's official policy was to pay overtime when plaintiffs alleged that they worked off-the-clock to meet enrollment goals set by management); *Pereira v. Foot Locker, Inc.*, 261 F.R.D. 60 (E.D.P.A. 2009) (conditionally certifying collective action where plaintiffs alleged that the hours budget allotted for certain employees at defendant's stores was inadequate for employees to perform all their duties without off-the-clock work, even though defendant's policies were explicitly against such work).

Here, Plaintiffs make a similar allegation to those made in *Vargas*, *Sabol*, and *Pereira* – Plaintiffs claim that Defendant's

RPD requirements, in their effect, constitute an unwritten policy encouraging service technicians not to report overtime hours, and that Defendant knew or should have known that service technicians worked off the clock.  To show that they are similarly situated to all other service technicians in regards to this policy, Plaintiffs point to (1) the fact that all service technicians must meet RPD requirements or face potential adverse employment actions, (2) declarations from 12 service technicians working for eight of twenty CSMs who all state that they work off the clock consistently in order to meet stringent RPD requirements and that their CSMs knew about such work, (3) the declaration of service technician Bradley Palmer, who states that his CSM told him that at annual meetings, CSMs discussed service technicians' off-the-clock work (Palmer Decl. ¶ 19), (4) Defendant's ability to track all service technicians off-the-clock work through the GPS sensors in their vans and their computer log-in times, and (5) the fact that over 80 more service technicians from multiple states have since opted into the lawsuit.

Arguing that Plaintiffs have not presented enough evidence for conditional certification, Defendant also relies on a very similar FLSA case brought by a GE Consumer Home Services technician in the United States District Court for the Western District of Missouri, where the court rejected the plaintiff's

request for conditional certification.  *Settles v. General Electric*, No. 12-00602-CV-W-BP, 2013 U.S. Dist. LEXIS 187008 (W.D. Mo. Feb. 19, 2013).  In *Settles*, a single named plaintiff brought a claim on behalf of himself and all other service technicians for unpaid overtime.  He made similar allegations to those Plaintiffs make here – namely, that service technicians performed certain tasks off the clock in order to meet RPD goals.[6]  *Id.* at *7-10.  The court held that conditional certification was improper because the plaintiff did not provide evidence that any managers knew about or facilitated illegal overtime practices and therefore failed to establish that all service technicians were victims of a single decision, policy or plan.  Id. at *10.

First, the *Settles* opinion is not binding on this Court. Second, plaintiff in that case submitted only his own declaration and declarations from one former service technician and one former dispatcher.  Here, we have ten named Plaintiffs who have submitted 12 declarations from service technicians.  In addition, as outlined above, Plaintiffs have presented evidence that CSMs knew or should have known about service technicians'

---

[6] Significantly, as far as this Court can tell from the *Settles* opinion, the plaintiff did not raise the time spent logging into his computer each morning to check his list of calls.  For this reason, this Court finds *Settles* irrelevant to the above discussion of that policy in the present case.

22

off-the-clock work.  This Court will not rely on the *Settles* decision.

There are certainly differences between Plaintiffs and proposed collective action members.  As Defendant points out, RPD requirements vary across different zones, each of which is "like its own little business."  (Wills Decl. ¶ 2).  The procedures for obtaining approval for overtime vary across different CSMs.  Plaintiffs themselves vary in the amount of time they spend off-the-clock performing the tasks discussed above.  The declarations Plaintiffs submitted generally discuss individual experiences and do not state that technicians have observed or spoken to others who have worked off the clock to make RPD requirements.  Last, some service technicians, though none of the named Plaintiffs, signed arbitration agreements with Defendant.

However, Plaintiffs and the service technicians to whom they want to facilitate notice all work in the same GE Consumer Home Services business segment and share similar circumstances of employment.  Common issues of law and fact arise from their collective experiences, and they seek the same relief. Plaintiffs' declarations demonstrate that all service technicians must find time to check on parts orders, organize parts deliveries, and service their vans while meeting challenging revenue goals.  Plaintiffs have presented evidence

23

that CSMs could track technicians' off-the-clock work, and knew

enough about off-the-clock work to change procedures and limit

access to Crystal Ball in the evening.  That Plaintiffs have

submitted declarations from service technicians in nine states

who have worked for eight different CSMs provides sufficient

evidence that service technicians across the United States, not

just in a few individual zones, are affected similarly by the

RPD goals.

Defendant's arguments against certification, specifically

the individual questions that arise regarding particular zones

and service technicians, may win the day when this Court

considers final certification.  But, at this stage, such

concerns are premature.[7]  *See Steinberg*, 2012 WL 2500331, at *8

---

[7] It is appropriate here to outline the procedure this Court will use with
regards to service technicians who signed arbitration agreements pursuant to
GE's Solutions Program.  That some service technicians have signed
arbitration agreements does not preclude conditional certification of all
service technicians across the United States.  Opt-in Plaintiffs subject to
such agreements do not themselves bring claims on behalf of those similarly
situated.  However, at the final certification stage, if this Court grants
certification, this Court may create two separate groups: (1) union service
technicians who have not signed arbitration agreements, and (2) non-union
service technicians subject to GE's Solutions Program.  The union service
technicians' claims will proceed to trial first, and, barring any challenges
to the validity of the arbitration agreements, this Court will stay the
arbitration of individual non-union service technicians' claims.  Following
the disposition of union service technicians' claims, individual non-union
service technicians may arbitrate their individual claims pursuant to the
Solutions Program.  At that point, this Court will consider any relevant
issues regarding claim or issue preclusion.
   This procedure acknowledges the inherent similarities in all potential
Plaintiffs' claims, whether or not they are subject to arbitration
agreements, but also maintains the integrity of the arbitration agreements
certain service technicians have signed.  It also constitutes the most
efficient use of this Court's and the parties' resources.  Plaintiff's
counsel may even represent both union service technicians at the initial
trial and non-union technicians at the subsequent individual arbitrations.

("[I]ssues of individualized proof and defenses are more appropriately addressed at the second stage of certification."); *Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D.P.A. 2009) (finding defendant's argument that plaintiffs' claims were too individualized to be a stage two inquiry).  This Court therefore holds that Plaintiffs have made the modest factual showing necessary to satisfy the lenient standard for conditional certification.

## IV.

For the reasons set forth above, the Court will **GRANT** Plaintiffs' Motion for Conditional Class Action Certification. An appropriate Order accompanies this Opinion.


Date: November 14th, 2014


 s/ Joseph E. Irenas
**Joseph E. Irenas, S.U.S.D.J.**